**UNITED STATES DISTRICT COURT OFFICE**
**DISTRICT OF MASSACHUSETTS**

STATE UNIVERSITIES RETIREMENT )
SYSTEM OF ILLINOIS, )
 )  2006 JAN -6  P 4: 09
 )
Plaintiff **06 CA 1 0 0 4 0 MLW**
 )
vs. )
 )  Civil Action No.
 )
SONUS NETWORKS, INC., HASSAN M. )  **69368**
AHMED, DR. MICHAEL G. HLUCHYJ, )
STEPHEN J. NILL, GARY A. ROGERS, )  MAGISTRATE JUDGE
JEFFREY MAYERSOHN, FRANK T. )  AMOUNT $ 250
WINIARSKI, RUBIN GRUBER, EDWARD )  SUMMONS ISSUED 4
T. ANDERSON, and ANOUSHEH ANSARI, )  LOCAL RULE 4.1
 )  WAIVER FORM
Defendants. )  **JURY TRIAL DEMANDED**
 )
 )  1/9/06
_____ )

## CLASS ACTION COMPLAINT

Plaintiff, by its undersigned attorneys, on behalf of itself and the Class it seeks to represent,

for its Class Action Complaint, makes the following allegations against Defendants based upon the

investigation conducted by and under the supervision of Plaintiff's counsel, which has included

reviewing and analyzing information relating to the relevant time period obtained from numerous

public and non-public sources, including among others, the United States Securities and Exchange

Commission (the "SEC") filings, including, among other things, annual and quarterly reports; press

releases; published interviews; news articles; and other media reports (such as Bloomberg, Dow

Jones, and LEXIS-NEXIS); and reports of securities analysts and investor advisory services (such as

First Call) of, or pertaining to, Defendants Sonus Networks, Inc. ("Sonus" or the "Company"), in

order to obtain the information necessary to plead Plaintiff's claims with particularity. Except as

alleged herein, underlying information relating to Defendants' misconduct and the particulars thereof

is not available to Plaintiff and the public and lies within the possession and control of defendants

SCANNED
DATE: 1/9/06
FDM

and other Sonus insiders, thus preventing Plaintiff from further detailing Defendants' misconduct at this time. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY AND OVERVIEW

1.      This is a securities class action on behalf of all purchasers of the common stock of Sonus during the period for December 11, 2000 through January 16, 2002, inclusive (the "Class Period"), against Sonus and certain of its officers and directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.      Defendant Sonus is a telecommunications company with a relatively small number of customers, all of which are large-scale communications service providers. These include long distance carriers, Internet service providers, cable operators, and international telephone companies. As explained in more detail below, transporting data in "packets" offers a more efficient means for transporting data than the existing circuit-based networks. Although packet-based networks are often used for transferring data or maintaining Internet connections, it is much more difficult to transfer voice traffic such as a telephone call over a packet-based network.

3.      Sonus designs and sells equipment that it claims enables voice telephone calls to be effectively delivered over these "packet-based" networks.

4.      Throughout the Class Period, Defendants knowingly or recklessly issued a series of materially false and misleading statements that misled the investing public about Sonus's business, operations, performance, and prospects, and, in particular, the quality and capabilities of its products. In fact, Sonus's products did not meet industry standards for reliability and were not capable of meeting Sonus's customers' requirements for transmitting voice calls over packet-based networks.

5.      Additionally, Defendants issued false guidance regarding the financial condition and performance of Sonus. Defendants not only falsely assured investors and analysts that Sonus was

2

not affected by slowdowns in capital expenditures by many companies, but that it actually was benefiting from the slowdowns as carriers moved away from the traditional large, bulky and expensive telephone switching equipment to lower cost solutions such as those ostensibly offered by Sonus. Defendants belatedly admitted that such adverse market conditions were in fact negatively affecting the Company.

6.      Defendants also issued misleading statements regarding certain customers during the Class Period. Defendants highlighted the addition of Qwest Communications International ("Qwest") and BellSouth Corporation ("BellSouth"): (i) as major accomplishments; (ii) as a validation that Sonus's products met industry standards for carrying voice traffic; and (iii) as evidence that Sonus's business was growing. However, Defendants failed to disclose that in order to land these customers, Sonus was forced to offer significant financial inducements, such as credits, which made the "sale" much less valuable to Sonus than Defendants led investors to believe.

7.      Defendants also emphasized the acquisition of telecom technologies inc. ("TTI") as a major accomplishment, claiming that TTI's products would be compatible with Sonus's products and that the acquisition would enable Sonus to land a major contract with Qwest. In fact, shortly after the acquisition of TTI near the beginning of the Class Period, Sonus quickly discarded the very product that supposedly had been the motivation for the purchase of TTI because Sonus's products were not, in fact, compatible with TTI's products. Defendants concealed this fact from the public and instead continued to characterize the TTI acquisition as a major accomplishment that would enable Sonus to retain Qwest as an important customer.

8.      As a result of Defendants' materially false and misleading statements and omissions, Sonus stock traded at artificially inflated levels during the Class Period.

3

9. The executive officers and directors named as Defendants herein benefited personally from the inflation of Sonus stock by selling 6.4 million shares of Sonus stock from their personal holdings for proceeds of over \$158 million during the Class Period, while in possession of non-public adverse information concerning the Company. Defendants' sales were highly suspicious and unusual not only in their amount but also in the fact that the sales were highly coordinated and often occurred within days of materially false public statements. Details regarding Defendants' insider trading activity during the Class Period are set forth in the tables attached hereto as Exhibit "A."

10. On January 16, 2002, the last day of the Class Period, Sonus surprised the market by announcing shocking fourth quarter and year end 2001 results. Actual net loss for the fourth quarter of 2001 was \$13.4 million, or \$0.07 per share, compared with an actual net loss for the fourth quarter of 2000 of just \$6.3 million, or \$0.04 per share. Actual net loss for fiscal 2001 was \$645.4 million, or \$3.74 per share, compared with an actual net loss for fiscal 2000 of only \$50.0 million, or \$0.52 per share. Defendants finally stopped claiming that Sonus provided "carrier-class" products, and that its products "enable[d] service providers to deploy an integrated network capable of carrying both voice and data traffic."

11. On this news, the following day Sonus's stock price dropped below \$5, from a Class Period high of \$45.88 on January 31, 2001. Volume was 20,640,000 shares, compared to an average daily trading volume during the Class Period of 6,259,735. It has never recovered and now trades for less than \$2 per share.

## JURISDICTION AND VENUE

12. Jurisdiction is conferred by §27 of the 1934 Act, and 28 U.S.C §§1331 and 1337. The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and Rule 10b-5.

13. Venue is proper in this District pursuant to §27 of the 1934 Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b). A substantial part of the events and omissions giving rise to the claims asserted

4

herein occurred in this District and many of the false and misleading statements complained of herein were made in or issued from this District.

14.     In connection with the acts, conducts, and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## THE PARTIES

### Plaintiff

15.     Plaintiff State Universities Retirement System of Illinois purchased shares of Sonus common stock during the Class Period and has suffered substantial damages as a result of the wrongful acts of Defendants as alleged herein.

### Defendants

16.     Defendant Sonus is a Delaware corporation which during the Class Period, designed and provided what it claimed to be "carrier-class" equipment and software to enable voice calls to be delivered over packet-based networks. During the Class Period, the Company's shares were actively traded in an efficient market on the NASDAQ National Market System, under the symbol "SONS."

17.     (a)     Defendant Hassan M. Ahmed ("Ahmed") was, throughout the Class Period, the Company's Chief Executive Officer and President and a member of the Board of Directors. Ahmed holds a Ph.D. in Electrical Engineering and, prior to joining Sonus, Ahmed served as Chief Technology Officer for Cascade Communications, a telecommunications company. During the Class Period, while in possession of undisclosed, material adverse information about Sonus, Ahmed sold 807,450 shares of his Sonus stock for $23.5 million in illegal insider trading proceeds.

        (b)     Defendant and Company founder Dr. Michael G. Hluchyj ("Hluchyj") was, during the Class Period, the Company's Chief Technology Officer. Hluchyj holds a Ph.D. in

5

Electrical Engineering.  During the Class Period, while in possession of undisclosed, material adverse information about Sonus, Hluchyj sold 854,475 shares of his Sonus stock for $25.7 million in illegal insider trading proceeds.  Defendants Ahmed and Hluchyj both worked at Motorola Codex prior to joining Sonus.

(c)      Defendant Stephen J. Nill ("Nill") was, during the Class Period, the Company's Chief Financial Office, Vice-President of Finance and Treasurer.  During the Class Period, while in possession of undisclosed, material adverse information and Sonus, Nill sold 468,000 shares of his Sonus stock for $15.2 million in illegal insider trading proceeds.

(d)      Defendant Gary A. Rogers ("Rogers") was, during the Class Period, the Company's Vice-President of Worldwide Sales and Marketing.  During the Class Period, while in possession of undisclosed, material adverse information about Sonus, Rogers sold 431,474 shares of his Sonus stock for $13.9 million in illegal insider trading proceeds.

(e)      Defendant Jeffery Mayersohn ("Mayersohn") was, during the Class Period, the Company's Vice-President of Customer Support and Professional Services.  During the Class Period, while in possession of undisclosed, material adverse information about Sonus, Mayersohn sold 486,000 shares of Sonus stock for 15.2 million in illegal insider trading proceeds.

(f)      Defendant Frank T. Winiarski ("Winiarski") was, during the Class Period, the Company's vVice-President of Manufacturing.  During the Class Period, while in possession of undisclosed, material adverse information about Sonus, Winiarski sold 254,000 shares of his Sonus stock for $7.6 million in illegal insider trading proceeds.

(g)      Defendant and Company founder Rubin Gruber ("Gruber") was, during the Class Period, Chairman of the Board of the Company.  During the Class Period, while in possession of undisclosed, material adverse information about Sonus, Gruber sold 782,475 shares of his Sonus

6

stock for $22.9 million in illegal insider trading proceeds. Prior to joining Sonus, Defendant Gruber worked at Videoserver, Inc., (now known as "ezenia!") with Defendant Nill and with Defendant Mayersohn at BBN Communications Corp.

      (h)    Defendant Edward T. Anderson ("Anderson") was, throughout the Class Period, a Director of the Company. During the Class Period, while in possession of undisclosed material adverse information about Sonus, Anderson sold 292,000 shares of his Sonus stock for $8.4 million in illegal insider trading proceeds.

      (i)    Defendant Anousheh Ansari ("Ansari") was a founder of TTI, and became Vice President and General Manger of Sonus's IntelligentIP Division, which manufactured a product central to this litigation, when TTI was acquired by Sonus on January 18, 2001. Ansari holds a B.S. and an M.S. in Electrical Engineering. During the Class Period, Ansari, while in possession of undisclosed, material adverse information about Sonus, sold 2,111,000 shares of Sonus stock she owned either directly or indirectly for $26.3 million in illegal insider trading proceeds.

      18.    The individuals named as Defendants in the preceding paragraphs are collectively referred to herein as the "Individual Defendants." By virtue of their high-level positions, the Individual Defendants were directly involved in the day-to-day operations of the Company, at the highest levels, and were privy to confidential and proprietary information concerning the Company, as alleged herein. The Individual Defendants had access to adverse non-public information concerning matters alleged in this Company through access to internal corporate documents, conversations, and other communications and contacts with corporate officers and employees, attendance at meetings of Sonus's Board of Directors and committees thereof, and periodic reports and other information provided to them. Except to the extent set forth in this Complaint, Plaintiff

and other members of the Class have had no access to such information, which was, and remains solely, under the control of Defendants.

19.     The Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the materially false and misleading statements complained of herein. They were aware (or recklessly disregarded) that materially false and misleading statements were being issued regarding the Company and nevertheless approved, ratified, and/or failed to correct those statements, in violation of the federal securities laws. The Individual Defendants are liable for the false and misleading statements pleaded herein that were issued by or in the name of the Company, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

20.     By reason of, among other things, their high-level positions, their status as officers and directors of Sonus, and their ability to make public statements in the name of Sonus, the Individual Defendants were and are controlling persons, and had the power and influence to cause (and did cause) Sonus to engage in the unlawful conduct complained of herein.

21.     Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements. They were provided copies of, reviewed and approved, and/or signed such filings, reports, releases, and other statements prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. They also were able to, and did, directly or indirectly, control the conduct of Sonus's business, the information contained in its filings with the SEC, and its public statements. Moreover, the Individual Defendants made affirmative statements to securities analysts and the investing public at large, and participated in meetings and discussions concerning such statements.

8

22. The Individual Defendants also had a duty to disseminate promptly accurate and truthful information with respect to Sonus's business, operations, and performance or to cause and direct that such information be disseminated. Defendants also had a duty to correct promptly any previously disseminated information that was, or had become, misleading to the market. As a result of their failure to do so, the price of Sonus common stock was artificially inflated during the Class Period, damaging Plaintiff and the Class.

23. Under rules and regulations promulgated by the SEC under the federal securities laws, including, among others, Item 303 of Regulation S-K, the Individual Defendants had a duty to report, among other things, all trends and uncertainties that were reasonably likely to affect Sonus's revenues or income. Their wrongdoing during the Class Period, as alleged herein, also violated this specific requirement and obligation, among others.

## CLASS ACTION ALLEGATIONS

24. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Sonus common stock (the "Class") during the Class Period. Excluded from the Class are Defendants; members of the immediate family of any Individual Defendant; the affiliates and subsidiaries of Sonus and the officers and directors of Sonus and its affiliates and subsidiaries; any entity in which any excluded person has a controlling interest; and the legal representatives, heirs, controlling persons, successors, and assigns of any excluded person.

25. The members of the Class are so numerous that joinder of all members is impractible. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of March 28, 2001, during the Class period, Sonus had more than 200 million shares of common stock outstanding, owned by hundreds, if not thousands, of persons. The Company's shares were actively traded during the Class Period.

9

26.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual Class members, in that Defendants have acted in a manner generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

(a)     Whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)     Whether Defendants' publicly disseminated releases and statements during the Class Period omitted and misrepresented material facts and whether Defendants breached any duty to convey material facts or to correct material facts previously disseminated;

(c)     Whether Defendants acted knowingly or recklessly;

(d)     Whether the market price of Sonus common stock during the Class Period was artificially inflated due to the material nondisclosures and misrepresentations complained of herein; and

(e)     Whether members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

27.     Plaintiff's claims are typical of those of the members of the Class because Plaintiff and other Class members sustained damages from Defendants' wrongful conduct complained of herein.

28.     Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the class.

29.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual members of

10

the Class may be small relative to the expense and burden of individual litigation, it is virtually impossible for many members of the Class individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class.

## BACKGROUND

### Circuit-Switched vs. Packet-Based Networks

30.     Sonus is a telecommunications company with a relatively small number of customers, all of which are large-scale communications service providers. These include long distance carriers, Internet service providers, cable operators, and international telephone companies. All of these customers are or were building "packet-based" networks to support the dramatic growth in data traffic resulting from Internet use.

31.     Traditional telephone lines work on what is known as a "circuit-switched" network. In a circuit-switched network, a dedicated path, or circuit, is established for each call, reserving a fixed amount of capacity in each direction. The dedicated circuit is maintained for the duration of the call, even when neither party is speaking. As a result, a circuit-switched network is inefficient for Internet applications, which tend to create large bursts of data traffic followed by long periods of silence.

32.     In contrast to the traditional circuit-switched telephone network, a packet-based network divides traffic into distinct units called packets and routes each packet independently. By combining traffic from users with differing capacity demands at different times, packet networks more efficiently fill the available capacity because they reduce the capacity wasted due to silence from any single user.

33.     The traditional circuit-switched network uses "Class 4" and "Class 5" switches to ensure there is a dial tone at the end of the phone line. Class 4 switches are physically bulky and are located regionally throughout the country. These switches are the core of the traditional telephone

11

network. Class 5 switches are secondary switches that are located in thousands of localities across the nation, and are also large and extremely reliable. Class 5 switches route calls and perform complicated applications such as 911, 411, call tracing, *69, conference calling, and numerous other call features.

34.     On the other hand, packet-based networks employ "softswitches." Softswitches are not only substantially small than Class 4 and 5 switches, but, according to industry analysts, were also approximately 40% less expensive than Class 5 switches. Softswitches are the core of a packet-based network and are one of Sonus's key products.

35.     The volume of data traffic on the traditional circuit-switched telephone network has significantly increased as more people use their home telephone lines to connection to the Internet. This increase in usage drove service providers to build the more efficient packet networks carry data traffic. Service providers continue to carry voice traffic over the traditional circuit-switched networks, while simultaneously carrying data traffic over separate packet networks. Consequently, service providers are faced with the expense and complexity of building and maintaining two different, or parallel, networks at the same time, one for data and one for voice calls.

36.     Sonus believed that it would be possible to unite these separate, parallel networks into a single new packet-based network capable of handling both voice and data traffic. This packet-based network was designed to replace both Class 4 and 5 switches and was called the "New Public Network." In theory, enormous potential savings could be realized by eliminating redundant or overlapping equipment purchases and reducing operating costs. As stated in the Sonus 2000 10-K, filed March 28, 2001, the key to realizing the full potential of this combined network would be making it possible for the world's traffic to run over packet-based networks.

12

37.     Early attempts to develop technologies to carry voice traffic over packet-based networks fell far short of the quality and reliability required by the public telephone network. These early systems lacked the ability to work together with the infrastructure of the traditional circuit-switched network. As a result, these technologies could not provide the consistent look, sound and feel of traditional telephone calls and were not well-suited to more complex applications such as voice mail.

38.     As detailed below, however, Defendants represented throughout the Class Period that Sonus's softswitches and other products were advanced enough to allow voice calls to be effectively and reliably delivered over packet-based networks. Sonus's 2000 10-K stated that the Company's products offered "the reliability and voice quality that have been hallmarks of the public telephone network for decades." Such representations were false because, in truth, Sonus's products could not carry voice calls over packet-based networks at a reliability level that was acceptable in the industry.

39.     Sonus's products could be used for a process known as Internet offloading, and so Sonus has been able to sell its products for this purpose. However, a product only reliable for Internet offloading does not have the same revenue potential as one that reliably carries voice traffic, and is capable for replacing Class 4 and 5 switches in the public telephone network, thereby serving as a platform to build the New Public Network. According to an August 1, 2001 article in *Communications Convergence*:

> Internet offload is a market with limited long-term growth potential, at least if broadband Internet access is going anywhere. Dialup access will peak over the next couple of years, then will inevitably level off for several years as new dialup users are offset by those migrating to cable and DSL.

40.     The Sonus switches' failings eventually caused Sonus to be relegated to only Internet offloading at Qwest and Bellsouth. Sonus softswitches were not a suitable replacement for the switches that were in place, nor were they compatible or reliable for voice calls.

13

41.     Defendants falsely led the investing public to believe the Company provided products that were capable of building the New Public Network. Such products would be significantly more valuable than one that is only reliable for Internet offloading. Consequently, Sonus's revenue expectations were over-inflated, thereby artificially inflating Sonus's stock prince.

**Specific Requirements of Sonus's Carrier Customers**

42.     Defendants claimed that Sonus's switches were designed for major carriers who built the public network system, such as Qwest and BellSouth.

43.     The New Public Network system, which was to be run on a packet-based network as described above, requires that any switch or softswitch that routes voice applications meet strict standards, so as to be as reliable as the traditional circuit-based network. The public network has five requirements that must be met in order for a switch to be implemented: 1) the product must provide "carrier-class" performance; 2) must have scalability and density; 3) must have compatibility with standards and existing infrastructure; 4) must have intelligent software in an open and flexible platform; and 5) have simple and rapid installation, deployment and support. Defendants were well aware of these standards. Thus, the Company's 2000 10-K, signed by Defendants Ahmed, Nill, Anderson and Gruber, described each of the requirements:

REQUIREMENTS FOR VOICE INFRASTRUCTURE PRODUCTS FOR THE NEW PUBLIC NETWORK

Users demand high levels of quality and reliability from the public telephone network and service providers require a cost-efficient network that enables new revenue-generating services. As a result, voice infrastructure products for the new public network must satisfy the following requirements:

CARRIER-CLASS PERFORMANCE. Because they operate complex, mission-critical networks, service providers have clear infrastructure requirements. These include extremely high reliability, quality and interoperability. For example, service providers typically require equipment that complies with their 99.999% availability standard.

14

SCALABILITY AND DENSITY. Infrastructure solutions for the new public network face challenging scalability requirements. Service providers' central offices typically support tens or even hundreds of thousands of simultaneous calls. In order to be economically attractive, the new infrastructure must compare favorably with existing networks in terms of cost per port, space occupied, power consumption and cooling requirements.

COMPATIBILITY WITH STANDARDS AND EXISTING INFRASTRUCTURE. New infrastructure equipment and software must support the full range of telephone network standars, including signaling protocols such as SS7 and various physical interfaces such as ISDN, primary rate interface, or PRI, and T1. It must also support data networking protocols such as Internet protocol, or IP, and asynchronous transfer mode, or ATM, as well as newer protocols such as H.323, IPDC and SIP. When operating, the new equipment and software cannot hinder, and ideally should enhance, the capabilities of the existing infrastructure, for example, by alleviating Internet access bottlenecks.

INTELLIGENT SOFTWARE IN AN OPEN AND FLEXIBLE PLATFORM. The architecture for the new public network will decouple the capabilities of traditional circuit-switching equipment into robust hardware elements and highly intelligent software platforms that provide control, signaling and service creation capabilities. This approach will transform the closed, proprietary circuit-switched public telephone network into a flexible, open environment accessible to a wide range of software developers. Service providers and third-party vendors will be able to develop and implement new applications independent of switch vendors. Moreover, the proliferation of independent software providers promises to drive the creation of innovative voice and data services that could expand service provider revenues.

SIMPLE AND RAPID INSTALLATION, DEPLOYMENT AND SUPPORT. Infrastructure solutions must be easy to install, deploy, configure and manage. These attributes will enable rapid growth and effective management of dynamic and complex service provider networks.

44.     As detailed below, during the Class Period, Defendants represented that Sonus had

five products that met the above standards. Defendants claimed that the GSX9000 Open Services

Switch, the PSX6000 SoftSwitch, the INtelligentIP softswitch, the SGX2000 SS7 Signaling

Gateway, and the System 9200 Internet offload solution were all carrier-class and met the above

standards. Defendants repeatedly confirmed that Sonus's products met carriers' standards

throughout the Class Period.

15

45.     In fact, as Defendants well knew, Sonus's products did not meet the necessary requirements.    According to a former Qwest engineer, with 25 years of experience in the telecommunications industry, who, during the Class Period, tested the Sonus softswitch to determine if it would meet "carrier class" criteria of 99.999% reliability ("Confidential Source 1"), the switch was a failure. According to Confidential Source 1, the key test in Qwest's evaluation of the Sonus softswitch was what was called the "72 hour soak," considered to be the standard in the telecom industry. In that test, the softswitch was given full power and run at maximum call volume capacity over a 72 hour period. To pass the test, the switch would have to run for the full 72 hours without errors or interruptions. Although this test was attempted numerous times, the Sonus softswitch never passed and, therefore, could not be considered carrier-class. During the Class Period, Confidential Source 1 alerted senior management at Sonus of this fact by providing computer printouts showing the failing test results to Warren Senegal, the senior manager. According to Confidential Source 1, during the Class Period the softswitch failed the same test when performed at different locations. Confidential Source 1 confirmed that the Sonus softswitch did not meet the criteria of the Public Network System and was not reliable for voice transmissions.

46.     Additional sources confirm that Sonus's products were not carrier-class because they were not capable of transmitting voice calls over a packet-based network at the level of reliability demanded by major carriers:

(i)     According to a former Sonus Systems Integration Engineer who was at the Company during the Class Period ("Confidential Source 2") and a former Qwest employee assigned to the Sonus/TTI project in Dallas during the Class Period ("Confidential Source 3"), the Sonus switch was not 99.999% reliable.

(ii)     According to Confidential Source 3, the Sonus Switch: (i) never worked for more than three hours at a time without crashing; (ii) did not meet the reliability benchmarks and did not have all the features needed to qualify as a carrier-class switch; and (iii) would only be sufficient for "mom and pop" operations.

(iii)     A former Sonus Technical Instructor during the Class Period ("Confidential Source 4") did not know of any Sonus softswitches actually deployed in the Qwest network and handling full traffic as of October 2001.

(iv)     According to a former salesperson for a Sonus competitor which did business with Qwest during the Class Period ("Confidential Source 5"), Sonus did not have a full functional working switch up until at least October 2002, long after Sonus claimed it had a functional "carrier-class" softswitch and months after the end of the Class Period.

(v)     According to a former Senior Design Engineer for Qwest who is familiar with the Sonus project during the Class Period ("Confidential Source 6"): (i) at least up until June 2002 there was no way to determine the "scalability" of the Sonus switch; and (ii) while Sonus did have a soft switch that worked on a small scale, it could not handle the call capacity needed to meet Qwest's volume demand.

(vi)     According to a former engineer at Sonus during the Class Period ("Confidential Source 7"), Sonus had a lot of problems with getting the softswitch to handle voice and data, and the voice function was not working.

(vii)     According to Confidential Source 7, emails were sent between Dallas (the site of the TTI project) and Boston (Sonus's headquarters) stating that Sonus was using unreliable testing methods to test the Sonus controller, which gave misleading results.

17

(viii)     According to a former Sonus/TTI Senior Systems Engineer during the Class Period ("Confidential Source 8"), emails were sent to upper management detailing the problems with the softswitch.

(ix)     According to a former sales employee at Sonus before, during and after the Class Period ("Confidential Source 9"), the Sonus softswitch was not capable of replacing a traditional Class 5 switch. According to this source, Sonus would routinely "oversell" the capabilities of its switches. It was common for Sonus to tell a customer that a switch would have a needed functionality in the near future and then afterwards try to develop that function.

(x)     According to Confidential Source 9, all the top Sonus executives, including Defendants Ahmed, Hluchyj, Nill, Rogers, Mayersohn, Winiarski, Gruber and Ansari were always present at sales meetings which were held in Westford, MA twice a year. One meeting would be held in January and another in the summer. During these meetings, problems with Sonus's products were discussed, and representatives from the Marketing Department would discuss how they would have to market the switch when certain features did not work.

(xi)     According to an engineer working in sales at Alcatel during the Class Period, and who actively engaged in the evaluation of competitors products, including Sonus softswitches ("Confidential Source 12"), Sonus used proprietary architecture when creating their switches.   This meant when Sonus switches were used in connection with other switches manufactured by other telecom firms, the Sonus switches did not allow an interface with the other switches, and rendered the system inoperative. This source also stated that the PSX6000 softswitch and the IntelligentIP softswitch could not handle voice data in the manner required of carrier-class, did not provide 99.999% reliability, and was not capable of replacing a Class 5 switch." The source

18

also stated that there were also problems with the Sonus SGX2000 SS7 Signaling Gateway in that it could not handle the required capacity.

47.     Accordingly, Defendants' representations throughout the Class Period that Sonus provided "voice infrastructure products for the new public network," that "Sonus solutions enable service providers to deploy an integrated network capable of carrying both voice and data traffic," that the Sonus softswitch met the industry's 99.999% reliability standard, and that Sonus's purported "highly scalable products fully inter-operate with and extend the life and utility of today's public network" were materially false and misleading.

48.     Defendants' positive representations concerning the Company's performance and prospects were also materially false and misleading, and lacking in a reasonable basis, as they were premised on the false claim that Sonus had products that met the requirements of the New Public Network. As Sonus products were viable only for Internet traffic and not voice, Sonus switches could not be used to build a network capable of carrying voice calls. With this limited application, the demand for Sonus switches and revenue generated were substantially less than represented.

49.     Defendant's announcements regarding new customers were also incomplete and materially misleading. Announcing new customers was important to increasing and maintaining Sonus's stock price. During the Class Period, Defendant Ahmed repeatedly emphasized the importance of new customers to Sonus, stating: "you should expect us to announce new customers every quarter" (Wall Street Transcript, Dec. 11, 2000); "One of the things that we challenge ourselves to do is to announce new customers every quarter. And it's something . . . that our investors should expect from us . . ." (Wall Street Transcript, Aug. 9, 2001); and "One thing I've encouraged investors to pay attention to from the day we went public is our customer

19

announcements. What I've said to people is that you should count on us to announce new customers every quarter" (Wall Street Transcript, Nov. 5, 2001).

50.    While highlighting sales to new customers, Defendants did not reveal that, in order to secure such deals, the Company had an undisclosed practice of providing customers with substantial financial inducements, such as loans or credits. Essentially, Sonus was paying customers to purchase its products, and these payments were not adequately disclosed to the investing public. An example of one such customer was Qwest. Although, during the Class Period, Defendants cited the Company's deal with Qwest as confirmation that the Company's products met the requirements of the New Public Network, they concealed material aspects of the transaction.

51.    According to Confidential Source 5, what Defendants did not tell investors that Qwest had required that Sonus purchase a $20 million IRU[1] from Qwest to secure the order. In fact, the product Qwest purportedly purchased from Sonus, the GSX9000, did not provide for Advanced Intelligent Network Interfaces or for Access Direct Lines for PBXs (which constituted 40% of Qwest's customer base). Sonus eventually had to replace the GSX9000s it sold to Qwest with a new version of the product. Had these facts been revealed, it would have been clear that Sonus had not obtained the Qwest contract based on the merit of its products.

52.    In addition, when Sonus announced a July 2001 deal with BellSouth, Defendants failed to disclose that, pursuant to an undisclosed practice of providing financial incentives to customers, the deal was only made possible because Sonus issued to BellSouth $10 million of convertible debt with a 4.75% coupon and the right to convert the debt into Sonus stock in the event the trading price of the stock reached $30 per share (on July 11, 2001, the day Defendants announced

---

[1]  IRUs are irrevocable rights of use or a contract obligating Sonus to pay for an amount of capacity on Qwest's fiber optic network over several years.

20

the deal with BellSouth, Sonus shares closed at $18.93). This conversion feature potentially was worth millions of dollars to BellSouth. In other words, Sonus was paying BellSouth to buy Sonus products, making the transaction much less valuable to Sonus than Defendant had led the investing public to believe.

53.    Practices such as those described above have been widely recognized and criticized as a means of misrepresenting a company's financial condition and performance. For example, according to James Crowe, Level 3 Communications Inc.'s chief executive, "the telecom industry has been rife with 'hollow swaps' which serve no purpose other than to inflate a company's bottom line. 'Transactions undertaken for the sole purpose of inflating revenue shoot an arrow at the heart of the system.'" Additionally, as Lynn Turner, former chief accountant at the SEC stated, "[i]t raises the real question of whether companies are creating real economic revenue or sham transactions financially engineered to report to shareholders."

54.    Defendant's failure to make a full and adequate disclosure with respect to all material terms of the transactions with Qwest and BellSouth, among others, was highly deceptive. In addition, Defendants knew or recklessly disregarded that Sonus's financial statements were false and misleading because they did not disclose key elements of the transactions. Companies that engage in one or more nonmonetary transactions, such as exchanges or swaps during a reporting period are required, under APB Opinion No. 29 ("APB 29"), Accounting for Nonmonetary Transactions, to disclose, in the footnotes to the financial statements, the nature of the transactions, the basis of accounting for the assets transferred (that is, fair value or book value), and gains or losses recognized.

55.    Moreover, SFAS No. 95, Statement of Cash Flows ("SFAS 95"), requires that information about all investing and financing activities of a company that affect recognized assets or

21

liabilities but that do not result in cash result in case receipts or payments, such as nonmonetary asset exchanges, be disclosed in the footnotes to the financial statements. *See* SFAS 95, ¶32.

56.     In light of the foregoing, the Company's representations in the SEC filings that covered the periods when these transactions occurred that the financial statements presented fairly, in all material respects, the financial position of the Company were materially false and misleading.

57.     Throughout the Class Period, Defendants also highlighted Sonus's acquisition of TTI, which closed in January 2001, as a significant accomplishment, as TTI allegedly had a particular technology required by Qwest. However, Defendants' representations regarding the value of the TTI transaction were materially false and misleading:

        (i)     According to Confidential Source 9, before acquiring TTI, Sonus knew that the protocol used by the TTI switch could not handle the call volume that Qwest wanted. However, Sonus agreed to change their platform to use the TTI protocol. Soon after the acquisition, Sonus conducted their own tests with the TTI product and confirmed what they already knew.

        (ii)    According to Confidential Source 2, Confidential Source 3, Confidential Source 7, a former network administrator of Sonus/TTI during the Class Period ("Confidential Source 10"), and a former sales employee at Sonus from October 2000 through October 2001 ("Confidential Source 11"), soon after the acquisition, Sonus scrapped the TTI product in favor of a Sonus-designed version.

        (iii)   According to Confidential Source 4, the fact that the TTI product was not compatible with the Sonus product was readily apparent, and management, engineering, and quality control must have realized, early on, that this was the case.

22

## Defendants' False and Misleading
## Statements During The Class Period

58. On December 11, 2000, the first day of the Class Period, The Wall Street Transcript

published an interview with Defendant Ahmed in which he stated:

Finally there are other start-up companies like ourselves and I think probably what
distinguishes us from virtually all of them is the fact that our main focus from the
beginning has been to build large public networks. That's what we think the big play
is and therefore we have focused on building products that are designed to live in the
hearts of some of the largest networks. What that means is that we deliver not only
the kind of carrier-class solutions that service providers have become accustomed to,
but we deliver the scale and the reliability that's required. If you would just want to
think of it in terms of the public switched telephone network for a minute, the
reliability of that network is really a benchmark that has been established over many,
many years. You pick [sic] your telephone, that network is always there. That's the
kind of reliability that we have to deliver, and we do. [Emphasis added.]

59. The foregoing representations concerning Sonus's products were materially false and

misleading in that, among other things:

(i) Contrary to the representation that the Company's products were

"carrier-class" and delivered "the scale and the reliability that's required," in truth and in fact, the

Company's products were not carrier-class and did not deliver the scale nor the reliability required

by service providers for transmitting voice calls, as detailed in ¶¶45-46 above. Sonus's products

were not carrier-class as they did not have 99.999% availability, did not provide voice quality as

good as circuit-switched networks, and did not have sophisticated network management and

configuration capabilities;

(ii) Contrary to Defendants' representation that Sonus's products met the

requirements of the New Public Network, in truth and in fact, they did not, as detailed in ¶¶45-46

above; and

(iii) In light of the foregoing, and other problems adversely affecting the

Company's performance and prospects as detailed herein, Defendants' unqualified positive

23

representations lacked a reasonable basis and were contradicted by negative facts known to, or

recklessly disregarded by, Defendants.

60. Almost immediately thereafter, from December 12-15, 2000, seven of the nine

Individual Defendants sold substantial amounts of Sonus stock:

- On December 12,2000, Defendants Gruber, Ahmed, Hluchyj,Nill and Rogers each sold 28,000 shares of stock at a price of $37.66 per share, for total proceeds to each of $1,054,480. Defendant Mayersohn sold 35,000 shares at $35.70 per share, for proceeds of $1,249,500. Defendant Winiarski sold 10,000 shares at $37.88 per share for proceeds of $378,800.

- On December 13, Defendant Winiarski sold 40,000 shares of stock at a price of $34.27 per share, for total proceeds of $1,370,800.

- On December 14, Defendant Winiarski sold 30,000 shares of stock at a price of $32.27 per share, for total proceeds of $968,100.

- On December 15, Defendant Winiarski sold 20,000 shares of stock at a price of $29.08 per share, for total proceeds of $581,600.

61. On December 24, 2000, The Dallas Morning News in an article titled, "MONEY,

MONEY, MONEY Mon-ey," Defendant Ansari gave an interview regarding the impending sale of

her privately owned company, TTI, to Sonus for Sonus stock, in which Ansari stated: "I stopped

watching it [the market price of Sonus stock]. I'm not selling the stock anytime soon."

62. In fact, Ansari began selling her Sonus stock only one month later. She sold 25,000

shares on January 30, 2001, at a price of $43.19, for proceeds of more than $1 million.

63. On January 1, 2001, the Internet Telephone Newsletter reported "Riverstone

Networks and Sonus Networks Partner to Deliver Central Office Solutions." The article quoted

Defendant Ahmed:

> "Deploying highly scalable switch sites demands an interconnect solution that is designed to carriers' stringent requirements . . . . We're very pleased to offer service providers . . . a complete central-office solution that meets carrier standards for reliability and performance." [Emphasis added.]

24

64.     The foregoing representations concerning the reliability and performance of Sonus's products were materially false and misleading in that, among other things:

(i)     Contrary to the representation that Sonus's products met "carrier standards for reliability and performance," Sonus's products did not meet the relevant standards for reliability or performance, as detailed in ¶¶45-46 above; and

(ii)    In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified positive representations lacked a reasonable basis and were contradicted by negative facts known to, or recklessly disregarded by, Defendants.

65.     On January 12, 2001, Sonus filed with the SEC a Form S-4 Registration Statement which was signed by Ahmed, Kill, Gruber and Anderson, relating to the acquisition of TTI. Defendants stated:

> Sonus is a leading provider of voice infrastructure products for the new public network. Sonus products are a new generation of carrier-class switching equipment and software that enable voice services to be delivered over packet-based networks.... By enabling voice traffic to be carried over these packet-based networks, Sonus' products will accelerate the convergence of voice and data into the new public network.

*     *     *

> Sonus' switching equipment and software can be rapidly and easily deployed, and readily expanded to accommodate growth in traffic volumes. Sonus' products also interoperate with service providers' existing telephone infrastructure, allowing them to preserve the investment in their current networks. Designed for the largest telephone networks in the world, Sonus' products offer the reliability and voice quality that have been hallmarks of the public telephone network for decades.

66.     The foregoing representations were materially false and misleading in that, among other things:

(i)     Contrary to the claim that Sonus offered "carrier-class switching equipment and software that enable voice services to be delivered over packet-based networks,"

25

Sonus's products were not capable of carrying voice traffic over packet-based networks, as detailed in ¶¶45-46 above;

(ii)      Contrary to the representation that "Sonus' products offer the reliability and voice quality that have been hallmarks of the public telephone network for decades," Sonus's products were not carrier-class as they did not have 99.999% availability, did not have voice quality as good as circuit-switched networks, and did not have sophisticated network management and configuration capabilities, as detailed in ¶¶45-46 above;

(iii)     Contrary to the representation that the Company's products were "designed for the largest telephone networks in the world," Sonus's softswitch was only useful only on a smaller scale network, as detailed in ¶¶45-46 above;

(iv)     Contrary to Defendants' representation that Sonus's products "fully intemperate with and extend the life and utility of today's public network," in truth and.in fact, Sonus's products did not fully interoperate with the New Public Network because, among other things, they did not meet the relevant performance standards;

(v)     In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified positive representations lacked a reasonable basis and were contradicted by negative facts known to, or recklessly disregarded by, Defendants.

67.     On January 18, 2001, Sonus reported its fourth quarter and full year 2000 results in a press release which stated in part:

> Revenues for the fourth quarter of fiscal 2000 were $28.6 million compared with $ 15.6 million for the third quarter ended September 31, [sic] 2000, an increase of 84 percent.
>
> \*    \*    \*
>
> Revenues for the fiscal year 2000 were $51.8 million.

26

\*     \*     \*

"We are extremely pleased with our fourth quarter results, particularly since we achieved our first quarter of profitability, excluding stock-based compensation," said Hassan Ahmed, president and CEO, Sonus Networks. "The significant growth in revenues reflects increased demand for our next-generation voice infrastructure products, and the expanding number of customers who have adopted Sonus solutions. We're very gratified with the progress we've made in our drive to become the premier franchise in next-generation voice infrastructure solutions."

Commenting on the year, Ahmed said: "Fiscal 2000 was a year of significant growth across every dimension of our business. During the year, we undertook the initiatives to establish Sonus as the leader in die market for packet voice solutions. We embarked upon our acquisition strategy with our purchase of telecom technologies. We expanded our product portfolio, established new partnerships, and moved into new geographies. At the same time, we continued to build an excellent team of networking professionals and an infrastructure that positions us for success as we enter the next phase of our company's growth."

Defendants also stated:

Sonus Networks, Inc. is a leading provider of voice infrastructure products for the new public network. Sonus' solutions enable service providers to deploy an integrated network capable of carrying both voice and data traffic, and to deliver a range of innovative, new services . . . . Its highly scalable products fully interoperate with and extend the life and utility of today's public network.

68.     The foregoing representations were materially false and misleading in that, among other things:

(i)     Contrary to the claim that "Sonus' solutions enable service providers to deploy an integrated network capable of carrying both voice and data traffic," Sonus's products were not capable of carrying voice traffic over packet-based networks at the reliability levels required by major carriers, as detailed in ¶¶45-46 above;

(ii)    Sonus's products were not carrier-class as they did not have 99.999% availability, did not have voice quality as good as circuit-switched networks and did not have sophisticated network management and configuration capabilities, as detailed in ¶¶45-46 above;

(iii)    Contrary to Defendants' representation that Sonus's products "fully interoperate with and extend the life and utility of today's public network," in truth and in fact, Sonus's products did not fully interoperate with the New Public Network because, among other things, they did not meet the relevant performance standards;

(iv)    In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified positive representations lacked a reasonable basis and were contradicted by negative facts known to, or recklessly disregarded by, Defendants.

69.    On January 18, 2001, Defendants also announced Sonus had completed the acquisition of ITT for 10.8 million shares of Sonus common stock. Defendants stated that:

> The integration of telecom technologies' INtelligentIP softswitch technology with Sonus' award-winning Packet Telephony suite will enable Sonus to offer carrier customers the industry's broadest range of features and functionality, telecom technologies' focus on multivendor softswitch services and media gateway interoperability complements Sonus' scalable, high-performance next-generation switching and softswitch platforms, and extends Sonus' product portfolio, particularly in the access market.

> "This acquisition gives us great confidence in our ability to win in this market," said Hassan Ahmed, president and CEO, Sonus Networks. "We are very proud to be joining forces with the TTI team, and we believe that the combination of the two companies will be great for our customers, will solidify our first mover advantage and will enhance our competitive position."

70.    Contrary to Defendants' representations regarding the compatibility of TTI's softswitch with existing Sonus products, in truth and in fact, TTI's products were not compatible with Sonus's products. In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified positive representations lacked a reasonable basis and were contradicted by negative facts known to, or recklessly disregarded by, Defendants.

28

71.    Following these events, analysts issued positive reports on Sonus which rated the

Company as follows and forecast the following earnings for Sonus:

| Firm | Analyst | Rating | 2001 EPS Forecast | 2001 Revenue Forecast |
|------|---------|--------|-------------------|------------------------|
| WRHambrecht | Savageaux | Strong Buy | $0.04 | $200m |
| Prudential | Scherago | Strong Buy | $(0.01) | $ 195m |
| Lehman Brothers | Levy | Strong Buy | $0.01 | $180m |
| J.P.Morgan | Funsch | Buy | $0.01 | $178m |

72.    These, and other assessments of Sonus by analysts during the Class Period, among

other things, demonstrate that the market was indeed misled by Defendants' materially false and

misleading statements and omissions.

73.    Sonus stock closed at $31.88 on January 17. By January 19, the price of Sonus Stock

closed at $40.94, and by January 31, climbed to $45.88.

74.    During the two weeks following the January 18, 2001 announcement, certain of the

Individual Defendants sold a total of 456,800 shares from their personal holdings of Sonus stock,

yielding total proceeds of $ 17,869,988:

- On January 23, 2001, Defendants Gruber, Ahmed, Hluchyj, Nill, Rogers and Mayersohn each sold 57,800 shares of stock at a price of $38.62 per share, for total proceeds to each of $2,232,236.

- The following day, January 24, 2001, Defendants Gruber, Ahmed, Hluchyj, Nill and Rogers each sold 5,800 additional shares of stock at a price of $40.83 per share, for total proceeds to each of $236,814. Defendant Mayersohn sold 4,800 shares at the same price, for total proceeds of $195,984.

- On January 29, 2001, Defendants Gruber, Ahmed, Hluchyj, Nil! and Rogers each sold 8,400 additional shares of stock at a price of $39.39 per share, for total proceeds to each of $330,876. Defendant Mayersohn sold 9,200 shares at the same price for total proceeds of $362,388.

- On January 30, 2001, Defendant Ansari sold 25,000 shares at a price of $43.19 per share, for total proceeds of $ 1,079,750.