UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN RE SONUS NETWORKS, INC.
SECURITIES LITIGATION-II

Civil Action No. 06-CV-10040 (MLW)

**<u>JURY TRIAL DEMANDED</u>**

## <u>CONSOLIDATED CLASS ACTION COMPLAINT</u>

Plaintiff, by its undersigned attorneys, on behalf of itself and the Class it seeks to represent, for its Consolidated Class Action Complaint, makes the following allegations against Defendants based upon the investigation conducted by and under the supervision of Plaintiff's counsel, which has included reviewing and analyzing information relating to the relevant time period obtained from numerous public and non-public sources, including among others, the United States Securities and Exchange Commission (the "SEC") filings, including, among other things, annual and quarterly reports; press releases; published interviews; news articles; and other media reports (such as Bloomberg, Dow Jones, and LEXIS-NEXIS); and reports of securities analysts and investor advisory services of, or pertaining to, Defendants Sonus Networks, Inc. ("Sonus" or the "Company"), in order to obtain the information necessary to plead Plaintiff's claims with particularity. Except as alleged herein, underlying information relating to Defendants' misconduct and the particulars thereof is not available to Plaintiff and the public and lies within the possession and control of Defendants and other Sonus insiders, thus preventing Plaintiff from further detailing Defendants' misconduct at this time. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## SUMMARY AND OVERVIEW

1.      This is a securities class action on behalf of all purchasers of the common stock of Sonus during the period for December 11, 2000 through January 16, 2002, inclusive (the "Class Period"), against Sonus and certain of its officers and directors for violations of the Securities Exchange Act of 1934 (the "1934 Act").

2.      Defendant Sonus is a telecommunications company with a relatively small number of customers, all of which are large-scale communications service providers.  These include long distance carriers, Internet service providers, cable operators, and international telephone companies. As explained in more detail below, transporting data in "packets" offers a more efficient means for transporting data than the existing circuit-based networks.  Although packet-based networks are often used for transferring data or maintaining Internet connections, it is much more difficult to transfer voice traffic such as a telephone call over a packet-based network.

3.      Sonus designs and sells equipment that it claims enables voice telephone calls to be effectively delivered over these "packet-based" networks.

4.      Throughout the Class Period, Defendants knowingly or recklessly issued a series of materially false and misleading statements that misled the investing public about Sonus's business, operations, performance, and prospects, and, in particular, the quality and capabilities of its products.  In fact, Sonus's products did not meet industry standards for reliability and were not capable of meeting Sonus's customers' requirements for transmitting voice calls over packet-based networks.

5.      Additionally, Defendants issued false guidance regarding the financial condition and performance of Sonus.  Defendants not only falsely assured investors and analysts that Sonus

was not affected by slowdowns in capital expenditures by many companies, but that it actually was benefitting from the slowdowns as carriers moved away from the traditional large, bulky and expensive telephone switching equipment to lower cost solutions such as those ostensibly offered by Sonus. Defendants belatedly admitted that such adverse market conditions were in fact negatively affecting the Company.

6.     Defendants also issued misleading statements regarding certain customers during the Class Period. Defendants highlighted the addition of Qwest Communications International ("Qwest") and BellSouth Corporation ("BellSouth"): (i) as major accomplishments; (ii) as a validation that Sonus's products met industry standards for carrying voice traffic; and (iii) as evidence that Sonus's business was growing. However, Defendants failed to disclose that in order to land these customers, Sonus was forced to offer significant financial inducements, such as credits, swap agreements, or issuing potentially lucrative Sonus convertible securities to such customers, which made the "sale" much less valuable to Sonus than Defendants led investors to believe.

7.     Defendants also emphasized the acquisition of Telecom Technologies Inc. ("TTI") as a major accomplishment, claiming that TTI's products would be compatible with Sonus's products and that the acquisition would enable Sonus to land a major contract with Qwest. In fact, shortly after the acquisition of TTI near the beginning of the Class Period, Sonus quickly discarded the very product that supposedly had been the motivation for the purchase of TTI because Sonus's products were not, in fact, compatible with TTI's products and TTI's key products were not sufficiently developed to meet Qwest's requirements. Defendants concealed this fact from the public and instead continued to characterize the TTI acquisition as a major accomplishment that would enable Sonus to retain Qwest as an important customer.

8.     As a result of Defendants' materially false and misleading statements and omissions, Sonus stock traded at artificially inflated levels during the Class Period.

9.     The executive officers and directors named as Defendants herein benefitted personally from the inflation of Sonus stock by selling 6.4 million shares of Sonus stock from their personal holdings for proceeds of over $158 million during the Class Period, while in possession of non-public adverse information concerning the Company.  Defendants' sales were highly suspicious and unusual not only in their amount but also in the fact that the sales were highly coordinated and often occurred within days of materially false public statements.  Details regarding Defendants' insider trading activity during the Class Period are set forth in the tables attached hereto as Exhibit "A."

10.    On January 16, 2002, the last day of the Class Period, Sonus surprised the market by announcing shocking fourth quarter and year end 2001 results.  Actual net loss for the fourth quarter of 2001 was $13.4 million, or $0.07 per share, compared with an actual net loss for the fourth quarter of 2000 of just $6.3 million, or $0.04 per share.  Actual net loss for fiscal 2001 was $645.4 million, or $3.74 per share, compared with an actual net loss for fiscal 2000 of only $50.0 million, or $0.52 per share.  Defendants finally stopped claiming that Sonus provided "carrier-class" products, and that its products "enable[d] service providers to deploy an integrated network capable of carrying both voice and data traffic."

11.    On this news, the following day, Sonus's stock price dropped below $5, from a Class Period high of $45.88 on January 31, 2001.  Volume was 20,873,100 shares, compared to an average daily trading volume during the Class Period of 6,259,735.  The stock has never recovered, falling below $2 per share and trading for most of 2006 in the $4-5 range.

## JURISDICTION AND VENUE

12.     Jurisdiction is conferred by §27 of the 1934 Act, and 28 U.S.C §§1331 and 1337.

The claims asserted herein arise under §§10(b) and 20(a) of the 1934 Act and SEC Rule 10b-5.

13.     Venue is proper in this District pursuant to §27 of the 1934 Act, 15 U.S.C. §78aa,

and 28 U.S.C. §1391(b).  A substantial part of the events and omissions giving rise to the claims

asserted herein occurred in this District and many of the false and misleading statements complained

of herein were made in or issued from this District.

14.     In connection with the acts, conducts, and other wrongs complained of herein,

Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including, but not limited to, the United States mails, interstate telephone communications, and the

facilities of the national securities markets.

## THE PARTIES

**Plaintiff**

15.     Plaintiff Public Employees' Retirement System of Mississippi ("MPERS")
        purchased

shares of Sonus common stock during the Class Period and has suffered substantial damages as a

result of the wrongful acts of Defendants as alleged herein.  MPERS was appointed Lead Plaintiff

pursuant to an Order of the Court dated December 27, 2006.

**Defendants**

16.     Defendant Sonus is a Delaware corporation which, during the Class Period, designed

and provided what it claimed to be "carrier-class" equipment and software to enable voice calls to

be delivered over packet-based networks.  During the Class Period, the Company's shares were

actively traded in an efficient market on the NASDAQ National Market System, under the symbol "SONS."

17.     (a)     Defendant Hassan M. Ahmed ("Ahmed") was, throughout the Class Period, the Company's Chief Executive Officer and President and a member of the Board of Directors.  Ahmed holds a Ph.D. in Electrical Engineering and, prior to joining Sonus, Ahmed served as Chief Technology Officer for Cascade Communications, a telecommunications company. During the Class Period, while in possession of undisclosed, material adverse information about Sonus, Ahmed sold 807,450 shares of his Sonus stock for $23.5 million in illegal insider trading proceeds.

        (b)     Defendant and Company founder Dr. Michael G. Hluchyj ("Hluchyj") was, during the Class Period, the Company's Chief Technology Officer.  Hluchyj holds a Ph.D. in Electrical Engineering.  During the Class Period, while in possession of undisclosed, material adverse information about Sonus, Hluchyj sold 854,475 shares of his Sonus stock for $25.7 million in illegal insider trading proceeds.  Defendants Ahmed and Hluchyj both worked at Motorola Codex prior to joining Sonus.

        (c)     Defendant Stephen J. Nill ("Nill") was, during the Class Period, the Company's Chief Financial Officer, Vice-President of Finance and Treasurer. During the Class Period, while in possession of undisclosed, material adverse information about Sonus, Nill sold 468,000 shares of his Sonus stock for $15.2 million in illegal insider trading proceeds.

        (d)     Defendant Gary A. Rogers ("Rogers") was, during the Class Period, the Company's Vice-President of Worldwide Sales and Marketing.  During the Class Period, while in possession of undisclosed, material adverse information about Sonus, Rogers sold 431,474 shares

of his Sonus stock for $13.9 million in illegal insider trading proceeds.

(e)    Defendant Jeffery Mayersohn ("Mayersohn") was, during the Class Period, the Company's Vice-President of Customer Support and Professional Services.  During the Class Period, while in possession of undisclosed, material adverse information about Sonus, Mayersohn sold 486,000 shares of Sonus stock for 15.2 million in illegal insider trading proceeds.

(f)    Defendant Frank T. Winiarski ("Winiarski") was, during the Class Period, the Company's Vice President of Manufacturing.  During the Class Period, while in possession of undisclosed, material adverse information about Sonus, Winiarski sold 254,000 shares of his Sonus stock for $7.6 million in illegal insider trading proceeds.

(g)    Defendant and Company founder Rubin Gruber ("Gruber") was, during the Class Period, Chairman of the Board of the Company.  During the Class Period, while in possession of undisclosed, material adverse information about Sonus, Gruber sold 782,475 shares of his Sonus stock for $22.9 million in illegal insider trading proceeds.  Prior to joining Sonus, Defendant Gruber worked at Videoserver, Inc. (now known as "ezenia!") with Defendant Nill and with Defendant Mayersohn at BBN Communications Corp.

(h)    Defendant Edward T. Anderson ("Anderson") was, throughout the Class Period, a Director of the Company, and a member of the Board's Audit Committee, expressly charged with, among other things, reviewing "the financial information that will be provided to shareholders" and others.  (Appendix A to Sonus April 20, 2001 Proxy Statement.)  During the Class Period, while in possession of undisclosed material adverse information about Sonus, Anderson sold 292,000 shares of his Sonus stock for $8.4 million in illegal insider trading proceeds.

(i)    Defendant Anousheh Ansari ("Ansari") was a founder of TTI, and became

Vice President and General Manger of Sonus's IntelligentIP Division, which manufactured a product central to this litigation, when TTI was acquired by Sonus on January 18, 2001. Ansari holds a B.S. and an M.S. in Electrical Engineering. During the Class Period, Ansari, while in possession of undisclosed, material adverse information about Sonus, sold 2,111,000 shares of Sonus stock she owned either directly or indirectly for $26.3 million in illegal insider trading proceeds.

18. The individuals named as Defendants in the preceding paragraphs are collectively referred to herein as the "Individual Defendants." By virtue of their high-level positions, the Individual Defendants were directly involved in the day-to-day operations of the Company, at the highest levels, and were privy to confidential and proprietary information concerning the Company, as alleged herein. The Individual Defendants had access to adverse non-public information concerning matters alleged in this Complaint through access to internal corporate documents, conversations, and other communications and contacts with corporate officers and employees, attendance at meetings of Sonus's Board of Directors and committees thereof, and periodic reports and other information provided to them. Except to the extent set forth in this Complaint, Plaintiff and other members of the Class have had no access to such information, which was, and remains solely, under the control of Defendants.

19. The Individual Defendants were involved in drafting, producing, reviewing, and/or disseminating the materially false and misleading statements complained of herein. They were aware (or recklessly disregarded) that materially false and misleading statements were being issued regarding the Company and nevertheless approved, ratified, and/or failed to correct those statements, in violation of the federal securities laws. The Individual Defendants are liable for the false and misleading statements pleaded herein that were issued by or in the name of the Company, as those

statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

20.     By reason of, among other things, their high-level positions, their status as officers and directors of Sonus, and their ability to make public statements in the name of Sonus, the Individual Defendants were and are controlling persons, and had the power and influence to cause (and did cause) Sonus to engage in the unlawful conduct complained of herein.

21.     Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of the Company's SEC filings, reports, press releases, and other public statements. They were provided copies of, reviewed and approved, and/or signed such filings, reports, releases, and other statements prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  They also were able to, and did, directly or indirectly, control the conduct of Sonus's business, the information contained in its filings with the SEC, and its public statements.  Moreover, the Individual Defendants made affirmative statements to securities analysts and the investing public at large, and participated in meetings and discussions concerning such statements.

22.     The Individual Defendants also had a duty to disseminate promptly accurate and truthful information with respect to Sonus's business, operations, and performance or to cause and direct that such information be disseminated.  Defendants also had a duty to correct promptly any previously disseminated information that was, or had become, misleading to the market.  As a result of their failure to do so, the price of Sonus common stock was artificially inflated during the Class Period, damaging Plaintiff and the Class.

23.     Under rules and regulations promulgated by the SEC under the federal securities laws, including, among others, Item 303 of Regulation S-K, the Individual Defendants had a duty to report, among other things, all trends and uncertainties that were reasonably likely to affect Sonus's revenues or income.  Their wrongdoing during the Class Period, as alleged herein, also violated this specific requirement and obligation, among others.

## CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Sonus common stock (the "Class") during the Class Period.  Excluded from the Class are Defendants; members of the immediate family of any Individual Defendant; the affiliates and subsidiaries of Sonus and the officers and directors of Sonus and its affiliates and subsidiaries; any entity in which any excluded person has a controlling interest; and the legal representatives, heirs, controlling persons, successors, and assigns of any excluded person.

25.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of March 28, 2001, during the Class Period, Sonus had more than 200 million shares of common stock outstanding, owned by hundreds, if not thousands, of persons.  The Company's shares were actively traded during the Class Period.

26.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual Class members, in that Defendants have acted in a manner generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)       Whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)       Whether Defendants publicly disseminated releases and statements during the Class Period omitted and misrepresented material facts and whether Defendants breached any duty to convey material facts or to correct material facts previously disseminated;

(c)       Whether Defendants acted knowingly or recklessly;

(d)       Whether the market price of Sonus common stock during the Class Period was artificially inflated due to the material nondisclosures and misrepresentations complained of herein; and

(e)       Whether members of the Class have sustained damages and, if so, what is the appropriate measure of damages.

27.       Plaintiff's claims are typical of those of the members of the Class because Plaintiff and other Class members sustained damages from Defendants' wrongful conduct complained of herein.

28.       Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

29.       A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual members of the Class may be small relative to the expense and burden of individual litigation, it is virtually impossible for many members of the Class individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## BACKGROUND

### Circuit-Switched vs. Packet-Based Networks

30.     Sonus is a telecommunications company with a relatively small number of customers, all of which are large-scale communications service providers.  These include long distance carriers, Internet service providers, cable operators, and international telephone companies. All of these customers are or were building "packet-based" networks to support the dramatic growth in data traffic resulting from Internet use.

31.     Traditional telephone lines work on what is known as a "circuit-switched" network. In a circuit-switched network, a dedicated path, or circuit, is established for each call, reserving a fixed amount of capacity in each direction.  The dedicated circuit is maintained for the duration of the call, even when neither party is speaking.  As a result, a circuit-switched network is inefficient for Internet applications, which tend to create large bursts of data traffic followed by long periods of silence.

32.     In contrast to the traditional circuit-switched telephone network, a packet-based network divides traffic into distinct units called packets and routes each packet independently.  By combining traffic from users with differing capacity demands at different times, packet networks more efficiently fill the available capacity because they reduce the capacity wasted due to silence from any single user.

33.     The traditional circuit-switched network uses "Class 4" and "Class 5" switches to ensure there is a dial tone at the end of the phone line.  Class 4 switches are physically bulky and are located regionally throughout the country.  These switches are the core of the traditional telephone network.  Class 5 switches are secondary switches that are located in thousands of

localities across the nation, and are also large and extremely reliable.  Class 5 switches route calls and perform complicated applications such as 911, 411, call tracing, *69, conference calling, and numerous other call features.

34.     On the other hand, packet-based networks employ "softswitches."  Softswitches are not only substantially smaller than Class 4 and 5 switches, but, according to industry analysts, were also approximately 40% less expensive than Class 5 switches.  Softswitches are the core of a packet-based network and are one of Sonus's key products.

35.     The volume of data traffic on the traditional circuit-switched telephone network has significantly increased as more people use their home telephone lines to connect to the Internet.  This increase in usage drove service providers to build the more efficient packet networks to carry data traffic.  Service providers continue to carry voice traffic over the traditional circuit-switched networks, while simultaneously carrying data traffic over separate packet networks.  Consequently, service providers are faced with the expense and complexity of building and maintaining two different, or parallel, networks at the same time, one for data and one for voice calls.

36.     Sonus believed that it would be possible to unite these separate, parallel networks into a single new packet-based network capable of handling both voice and data traffic.  This packet-based network was designed to replace both Class 4 and 5 switches and was called the "New Public Network."  In theory, enormous potential savings could be realized by eliminating redundant or overlapping equipment purchases and reducing operating costs.  As stated in the Sonus 2000 10-K, filed March 28, 2001, the key to realizing the full potential of this combined network would be making it possible for the world's traffic to run over packet-based networks.

37.     Early attempts to develop technologies to carry voice traffic over packet-based

networks fell far short of the quality and reliability required by the public telephone network. These early systems lacked the ability to work together with the infrastructure of the traditional circuit-switched network. As a result, these technologies could not provide the consistent look, sound and feel of traditional telephone calls and were not well-suited to more complex applications such as voice mail.

38.     As detailed below, however, Defendants represented throughout the Class Period that Sonus's softswitches and other products were advanced enough to allow voice calls to be effectively and reliably delivered over packet-based networks. Sonus's 2000 10-K stated that the Company's products offered "the reliability and voice quality that have been hallmarks of the public telephone network for decades." Such representations were false because, in truth, Sonus's products could not carry voice calls over packet-based networks at a reliability level that was acceptable in the industry.

39.     Sonus's products could be used for a process known as Internet offloading, and so Sonus has been able to sell its products for this purpose. However, a product only reliable for Internet offloading does not have the same revenue potential as one that reliably carries voice traffic, and is capable for replacing Class 4 and 5 switches in the public telephone network, thereby serving as a platform to build the New Public Network. According to an August 1, 2001 article in *Communications Convergence*:

> Internet offload is a market with limited long-term growth potential, at least if broadband Internet access is going anywhere. Dialup access will peak over the next couple of years, then will inevitably level off for several years as new dialup users are offset by those migrating to cable and DSL.

40.     The Sonus switches' failings eventually caused Sonus to be relegated to only Internet offloading at Qwest and BellSouth. Sonus softswitches were not a suitable replacement for the switches that were in place, nor were they compatible or reliable for voice calls.

41.     Defendants falsely led the investing public to believe the Company provided products that were capable of building the New Public Network.  Such products would be significantly more valuable than one that is only reliable for Internet offloading.  Consequently, Sonus's revenue expectations were over-inflated, thereby artificially inflating Sonus's stock price.

**Specific Requirements of Sonus's Carrier Customers**

42.     Defendants claimed that Sonus's switches were designed for major carriers who built the public network system, such as Qwest and BellSouth.

43.     The New Public Network system, which was to be run on a packet-based network as described above, requires that any switch or softswitch that routes voice applications meet strict standards, so as to be as reliable as the traditional circuit-based network.  The public network has five requirements that must be met in order for a switch to be implemented:  1) the product must provide "carrier-class" performance; 2) must have scalability and density; 3) must have compatibility with standards and existing infrastructure; 4) must have intelligent software in an open and flexible platform; and 5) have simple and rapid installation, deployment and support. Defendants were well aware of these standards.  Thus, the Company's 2000 10-K, signed by Defendants Ahmed, Nill, Anderson and Gruber, described each of the requirements:

REQUIREMENTS FOR VOICE INFRASTRUCTURE PRODUCTS FOR THE NEW PUBLIC NETWORK

Users demand high levels of quality and reliability from the public telephone network and service providers require a cost-efficient network that enables new revenue-generating services.  As a result, voice infrastructure products for the new public network must satisfy the following requirements:

CARRIER-CLASS PERFORMANCE.     Because they operate complex, mission-critical networks, service providers have clear infrastructure requirements. These include extremely high reliability, quality and interoperability.  For example, service providers typically require equipment that complies with their 99.999%

availability standard.

SCALABILITY AND DENSITY.  Infrastructure solutions for the new public network face challenging scalability requirements.  Service providers' central offices typically support tens or even hundreds of thousands of simultaneous calls.  In order to be economically attractive, the new infrastructure must compare favorably with existing networks in terms of cost per port, space occupied, power consumption and cooling requirements.

COMPATIBILITY WITH STANDARDS AND EXISTING INFRASTRUCTURE. New infrastructure equipment and software must support the full range of telephone network standards, including signaling protocols such as SS7 and various physical interfaces such as ISDN, primary rate interface, or PRI, and T1.  It must also support data networking protocols such as Internet protocol, or IP, and asynchronous transfer mode, or ATM, as well as newer protocols such as H.323, IPDC and SIP.  When operating, the new equipment and software cannot hinder, and ideally should enhance, the capabilities of the existing infrastructure, for example, by alleviating Internet access bottlenecks.

INTELLIGENT SOFTWARE IN AN OPEN AND FLEXIBLE PLATFORM.  The architecture for the new public network will decouple the capabilities of traditional circuit-switching equipment into robust hardware elements and highly intelligent software platforms that provide control, signaling and service creation capabilities. This approach will transform the closed, proprietary circuit-switched public telephone network into a flexible, open environment accessible to a wide range of software developers.  Service providers and third-party vendors will be able to develop and implement new applications independent of switch vendors.  Moreover, the proliferation of independent software providers promises to drive the creation of innovative voice and data services that could expand service provider revenues.

SIMPLE AND RAPID INSTALLATION, DEPLOYMENT AND SUPPORT. Infrastructure solutions must be easy to install, deploy, configure and manage.  These attributes will enable rapid growth and effective management of dynamic and complex service provider networks.

44.    As detailed below, during the Class Period, Defendants represented that Sonus had

five products that met the above standards.  Defendants claimed that the GSX9000 Open Services

Switch, the PSX6000 SoftSwitch, the INtelligentIP softswitch (acquired from TTI), the SGX2000

SS7 Signaling Gateway, and the System 9200 Internet offload solution were all carrier-class and met

the above standards.  Defendants repeatedly confirmed that Sonus's products met carriers' standards

throughout the Class Period.

45.     In fact, as Defendants well knew, Sonus's products did not meet the necessary requirements.   According to a former Qwest engineer, with 25 years of experience in the telecommunications industry, who, during the Class Period, tested the Sonus softswitch to determine if it would meet "carrier class" criteria of 99.999% reliability ("Confidential Source 1"), the switch was a failure.   According to Confidential Source 1, the key test in Qwest's evaluation of the Sonus softswitch was what was called the "72 hour soak," considered to be the standard in the telecom industry.   In that test, the softswitch was given full power and run at maximum call volume capacity over a 72 hour period.   To pass the test, the switch would have to run for the full 72 hours without errors or interruptions.   Although this test was attempted numerous times, the Sonus softswitch never passed and, therefore, could not be considered carrier-class.   During the Class Period, Confidential Source 1 alerted senior management at Sonus of this fact by providing computer printouts showing the failing test results to the Sonus team, which included Warren Senecal, the senior manager. A senior manager at Sonus ("Confidential Source 10") confirmed that Mr. Senecal received such reports and passed them on to his superiors.   According to Confidential Source 1, during the Class Period the softswitch failed the same test when performed at different locations. Confidential Source 1 confirmed that the Sonus softswitch did not meet the criteria of the Public Network System and was not reliable for voice transmissions.

46.     A former Sonus Vice President, Global Customer Services during the Class Period ("Confidential Source 11") likewise confirmed that the Sonus INtelligentIP softswitch, acquired through TTI, could not pass the "72 hour soak" test and was a dismal failure.   Confidential Source 11 stated that he visited the TTI facilities in Texas shortly after the TTI acquisition in connection

with integrating his service department with TTI's service department, and quickly recognized that the TTI softswitch acquired by Sonus was incapable.  Confidential Source 11 stated he told Sonus's senior executive team upon his return that they got "ripped off" in the acquisition because they had "bought a product that is basically smoke and mirrors," and that they should let go the TTI people at the Texas facility working on the product as soon as possible and cut their losses.  According to Confidential Source 11, the softswitch "didn't work at all, it only worked in a lab and it took 10 guys to keep it working."  He stated that "it didn't function, it didn't have any capacity, it didn't have any speed and it just wasn't a hardened 'telco' product."  Source 11 stated that the problems with the softswitch were brought up in meetings at Sonus's corporate offices in Westford, MA, which occurred quite often, weekly, sometimes daily, and that cross-functional executive meetings were held in Westford to deal with the integration issues regarding TTI.  Confidential Source 11 stated that present at these meetings were, among others, Defendants Rogers, Mayersohn, Winiarski, and frequently Defendants Ahmed, Hluchyj and Nill.  Confidential Source 11 also stated he personally discussed these problems outside these meetings with, among others, Defendants Gruber and Mayersohn.  Confidential Source 11 stated that Sonus' senior executives "were very involved and were very aware of what was going on."  Additionally, a former Sonus/TTI Sales Engineer, Manager during the Class Period ("Confidential Source 12") also confirmed that the softswitch was "terrible," could not pass the "72 hour soak test," adding that the Qwest engineers could not get it to do better than three to four hours, and that the softswitch was not redundant enough (*i.e.*, did not have sufficient fail-safe back-up capacity) to handle traffic to any heavy capacity.  Confidential Source 12 further stated that there were frequent meetings and calls at Sonus/TTI about the softswitch problems with respect to Qwest, monthly, weekly and even daily, as this was a major project for

Qwest and Sonus/TTI.  Source 12 stated that Sonus senior executives knew about these problems as they would frequently meet with Sonus personnel regarding such problems in person.  Source 12 stated that Defendant Rogers in particular traveled to the Sonus/TTI facility in Texas on a regular basis.

47.     Additional sources confirm that Sonus's products were not carrier-class because they were not capable of transmitting voice calls over a packet-based network at the level of reliability demanded by major carriers:

(i)     According to a former Sonus Systems Integration Engineer who was at the Company during the Class Period ("Confidential Source 2"), the Sonus switch was not 99.999% reliable.  Confidential Source 12 also confirmed that the switch was not "carrier-class" and was nowhere near the 99.999% (known in the industry as "Five Nines") reliability standard, stating that it was more like Five "Sixes" than Five "Nines."  Confidential Source 11 likewise confirmed that the Sonus switch was not 99.999% reliable during the Class Period.

(ii)     According to Confidential Source 12, the Sonus switch never worked for more than three to four hours at a time without crashing, a fact he knew from dealing with Qwest every day.  According to Confidential Source 1, the Sonus switch (i) did not meet the reliability benchmarks and did not have all the features needed to qualify as a carrier-class switch; and (ii) would only be sufficient for "mom and pop" operations.  Indeed, Confidential Source 12 stated that Qwest wanted to add more features to the softswitch, but that Sonus could never get the switch up and running for any significant period of time without crashing, let alone have the ability or time to develop or test such features.  Confidential Source 11 similarly corroborated that the switch did not meet reliability benchmarks and did not perform the necessary features to be a "carrier-class"

product.

(iii)     A former Sonus Technical Instructor during the Class Period ("Confidential Source 3") did not know of any Sonus softswitches actually deployed in the Qwest network and handling full traffic as of October 2001.  This statement was corroborated by numerous other Confidential Sources, including Confidential Sources 10, 11 and 12.

(iv)     According to a Sonus Senior Presales Systems Engineer during the Class Period ("Confidential Source 13"), the Sonus softswitch was still an immature product during the Class Period, and was still more of an "alpha" or at best a "beta" version of the product by the end of the Class Period, that did not have the capacity to handle Qwest's requirements during the Class Period.  Source 13 stated that the Sonus softswitch had stability problems, many bugs, lacked features, was difficult to install, and was a difficult product to support as an engineer because there were so many facets that had to be built and constructed from the ground up to get the product to work.  Source 13 stated that the Sonus softswitch was not able to handle as large a customer as Qwest.  Confidential Source 4 (described below) also confirmed that the Sonus softswitch was not a mature product and was still in early development and testing during the Class Period.

(v)     According to a former Senior Design Engineer for Qwest who is familiar with the Sonus project during the Class Period ("Confidential Source 4"):  (i) at least up until June 2002 there was no way to determine the "scalability" of the Sonus switch; and (ii) while Sonus did have a soft switch that worked on a small scale, it could not handle the call capacity needed to meet Qwest's volume demand.  Confidential Source 12 confirmed that the Sonus softswitch was not scalable and was not designed to handle the call traffic Qwest demanded.  Confidential Source 1 likewise confirmed that the Sonus switch could not handle the call volume needed to meet Qwest's

volume demand.  Confidential Source 11 further stated that the softswitch did not comply with the

network operations infrastructure, and did not have the features Qwest required, so that quite often

Confidential Source 11 had his personnel at the Qwest central office and network operations centers

to help Qwest diagnose the product and the problems.

(vi)     According to a former Senior Staff Engineer of Sonus/TTI during the Class

Period ("Confidential Source 5"), Sonus had a lot of problems with getting the softswitch to handle

voice and data.

(vii)    According to a former Sonus/TTI Senior Systems Engineer during the Class

Period ("Confidential Source 6"), emails were sent to upper management detailing the problems with

the softswitch.  Confidential Source 11 confirmed that he himself sent emails about the trouble with

the Qwest account due to the problems with the Sonus softswitches to Sonus's senior executives,

including Defendant Mayersohn and others, and recalled seeing Defendant Ahmed's and Hluchyj's

names on other emails (as recipients or senders) concerning the problems.  Confidential Source 11

went on to say that there were "tons of emails flying back and forth between Texas and [Sonus's

headquarters in] Massachusetts about the problems."  He stated that another source of information

about the problems were the reports from the customers that would say the product was not working,

and that there was a comprehensive bug tracking system that was used at Sonus to document the

problems.  Source 2 also confirmed that Sonus senior management knew of the problems from the

internal trouble-ticket management system Sonus had in place during the Class Period.  Confidential

Source 13 also stated that he had sent emails regarding the problems with the Sonus softswitch to

senior executives including Defendant Rogers, and Sonus' Vice President of Marketing (responsible

for all marketing functions, including product management and marketing communications), who

reported directly to Defendant Ahmed, and spoke with them personally about the problems.  Source 13 stated that as a matter of practice, any time there was a complaint or comment from a customer regarding Sonus' product it would be passed along via e-mail and tracked to make sure there was follow-up.  Source 13 stated that Defendant Rogers was regularly copied on such emails.

(viii)   According to a former sales representative at Sonus/TTI from April 2000 through October 2002 ("Confidential Source 7"), the Sonus softswitch was not capable of replacing a traditional Class 5 switch.  According to this source, it was common for Sonus to tell a customer that a switch would have a needed functionality in the near future and then afterwards try to develop that function.  Confidential Sources 2, 11 and 13 confirmed that the Sonus softswitch was not capable of replacing a traditional Class 5 switch.  In addition, Confidential Sources 2, 11 and 13 also confirmed that Sonus would routinely "oversell" the capabilities of its switches, and tell customers that a switch had or would have the needed functionality in the near future, and then try to develop that function.

(ix)   According to Confidential Source 7, all the top Sonus executives, including Defendants Ahmed, Hluchyj, Nill, Rogers, Mayersohn, Winiarski, Gruber and Ansari were always present at sales meetings which were held in Westford, MA twice a year.  One meeting would be held in January and another in the summer.  (The January 2001 meeting was held in the Bahamas.)  During these meetings, problems with Sonus's products were discussed, and representatives from the Marketing Department would discuss how they would have to market the switch when certain features did not work. Confidential Source 11 confirmed that the top executives attended these Winter and Summer sales meetings.  He also confirmed that the problems with the softwitch were discussed at these meetings and that Sonus employees were told to work around them and tell

customers what they needed to satisfy them.  Source 11 stated that Defendant Rogers was among the most vocal at the meetings who would tell the Sonus people at the meetings to sell the product as if it had all the features required by the customer, even though it did not have them.  Confidential Source 13 also stated that all the Sonus senior executives attended the Sales meetings in Westford, and that discussions took place between the Sonus executives and the sales and marketing personnel regarding the problems and limitations of the Sonus softswitches, and the importance of selling around the problems or features that the softswitches did not have.

(x)     According to an engineer working in sales at Alcatel during the Class Period, who integrated and deployed Sonus's product beginning in the Spring of 2001 with a mutual customer of Sonus ("Confidential Source 9"), as well as Confidential Source 13, Sonus used proprietary architecture when creating their switches.  This meant when Sonus switches were used in connection with other switches manufactured by other telecom firms, the Sonus switches did not allow an interface with the other switches, and rendered the system inoperative.  Source 9 did not believe the Sonus softswitch to be carrier-class, and stated that most of the feature sets that Sonus advertised the softswitch as having, which were typical in standard telecom-type designs, "never came to fruition as far as functionality."  Source 13 also stated that the Sonus PSX6000 softswitch and the INtelligentIP softswitch could not handle voice data in the manner required of carrier-class, did not provide 99.999% reliability, and were not capable of replacing a Class 5 switch.  Confidential  Source 14, a former Sonus Systems Engineer Consultant during the Class Period, stated that there were also problems with the Sonus SGX2000 SS7 Signaling Gateway in that it could not handle the required capacity.

48.     Accordingly, Defendants' representations throughout the Class Period that Sonus

provided "voice infrastructure products for the new public network," that "Sonus solutions enable service providers to deploy an integrated network capable of carrying both voice and data traffic," that the Sonus softswitch met the industry's 99.999% reliability standard, and that Sonus's purported "highly scalable products fully inter-operate with and extend the life and utility of today's public network" were materially false and misleading.

49.     Defendants' positive representations concerning the Company's performance and prospects were also materially false and misleading, and lacking in a reasonable basis, as they were premised on the false claim that Sonus had products that met the requirements of the New Public Network.  As Sonus products were viable only for Internet traffic and not voice, Sonus switches could not be used to build a network capable of carrying voice calls.  With this limited application, the demand for Sonus switches and revenue generated were substantially less than represented.

50.     Defendants' announcements regarding new customers were also incomplete and materially misleading.  Announcing new customers was important to increasing and maintaining Sonus's stock price.  During the Class Period, Defendant Ahmed repeatedly emphasized the importance of new customers to Sonus, stating: "you should expect us to announce new customers every quarter" (Wall Street Transcript, Dec. 11, 2000); "One of the things that we challenge ourselves to do is to announce new customers every quarter.  And it's something ... that our investors should expect from us ..." (Wall Street Transcript, Aug. 9, 2001); and "One thing I've encouraged investors to pay attention to from the day we went public is our customer announcements.  What I've said to people is that you should count on us to announce new customers every quarter" (Wall Street Transcript, Nov. 5, 2001).

51.     While highlighting sales to new customers, Defendants did not reveal that, in

order to secure such deals, the Company had an undisclosed practice of providing customers with substantial financial inducements, such as loans, swaps or credits. Essentially, Sonus was paying customers to purchase its products, and these payments were not adequately disclosed to the investing public. An example of one such customer was Qwest. Although, during the Class Period, Defendants cited the Company's deal with Qwest as confirmation that the Company's products met the requirements of the New Public Network, they concealed material aspects of the transaction.

52.     What Defendants did not tell investors was that Qwest had required that Sonus and/or a related third party purchase a $20 million IRU[1] from Qwest to secure the order. In fact, the product Qwest purportedly purchased from Sonus, the GSX9000, did not provide for Advanced Intelligent Network Interfaces or for Access Direct Lines for PBXs (which constituted 40% of Qwest's customer base), a fact confirmed by Confidential Source 7. Sonus eventually had to replace the GSX9000s it sold to Qwest with a new version of the product. Had these facts been revealed, it would have been clear that Sonus had not obtained the Qwest contract based on the merit of its products. Moreover, on October 22, 2003, Hamid Ansari, who joined Sonus in January 2001 from TTI as an employee with his wife, Defendant Ansari, filed a lawsuit against Qwest in the District of Colorado federal court, alleging that Qwest had reneged on its swap agreement, executed in June 2001, to sell $20 million of transmission capacity on Qwest's fiber-optic network, in exchange for Qwest purchasing $33.6 million in switching products from Ansari's then-employer, Sonus. Specifically, according to a Tenth Circuit Court of Appeals opinion issued July 12, 2005 (resolving a dispute concerning an arbitration clause), the complaint alleged that Qwest induced the swap agreement "by entering into a contemporaneous equipment purchase agreement with Sonus

---

[1]IRUs are indefeasible or irrevocable rights of use or a contract obligating Sonus to pay for an amount of capacity on Qwest's fiber optic network over several years.

Networks that Qwest never intended to honor." A November 24, 2003 article in the <u>Denver Post</u> (Qwest's local paper) reported that former employees of two other companies spoke of two other deals "in which Qwest pressured those companies to buy unneeded services from it before it would complete orders for their telecommunications equipment" [and that] [a]nother, a former executive of Sonus Networks, sued Qwest in October with similar claims." The article stated that, "Hamid Ansari, the former Sonus executive, described Qwest's quid pro quo deals in his lawsuit as 'engineered business and accounting practices' that allowed Qwest to meet its financial goals." The article noted that the Qwest senior vendor-relations executive who purportedly put together this and similar swap deals for Qwest, Michael Perusse, now works with Ansari in Texas at venture capital firm Prodea, a firm headed by Defendant Ansari. According to the article, and the district court docket, Hamid Ansari's complaint was sealed within days of filing.

53.     In addition, when Sonus announced a July 2001 deal with BellSouth, Defendants failed to disclose that, pursuant to an undisclosed practice of providing financial incentives to customers, the deal was only made possible because Sonus issued to BellSouth $10 million of convertible debt with a 4.75% coupon and the right to convert the debt into Sonus stock in the event the trading price of the stock reached $30 per share. (On July 11, 2001, the day Defendants announced the deal with BellSouth, Sonus shares closed at $18.93.) This conversion feature potentially was worth millions of dollars to BellSouth. In other words, Sonus was paying BellSouth to buy Sonus products, making the transaction much less valuable to Sonus than Defendant had led the investing public to believe. An article in the September 17, 2001 issue of <u>Forbes</u> magazine made mention of the side agreement to issue BellSouth convertible debt and its omission from the Sonus press release, although it quoted Defendant Ahmed as insisting the switch sale and debt deal were

unrelated.

54.     Practices such as those described above have been widely recognized and criticized as a means of misrepresenting a company's financial condition and performance.  For example, according to James Crowe, Level 3 Communications Inc.'s chief executive, "the telecom industry has been rife with 'hollow swaps' which serve no purpose other than to inflate a company's bottom line.  'Transactions undertaken for the sole purpose of inflating revenue shoot an arrow at the heart of the system.'"  Additionally, as Lynn Turner, former chief accountant at the SEC stated, "[i]t raises the real question of whether companies are creating real economic revenue or sham transactions financially engineered to report to shareholders."  Moreover, as set forth above, the November 24, 2003 Denver Post article reported that Hamid Ansari himself termed Qwest's quid pro quo deals such as those with Sonus "'engineered business and accounting practices' that allowed Qwest to meet its financial goals."

55.     Defendants' failure to make a full and adequate disclosure with respect to all material terms of the transactions with Qwest and BellSouth, among others, was highly deceptive.  In addition, Defendants knew or recklessly disregarded that Sonus's financial statements were false and misleading because they did not disclose key elements of the transactions.  Companies that engage in one or more non-monetary transactions, such as exchanges or swaps during a reporting period are required, under APB Opinion No. 29 ("APB 29"), Accounting for Non-monetary Transactions, to disclose, in the footnotes to the financial statements, the nature of the transactions, the basis of accounting for the assets transferred (that is, fair value or book value), and gains or losses recognized.

56.     Moreover, SFAS No. 95, Statement of Cash Flows ("SFAS 95"), requires that

information about all investing and financing activities of a company that affect recognized assets or liabilities but that do not result in cash receipts or payments, such as non-monetary asset exchanges, be disclosed in the footnotes to the financial statements. *See* SFAS 95,132.

57.    In light of the foregoing, the Company's representations in the SEC filings that covered the periods when these transactions occurred that the financial statements presented fairly, in all material respects, the financial position of the Company, were materially false and misleading.

58.    Throughout the Class Period, Defendants also highlighted Sonus's acquisition of TTI, which closed in January 2001, as a significant accomplishment, as TTI allegedly had a particular technology required by Qwest. However, Defendants' representations regarding the value of the TTI transaction were materially false and misleading:

(i)    According to Confidential Source 7, before acquiring TTI, Sonus knew that the protocol used by the TTI switch could not handle the call volume that Qwest wanted, a fact confirmed by Source 2. However, Sonus agreed to change their platform to use the TTI protocol. Soon after the acquisition, Sonus conducted their own tests with the TTI product and confirmed what they already knew.

(ii)    According to Confidential Source 2 and Confidential Source 5, and a former Sonus Voice-Over-Internet Protocol/Telecommunications Engineer before, during and after the Class Period ("Confidential Source 8"), soon after the acquisition, Sonus scrapped the TTI product in favor of a Sonus-designed version. Confidential Sources 7, 10 and 11 further confirm that Sonus scrapped the TTI switch in favor of the Sonus switch soon after the TTI acquisition. According to Confidential Sources 10, 13 and 16, at the time Sonus scrapped the TTI switch in favor of the Sonus softswitch, the Sonus switch was still only in development. According to Confidential Sources 10,

the Sonus switch was only certified by Qwest in late November/early December 2001, near the very

end of the Class Period, and deployed in production only thereafter.

(iii)     According to Confidential Sources 3, 7, 8 and 11, the fact that the TTI product

was not compatible with the Sonus product was readily apparent, and management, engineering, and

quality control must have realized, early on, that this was the case.

(iv)     According to Confidential Sources 10, 11 and 8,  Sonus bought TTI without

regard to TTI's product, but mainly to eliminate a competitor which had landed the Qwest contract,

and thereby land Qwest as a customer when they had failed to do so themselves.

### DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

59.     On December 11, 2000, the first day of the Class Period, <u>The Wall Street

Transcript</u> published an interview with Defendant Ahmed in which he stated:

> Finally there are other start-up companies like ourselves and I think probably what
> distinguishes us from virtually all of them is the fact that our main focus from the
> beginning has been to build large public networks.  That's what we think the big play
> is and therefore we have focused on building products that are designed to live in the
> hearts of some of the largest networks.  <u>What that means is that we deliver not only
> the kind of carrier-class solutions that service providers have become accustomed to,
> but we deliver the scale and the reliability that's required.</u>  If you would just want to
> think of it in terms of the public switched telephone network for a minute, the
> reliability of that network is really a benchmark that has been established over many,
> many years.  You pick [sic] your telephone, that network is always there.  That's the
> kind of reliability that we have to deliver, and we do.  [Emphasis added.]

60.     The foregoing representations concerning Sonus's products were materially false

and misleading in that, among other things:

(i)     Contrary to the representation that the Company's products were

"carrier-class" and delivered "the scale and the reliability that's required," in truth and in fact, the

Company's products were not carrier-class and did not deliver the scale nor the reliability required

by service providers for transmitting voice calls, as detailed in ¶¶45-47 above. Sonus's products were not carrier-class as they did not have 99.999% availability, did not provide voice quality as good as circuit-switched networks, and did not have sophisticated network management and configuration capabilities;

(ii)    Contrary to Defendants' representation that Sonus's products met the requirements of the New Public Network, in truth and in fact, they did not, as detailed in ¶¶45-47 above; and

(iii)    In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified positive representations lacked a reasonable basis and were contradicted by negative facts known to, or recklessly disregarded by, Defendants.

61.    Almost immediately thereafter, from December 12-15, 2000, seven of the nine Individual Defendants sold substantial amounts of Sonus stock:

- On December 12,2000, Defendants Gruber, Ahmed, Hluchyj, Nill and Rogers each sold 28,000 shares of stock at a price of $37.66 per share, for total proceeds to each of $1,054,480. Defendant Mayersohn sold 35,000 shares at $35.70 per share, for proceeds of $1,249,500. Defendant Winiarski sold 10,000 shares at $37.88 per share for proceeds of $378,800.

- On December 13, Defendant Winiarski sold 40,000 shares of stock at a price of $34.27 per share, for total proceeds of $1,370,800.

- On December 14, Defendant Winiarski sold 30,000 shares of stock at a price of $32.27 per share, for total proceeds of $968,100.

- On December 15, Defendant Winiarski sold 20,000 shares of stock at a price of $29.08 per share, for total proceeds of $581,600.

62.    On December 24, 2000, in an article in the <u>The Dallas Morning News</u> entitled, "MONEY, MONEY, MONEY Mon-ey," Defendant Ansari gave an interview regarding the

impending sale of her privately owned company, TTI, to Sonus for Sonus stock, in which Ansari stated: "I stopped watching it [the market price of Sonus stock]. I'm not selling the stock anytime soon."

63.    In fact, Ansari began selling her Sonus stock only one month later. She sold 25,000 shares on January 30, 2001, at a price of $43.19, for proceeds of more than $1 million.

64.    On January 1, 2001, the <u>Internet Telephone Newsletter</u> reported "Riverstone Networks and Sonus Networks Partner to Deliver Central Office Solutions." The article quoted Defendant Ahmed:

> "Deploying highly scalable switch sites demands an interconnect solution that is designed to carriers' stringent requirements .... <u>We're very pleased to offer service providers ... a complete central-office solution that meets carrier standards for reliability and performance.</u>" [Emphasis added.]

65.    The foregoing representations concerning the reliability and performance of Sonus's products were materially false and misleading in that, among other things:

(i)    Contrary to the representation that Sonus's products met "carrier standards for reliability and performance," Sonus's products did not meet the relevant standards for reliability or performance, as detailed in ¶¶45-47 above; and

(ii)    In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified positive representations lacked a reasonable basis and were contradicted by negative facts known to, or recklessly disregarded by, Defendants.

66.    On January 12, 2001, Sonus filed with the SEC a Form S-4 Registration Statement which was signed by Ahmed, Kill, Gruber and Anderson, relating to the acquisition of TTI. Defendants stated:

31

Sonus is a leading provider of voice infrastructure products for the new public network. Sonus products are a new generation of carrier-class switching equipment and software that enable voice services to be delivered over packet-based networks.... By enabling voice traffic to be carried over these packet-based networks, Sonus' products will accelerate the convergence of voice and data into the new public network.

*   *   *

Sonus' switching equipment and software can be rapidly and easily deployed, and readily expanded to accommodate growth in traffic volumes. Sonus' products also interoperate with service providers' existing telephone infrastructure, allowing them to preserve the investment in their current networks. Designed for the largest telephone networks in the world, Sonus' products offer the reliability and voice quality that have been hallmarks of the public telephone network for decades.

67.     The foregoing representations were materially false and misleading in that, among other things:

(i)     Contrary to the claim that Sonus offered "carrier-class switching equipment and software that enable voice services to be delivered over packet-based networks," Sonus's products were not capable of carrying voice traffic over packet-based networks, as detailed in ¶¶45-47 above;

(ii)    Contrary to the representation that "Sonus' products offer the reliability and voice quality that have been hallmarks of the public telephone network for decades," Sonus's products were not carrier-class as they did not have 99.999% availability, did not have voice quality as good as circuit-switched networks, and did not have sophisticated network management and configuration capabilities, as detailed in ¶¶45-47 above;

(iii)   Contrary to the representation that the Company's products were "designed for the largest telephone networks in the world," Sonus's softswitch was only useful only on a smaller scale network, as detailed in ¶¶45-47 above;

(iv)    Contrary to Defendants' representation that Sonus's products "fully

interoperate with and extend the life and utility of today's public network," in truth and in fact, Sonus's products did not fully interoperate with the New Public Network because, among other things, they did not meet the relevant performance standards;

(v)     In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified positive representations lacked a reasonable basis and were contradicted by negative facts known to, or recklessly disregarded by, Defendants.

68.     On January 18, 2001, Sonus reported its fourth quarter and full year 2000 results in a press release which stated in part:

> Revenues for the fourth quarter of fiscal 2000 were $28.6 million compared with $15.6 million for the third quarter ended September 31, [sic] 2000, an increase of 84 percent.
>
> *       *       *
>
> Revenues for the fiscal year 2000 were $51.8 million.
>
> *       *       *
>
> "We are extremely pleased with our fourth quarter results, particularly since we achieved our first quarter of profitability, excluding stock-based compensation," said Hassan Ahmed, president and CEO, Sonus Networks.  "The significant growth in revenues reflects increased demand for our next-generation voice infrastructure products, and the expanding number of customers who have adopted Sonus solutions.  We're very gratified with the progress we've made in our drive to become the premier franchise in next-generation voice infrastructure solutions."
>
> Commenting on the year, Ahmed said: "Fiscal 2000 was a year of significant growth across every dimension of our business.  During the year, we undertook the initiatives to establish Sonus as the leader in the market for packet voice solutions. We embarked upon our acquisition strategy with our purchase of telecom technologies.  We expanded our product portfolio, established new partnerships, and moved into new geographies.  At the same time, we continued to build an excellent team of networking professionals and an infrastructure that positions us for success as we enter the next phase of our company's growth."

Defendants also stated:

> Sonus Networks, Inc. is a leading provider of voice infrastructure products for the new public network.  Sonus' solutions enable service providers to deploy an integrated network capable of carrying both voice and data traffic, and to deliver a range of innovative, new services....  Its highly scalable products fully interoperate with and extend the life and utility of today's public network.

69.     The foregoing representations were materially false and misleading in that, among other things:

(i)     Contrary to the claim that "Sonus' solutions enable service providers to deploy an integrated network capable of carrying both voice and data traffic," Sonus's products were not capable of carrying voice traffic over packet-based networks at the reliability levels required by major carriers, as detailed in ¶¶45-47 above;

(ii)    Sonus's products were not carrier-class as they did not have 99.999% availability, did not have voice quality as good as circuit-switched networks and did not have sophisticated network management and configuration capabilities, as detailed in ¶¶45-47 above;

(iii)   Contrary to Defendants' representation that Sonus's products "fully interoperate with and extend the life and utility of today's public network," in truth and in fact, Sonus's products did not fully interoperate with the New Public Network because, among other things, they did not meet the relevant performance standards;

(iv)    In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified positive representations lacked a reasonable basis and were contradicted by negative facts known to, or recklessly disregarded by, Defendants.

70.     On January 18, 2001, Defendants also announced that Sonus had completed the

acquisition of TTI for 10.8 million shares of Sonus common stock.  Defendants stated that:

> The integration of telecom technologies' INtelligentIP softswitch technology with Sonus' award-winning Packet Telephony suite will enable Sonus to offer carrier customers the industry's broadest range of features and functionality.  telecom technologies' focus on multi-vendor softswitch services and media gateway interoperability complements Sonus' scalable, high-performance next-generation switching and softswitch platforms, and extends Sonus' product portfolio, particularly in the access market.

> "This acquisition gives us great confidence in our ability to win in this market," said Hassan Ahmed, president and CEO, Sonus Networks.  "We are very proud to be joining forces with the TTI team, and we believe that the combination of the two companies will be great for our customers, will solidify our first mover advantage and will enhance our competitive position."

71.     Contrary to Defendants' representations regarding the compatibility of TTI's softswitch with existing Sonus products, in truth and in fact, TTI's products were not compatible with Sonus's products.  In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified positive representations lacked a reasonable basis and were contradicted by negative facts known to, or recklessly disregarded by, Defendants.

72.     Following these events, analysts issued positive reports on Sonus which rated the Company as follows and forecast the following earnings for Sonus:

| Firm | Analyst | Rating | 2001 EPS Forecast | 2001 Revenue Forecast |
|---|---|---|---|---|
| WRHambrecht | Savageaux | Strong Buy | $0.04 | $200m |
| Prudential | Scherago | Strong Buy | $(0.01) | $195m |
| Lehman Brothers | Levy | Strong Buy | $0.01 | $180m |
| J.P Morgan | Funsch | Buy | $0.01 | $178m |

73.     These, and other assessments of Sonus by analysts during the Class Period, among other things, demonstrate that the market was indeed misled by Defendants' materially false and misleading statements and omissions.

74.     Sonus stock closed at $31.88 on January 17, 2001.  By January 19, the price of Sonus stock closed at $40.94, and by January 31, it had climbed to $45.88.

75.     During the two weeks following the January 18, 2001 announcement, certain of the Individual Defendants sold a total of 456,800 shares from their personal holdings of Sonus stock, yielding total proceeds of $17,869,988:

- On January 23, 2001, Defendants Gruber, Ahmed, Hluchyj, Nill, Rogers and Mayersohn each sold 57,800 shares of stock at a price of $38.62 per share, for total proceeds to each of $2,232,236.

- The following day, January 24, 2001, Defendants Gruber, Ahmed, Hluchyj, Nill and Rogers each sold 5,800 additional shares of stock at a price of $40.83 per share, for total proceeds to each of $236,814.  Defendant Mayersohn sold 4,800 shares at the same price, for total proceeds of $195,984.

- On January 29, 2001, Defendants Gruber, Ahmed, Hluchyj, Nill and Rogers each sold 8,400 additional shares of stock at a price of $39.39 per share, for total proceeds to each of $330,876.  Defendant Mayersohn sold 9,200 shares at the same price for total proceeds of $362,388.

- On January 30, 2001, Defendant Ansari sold 25,000 shares at a price of $43.19 per share, for total proceeds of $ 1,079,750.

76.     A January 30, 2001 Sonus press release published by <u>PR Newswire</u> and <u>Business Wire</u> stated, among other things:

Sonus' INtelligentIP softswitch is a scalable, carrier-grade softswitch platform that provides carriers an open, cost-effective solution to the packet-circuit network challenge.  The INtelligentIP softswitch integrates with application software and media gateway hardware, enabling carriers to successfully compete in the highly dynamic and cost-conscious telecommunications marketplace.  The INtelligentIP softswitch also allows the carriers that build and operate converged networks to provide new communications services for enterprises and consumers more rapidly

and at lower costs.

*     *     *

Sonus Networks, Inc. is a leading provider of voice infrastructure products for the new public network.  Sonus' solutions enable service providers to deploy an integrated network capable of carrying both voice and data traffic, and to deliver a range of innovative, new services....  Its highly scalable products fully interoperate with and extend the life and utility of today's public network.

77.     The foregoing representations were materially false and misleading in that, among other things:

(i)     Contrary to the claim that 'Sonus' INtelligentIP softswitch is a scalable, carrier-grade softswitch platform," in truth and in fact, Sonus's products were not carrier-class as they did not have 99.999% availability, did not provide voice quality as good as circuit-switched networks and did not have sophisticated network management and configuration capabilities, as detailed in ¶¶45-47 above;

(ii)     Contrary to the claim that "Sonus' solutions enable service providers to deploy an integrated network capable of carrying both voice and data traffic," in truth and in fact, Sonus's products were not capable of carrying voice traffic over packet-based networks at the reliability levels required by major carriers, as detailed in ¶¶45-47 above;

(iii)     Contrary to Defendants' representation that Sonus's products met the requirements of the New Public Network, in truth and in fact, they did not, as detailed in ¶¶45-47 above;

(iv)     Contrary to Defendants' representation that Sonus's products "fully interoperate with and extend the life and utility of today's public network," in truth and in fact, Sonus's products did not fully interoperate with the New Public Network because, among other things, they did not meet the relevant performance standards;

(v)     In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified positive representations lacked a reasonable basis and were contradicted by negative facts known to, or recklessly disregarded by, Defendants.

78.     On February 12, 2001, certain of the Individual Defendants sold significant amounts of shares from their personal holdings of Sonus stock:

• Defendants Gruber and Hluchyj each sold 52,475 shares at $34.94 per share for total proceeds to each of $1,833,476.50.  Defendant Ahmed sold 4,950 shares, Rogers sold 27,474 shares, and Nill sold 50,000 shares at the same price for total proceeds to each of $172,953, $959,941.56 and $1,747,000, respectively.

79.     A February 20, 2001 Sonus press release published by <u>Business Wire</u> again represented:

Sonus Networks, Inc. is a leading provider of voice infrastructure products for the new public network.  Sonus' solutions enable service providers to deploy an integrated network capable of carrying both voice and data traffic, and to deliver a range of innovative, new services....  Its highly scalable products fully interoperate with and extend the life and utility of today's public network.

80.     The foregoing representations were materially false and misleading in that, among other things:

(i)     Contrary to the claim that "Sonus' solutions enable service providers to deploy an integrated network capable of carrying both voice and data traffic," in truth and in fact, Sonus's products were not capable of carrying voice traffic over packet-based networks at the reliability levels required by major carriers, as detailed in ¶¶45-47 above;

(ii)     Contrary to Defendants' representation that Sonus's products met the requirements of the New Public Network, in truth and in fact, they did not, as detailed in ¶¶45-47 above;

(iii)   Contrary to Defendants' representation that Sonus's products "fully interoperate with and extend the life and utility of today's public network," in truth and in fact, Sonus's products did not fully interoperate with the New Public Network because, among other things, they did not meet the relevant performance standards;

(iv)   In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified positive representations lacked a reasonable basis and were contradicted by negative facts known to, or recklessly disregarded by, Defendants.

81.   A February 26, 2001 Sonus press release, titled "Sonus Networks Leads in Carrier-Class Packet Voice Market," published by <u>Business Wire</u>, stated:

> Continued customer acceptance of Sonus' Packet Telephony suite, including the award-winning GSX9000(TM) Open Services Switch, has propelled Sonus to the leading position in the market for next-generation packet voice solutions.   The GSX9000 is a key component of the Sonus Open Services Architecture(TM), a system that delivers the scalability, reliability, interconnectivity and voice quality required for deployment in global service provider networks.   Moreover, the comprehensive Sonus solution offers a powerful and open platform upon which carriers can build new revenue streams through the rapid development and delivery of innovative voice and data services.
>
> About Sonus Networks
>
> Sonus Networks, Inc. is a leading provider of voice infrastructure products for the new public network.   Sonus' solutions enable service providers to deploy an integrated network capable of carrying both voice and data traffic, and to deliver a range of innovative, new services....   Its highly scalable products fully interoperate with and extend the life and utility of today's public network.

82.   The foregoing representations were materially false and misleading in that., among other things:

(i)   Contrary to the claim that "Sonus' solutions enable service providers to deploy

an integrated network capable of carrying both voice and data traffic," in truth and in fact, Sonus's

products were not capable of carrying voice traffic over packet-based networks at the reliability

levels required by major carriers, as detailed in ¶¶45-47 above;

(ii)    Contrary to Defendants' representation that Sonus's products met the

requirements of the New Public Network, in truth and in fact, they did not, as detailed in ¶¶45-47

above;

(iii)    Contrary to Defendants' representation that Sonus's products "fully

interoperate with and extend the life and utility of today's public network," in truth and in fact,

products did not fully interoperate with the New Public Network because, among other

things, they did not meet the relevant performance standards; and

(iv)    In light of the foregoing, and other problems adversely affecting the

Company's performance and prospects as detailed herein, Defendants' unqualified positive

representations lacked a reasonable basis and were contradicted by negative facts known to, or

recklessly disregarded by, Defendants.

83.    Within days, certain of the Individual Defendants sold a significant amount of

shares from their personal holdings of Sonus stock.

- On February 27, 2001, Defendant Anderson sold 35,000 shares at $31.02 per share for total proceeds of $1,085,700.

- On March 1, 2001, Anderson sold 45,000 shares at $31.17 per share for total proceeds of $1,402,650.

- On March 6, 2001, Winiarski sold 11,500 shares at $29.98 per share for total proceeds of $344,770, Gary Rogers sold 40,000 shares at $29.96 for total proceeds of $1,198,400, and Defendants Mayersohn, Mill, Gruber and Hluchyj each sold 80,000 shares at $29.96 per share for total proceeds to each of $2,396,800.

- On March 7, 2001, Winiarski sold 13,500 shares at $29.57 per share for total

proceeds of $399,195, Rogers sold 3,000 shares at $29.96 per share for total proceeds of $89,880, Mayersohn sold 6,500 shares at $29.96 per share for total proceeds of$194,740, Ahmed sold 12,000 shares at $29.96 per share for total proceeds of $359,520, and Nill, Gruber and Hluchyj each sold 6,500 shares at $29.96 per share for total proceeds to each of $194,740.

84.     On March 9, 2001, The Boston Business Journal published an article entitled "Local telecom equipment makers pray for rebound." The article noted the slowdown in spending in the telecom industry. The article also noted that "Sonus Networks, Inc., a Westford-based maker of voice-switching equipment, is sticking by its growth forecasts.... 'We haven't felt the impact,' said Stephen Nill, chief financial officer at Sonus."

85.     Defendants' representations concerning Sonus's performance and prospects were materially false and misleading and lacked a reasonable basis because Sonus's products were only capable of Internet offload functions, which carried a much lower revenue expectation than if the products were capable of carrying voice calls over packet-based networks, as detailed in ¶¶39-41 above.

86.     On March 13, 2001, Sonus issued a press release announcing that Qwest would deploy Sonus products. The release stated in part:

Sonus Networks, a leading provider of voice infrastructure solutions for the new public network, today announced that Qwest Communications International Inc. has selected Sonus' packet voice technology for deployment in its leading nationwide all-optical Internet Protocol (IP) network. Under terms of the multi-year, multimillion-dollar agreement, Qwest plans to use a range of Sonus' carrier-class packet telephony equipment as part of its development of services that blend Internet and voice technologies.

Qwest is building its next-generation voice network using Sonus' GSX9000 Open Services Switch, the INtelligentIP Softswitch, which Sonus gained through the recently completed acquisition of telecom technologies, inc., the PSX6000 SoftSwitch and the SGX2000 SS7 Signaling Gateway. Today, Qwest announced its first suite of services based on the Sonus platform, Qwest CyberVoice Interconnect, a wholesale Voice-over-Internet Protocol (VoIP) terminating service that enables

providers to deliver clear, reliable voice calls over Qwest's nationwide broadband Internet network.  Qwest is also evaluating the new Sonus-based infrastructure for a number of next-generation, collaborative applications.

"Qwest takes a cutting-edge approach to technology, one that has propelled it to a leadership position in the broadband Internet communications industry," said Hassan Ahmed, president and CEO, Sonus Networks. "Sonus' voice-over-packet technology supports Qwest's development of the most technologically-innovative IP network in the world, and we look forward to working closely with Qwest to help it achieve its business objectives."

*        *        *

"We are very proud that Qwest has selected Sonus to help it build out its next-generation packet voice network, and we're tremendously excited about the range of services that Qwest will be able to deliver to its customers through this softswitch-based infrastructure," commented Anousheh Ansari, vice president and general manager of Sonus' INtelligentIP division.

87.     The foregoing representations were materially false and misleading in that, among other things:

(i)     Sonus's products were not carrier-class as they did not have 99.999% availability, did not provide voice quality as good as circuit-switched networks, and did not have sophisticated network management and configuration capabilities, as detailed in ¶¶45-47 above;

(ii)     Defendants did not disclose that, pursuant to an undisclosed practice of providing financial incentives to customers, the transaction with Qwest, which contributed more than 10% of Sonus's first quarter 2001 revenues, was actually a quid pro quo deal wherein Sonus had to agree to a purchase of a $20 million IRU from Qwest in exchange for an approximately $33 million order from Qwest for Sonus switching equipment, as detailed in ¶52 above;

(iii)     Contrary to Defendants' representation that Sonus's products met the requirements of the New Public Network, and in particular, Qwest's requirements for building a New Public Network, in truth and in fact, they did not, as detailed in ¶¶45-47 above;

(iv)     Contrary to the representation that Sonus's equipment and software enabled voice service to be delivered over packet-based networks, in truth and in fact, Sonus's products were not capable of carrying voice calls over packet-based networks at the reliability levels required by major carriers, as detailed in ¶¶45-47 above; and

(v)     In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified positive representations lacked a reasonable basis and were contradicted by negative facts known to, or recklessly disregarded by, Defendants.

88.     Sonus's stock price rose on this news, and closed on March 13, 2001 at $26.00, up from $21.94 the previous day.

89.     From March 13-16, 2001, certain of the Individual Defendants sold a total of 114,000

shares from their personal holdings of Sonus stock, yielding total proceeds of $2,851,765:

- On March 13, 2001, Defendants Gruber, Hluchyj, Mayersohn and Nill each sold 13,500 shares at a price of $24.91 per share for total proceeds to each of $336,285. Defendant Ahmed sold 28,000 shares for total proceeds of $697,480, and Defendant Rogers sold 7,000 shares for total proceeds of $174,370.

- On March 14, 2001, Defendant Winiarski sold 5,000 shares at $28.35 per share for total proceeds of $141,750.

- On March 15, 2001, Defendant Winiarski sold 2,500 shares at $25.85 per share for total proceeds of $64,625.

- On March 16, 2001, Defendant Winiarski sold 17,500 shares at $24.48 per share for total proceeds of $428,400.

90.     On March 19, 2001, a <u>Mass High Tech</u> article entitled "Sonus closes big deal with Qwest for softswitches" quoted Defendant Ahmed as stating:

It was an important piece of the puzzle, in that Qwest is not only a next generation IP network, but also an incumbent telephone company....  Qwest is taking these traditional networks and transforming them, and that is where a lot of things have to happen that we do well.

91.     The foregoing representations were materially false and misleading in that, among other things, Defendants did not disclose that, pursuant to an undisclosed practice of providing financial incentives to customers, the transaction with Qwest, which contributed more than 10% of Sonus's first quarter 2001 revenues, was actually a quid pro quo deal wherein Sonus had to agree to the purchase of a $20 million IRU from Qwest in exchange for an approximately $33 million order from Qwest for Sonus switching equipment, as detailed in ¶52 above.

92.     On March 28, 2001, Sonus filed its 2000 Form 10-K with the SEC, signed by Ahmed, Mill, Gruber, and Anderson.  In the 10-K, Defendants represented:

We are a leading provider of voice infrastructure products for the new public network. Our products are a new generation of carrier-class switching equipment and software that enable voice services to be delivered over packet-based networks.... By enabling voice traffic to be carried over these packet-based networks, our products will accelerate the convergence of voice and data into the new public network ... .

Our switching equipment and software can be rapidly and easily deployed, and readily expanded to accommodate growth in traffic volumes.  Our products also interoperate with service providers' existing telephone infrastructure, allowing them to preserve the investment in their current networks.  Designed for the largest telephone networks in the world, our products offer the reliability and voice quality that have been hallmarks of the public telephone network for decades.

*       *       *

THE SONUS SOLUTION

We develop, market and sell what we believe to be the first comprehensive suite of voice infrastructure products purpose-built for deployment and management of voice and data services over the new public network.  The Sonus solution consists of five carrier-class products:

- the GSX9000 Open Services Switch;

- the PSX6000 SoftSwitch;

- the INtelligentIP softswitch;

- the SGX2000 SS7 Signaling Gateway; and

- the System 9200 Internet offload solution.

<u>These products are designed to offer high reliability, toll-quality voice, improved economics, interoperability, rapid deployment and an open architecture enabling the design and implementation of new services and applications.  Our solution has been specifically designed to meet the requirements of the new public network</u>....

\*        \*        \*

CARRIER-CLASS PERFORMANCE.  Our products are designed to offer the highest levels of quality, reliability and interoperability, including:

  -  full redundancy, <u>enabling 99.999% availability</u>.

  -  voice quality as good as, or superior to, today's circuit-switched network;...

  -  a complete set of service features, addressing those found in the existing voice network and extending them to offer greater flexibility; and

  -  sophisticated network management and configuration capabilities.

COMPATIBILITY WITH STANDARDS AND EXISTING INFRASTRUCTURE.  <u>Our products are designed to be compatible with all applicable voice and data networking standards and interfaces</u>....

\*        \*        \*

The Sonus solution is designed to interface with legacy circuit-switching equipment, supporting the transparent flow of calls and other information between the circuit and packet networks.  As a result, our products allow service providers to migrate to the new public network, while preserving their significant legacy infrastructure investments.

[Emphasis added.]

93.    The foregoing representations were materially false and misleading in that, among

other things:

(i)     Sonus's products were not carrier-class as they did not have 99.999% availability, full redundancy, did not provide voice quality as good as circuit-switched networks and did not have sophisticated network management and configuration capabilities, as detailed in ¶¶45-47 above;

(ii)    Contrary to Defendants' representation that Sonus's products met the requirements of the New Public Network, in truth and in fact, they did not, as detailed in ¶¶45-47 above;

(iii)   Contrary to the representation that Sonus's equipment and software enabled voice service to be delivered over packet-based networks, in truth and in fact, Sonus's products were not capable of carrying voice calls over packet-based networks at the reliability levels required by major carriers, as detailed in ¶¶45-47 above;

(iv)    Contrary to Defendants' representation that Sonus's products "fully interoperate with and extend the life and utility of today's public network," in truth and in fact, Sonus's products did not fully interoperate with the New Public Network because, among other things, they did not meet the relevant performance standards; and

(v)     In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified positive representations lacked a reasonable basis and were contradicted by negative facts known to, or recklessly disregarded by, Defendants.

94.     On April 10, 2001, Sonus reported its first quarter 2001 results in a release which stated in part:

Revenues for the first quarter of fiscal 2001 were $41.5 million compared with $28.6 million for the fourth quarter ended December 31, 2000, an increase of 45 percent.

\*          \*          \*

"We are extremely gratified with our results this quarter," said Hassan Ahmed, president and CEO, Sonus Networks. "During the quarter, we continued to execute on our business strategy and have made significant progress across several fronts. We expanded our customer base, delivered new product capabilities and features, broadened our partner program and have made great strides in the integration of telecom technologies following the completion of the acquisition in January. We're off to a great start this year."

In March, Sonus announced that it signed a multi-year, multimillion-dollar contract with Qwest Communications. Qwest has selected Sonus' packet voice technology for deployment in Qwest's nationwide, all-optical IP network. Qwest is building its next generation voice network using the full range of Sonus solutions, including the GSX9000 Open Services Switch, the INtelligentIP Softswitch, which was gained through the acquisition of telecom technologies, inc., the PSX6000 Softswitch and the SGX2000 SS7 Signaling Gateway.

95.    The foregoing representations were materially false and misleading in that, among other things:

(i)    Defendants did not disclose that, pursuant to an undisclosed practice of providing financial incentives to customers, the transaction with Qwest, which contributed more than 10% of Sonus's first quarter 2001 revenues, was actually a quid pro quo deal wherein Sonus had to agree to the purchase of a $20 million IRU from Qwest in exchange for an approximately $33 million order from Qwest for Sonus switching equipment, as detailed in ¶52 above.

(ii)    Sonus's products were not carrier-class as they did not have 99.999% availability, did not provide voice quality as good as circuit-switched networks, and did not have sophisticated network management and configuration capabilities, as detailed in ¶¶45-47 above;

(iii)    Contrary to Defendants' representation that Sonus's products met the requirements of the New Public Network, in truth and in fact, they did not, as detailed in ¶¶45-47

above;

(iv)     In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified positive representations lacked a reasonable basis and were contradicted by negative facts known to, or recklessly disregarded by, Defendants.

96.     Subsequent to issuing its results, on April 10, 2001, Sonus hosted a conference call with analysts in which Sonus management (Ahmed and Nill) made the following statements:

> [HASSAN] AHMED:  Last month, Quest [sic] selected Sonus as its partner in building out Quest's [sic] next generation voice network.  Sonus signed a multiyear, multimillion dollar contract with Quest [sic]....  This win is particularly exciting for a number of reasons....  Their move to packet voice not only validates Sonus Solutions, but it is also an important validation of the market for packet voice in general.  Second, the size of this contract makes it the largest Sonus has garnered today.  And lastly, this win demonstrates the early and significant evidence that the Sonus TTI merger is yielding.  Not only did Quest [sic] select Sonus, but we also recorded revenue in Ql from Quest [sic] ... .

> On another subject, I'm also happy to report to you that our acquisition of TTI is working.  In being selected by Quest [sic], we've already been successful together.

> *       *       *

> STEVE NILL:  We continue to see strong demands for our products in the marketplace.  We experienced a healthy diversity in our customer base recording measurable revenues from 11 customers this quarter.  We had four customers this quarter each contributing more than 10% of our revenue:  Global Crossing, Point One Communications, BroadBand Office, and Quest [sic]....  As to the mix of applications, voice applications drove our Ql revenues.

> *       *       *

> TED JACKSON:  Okay.  Then one last question which goes kind of into TTI, and I was curious as the integration between the two organizations moves forward.  Could you give us some sort of qualitative sense at least with regards to the number of opportunities that you are addressing or responding to in the market place, that are inclusive of TTI's technology?

[HASSAN] AHMED:  Yeah. We are actually responding to a significant number. I don't want to put a numeral on it.

TED JACKSON:  No one on the call would mind if you do.

[HASSAN] AHMED:  I do respond with our entire capability or we are responding with a substantive capability, which includes TTI's technology.

97.    The foregoing representations were materially false and misleading in that, among other things:

(i)    Defendants did not disclose that, pursuant to an undisclosed practice of providing financial incentives to customers, the transaction with Qwest, which contributed more than 10% of Sonus's first quarter 2001 revenues, was actually a quid pro quo deal wherein Sonus had to agree to the purchase of a $20 million IRU from Qwest in exchange for an approximately $33 million order from Qwest for Sonus switching equipment, as detailed in ¶52 above;

(ii)    Contrary to the statement that "our acquisition of TTI' is working," in truth and in fact Sonus abandoned the TTI equipment almost immediately after the January 2001 acquisition of TTI, as detailed in ¶58 above; and

(iii)    In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified positive representations lacked a reasonable basis and were contradicted by negative facts known to, or recklessly disregarded by, Defendants.

98.    Based on these statements and other guidance provided by Defendants, analysts issued positive reports on Sonus which rated the Company as follows and forecast the following earnings for Sonus:

| Firm | Analyst | Rating | 2001 EPS Forecast | 2001 Revenue Forecast |
|---|---|---|---|---|
| WR Hambrecht | Savageaux | Strong Buy | $0.05 | $215 m |
| Prudential | Scherago | Strong Buy | $0.03 | $208.5 m |
| Josephthal & Co. | Harris | Buy | $0.03 | $195.0 m |
| JP Morgan | Funsch | Buy | $0.03 | |

99.     These analysts also stated the following about Sonus:

• Prudential Securities

Qwest deployment. Sonus announced on March 13, that Qwest Communications International Inc. will deploy Sonus' packet voice technology in its all-optical Internet Protocol (IP) network. The three-year contract represents Sonus' largest win to date, and we expect revenues to ramp through the remainder of the year. Qwest is deploying Sonus' GSX9000 Open Services Switch, the INtelligentIP softswitch, the PSX6000 SoftSwitch and the SGX2000 SS7 Signalling Gateway. Qwest's first suite of services based on the Sonus platform includes Qwest CyberVoice Interconnect, a wholesale Voice-over-Internet Protocol (VoIP) terminating service. Qwest is also evaluating next-generation, collaborative applications based on the Sonus infrastructure.

*     *     *

The Company continues to model conservative numbers and exceed Wall Street's expectations. We believe Sonus will sail through these troubled telecom waters with innovative technology for next generation voice and packet switching.

• Josephthal & Co.:

We are leaving our full-year EPS forecasts for both 2001 and 2002 unchanged at $0.03 and $0.25, respectively. Our revenue projection for 2001 has been raised to $195 million from $185 million. The company's current EPS 2001 guidance is $0.02 to $0.03. The company's revenue guidance was increased to a range of $180 million to $200 million, from a prior range of $170 million to $190 million.

100.    On April 11, 2001, Ahmed was interviewed on CNNfn and stated:

[W]e're providing guidance for 2001 on the top line of between $180 and $200 million.  That compares to $51.8 million that we did last year.  So we feel that that's a pretty substantial growth and we're also providing guidance on the bottom line before extraordinary changes of between 2 and 3 cents on a pro forma basis.

*       *       *

Well, the customer base that we work most closely with are carriers really of all types, next generation carriers as well as incumbent carriers, and our carrier customers are very well respected carriers.  They're - some names like Qwest Communications ... and so forth.  Companies that really have very solid business plans and very solid management teams.  So we're finding that their ability to go and build networks and make the transition to packet networking is really still very strong and we're pleased to be building those networks with them.

101.    The foregoing representations were materially false and misleading in that, among other things:

(i)     In light of the serious problems with the Company's products at this time, Defendants' positive representations regarding the Company's revenues, and other unqualified positive representations, lacked a reasonable basis and were contradicted by negative facts known to, or recklessly disregarded by, Defendants;

(ii)    Defendants did not disclose that, pursuant to an undisclosed practice of providing financial incentives to customers, the transaction with Quest, which contributed more than 10% of Sonus's first quarter 2001 revenues, was actually a quid pro quo deal wherein Sonus had to agree to the purchase of a $20 million IRU from Quest in exchange for an approximately $33 million order from Qwest for Sonus switching equipment, as detailed in ¶52 above.

102.    In the days following the announcements of April 10 and 11, Sonus's stock price again rose.  Sonus had closed at $16.01 on April 9, but by April 16 it reached $20.03, and by April 19, it closed at $25.68.

103.    In the three weeks from April 16 through May 7, 2001, certain of the Individual Defendants sold a total of 739,000 shares from their personal holdings of Sonus stock, yielding total proceeds of $18,407,620:

- On April 16, 2001, Defendants Ahmed, Gruber and Hluchyj each sold 27,500 shares at a price of $20.59 per share, for total proceeds to each of $566,225.  Defendant Anderson sold 5,500 shares at $20.87 per share and 5,500 shares at $20.59 per share, for total proceeds of $228,030.  Defendants Mayersohn and Rogers each sold 11,000 shares at $20.59 per share for proceeds to each of $226,490.  Defendant Nill sold 8,000 shares at $20.59 per share for proceeds of $164,720, and Defendant Winiarski sold 4,500 shares at $20.59 per share for proceeds of $92,655.

- On April 18, 2001, Defendant Ansari sold 27,000 shares of stock in which she had a beneficial interest at $23.44 per share, for proceeds of $632,880.

- On April 19, 2001 Defendant Ansari sold 200,000 shares of stock in which she had a beneficial interest at $24.77 per share, for proceeds of $4,954,000.

- On April 25, 2001, at a price of $23.58 per share, Defendants Ahmed, Gruber and Hluchyj each sold 27,500 shares for total proceeds to each of $648,450.  Defendants Anderson, Mayersohn and Rogers each sold 11,000 shares for total proceeds to each of $259,380.  Defendant Nill sold 8,000 shares for proceeds of $188,640, and Defendant Winiarski sold 4,500 shares for proceeds of $106,110.

- On May 1, 2001, at a price of $26.13 per share, Defendants Ahmed, Gruber and HIuchyj each sold 27,500 shares for total proceeds to each of $718,575. Defendants Anderson, Mayersohn and Rogers each sold 11,000 shares for total proceeds to each of $287,430.  Defendant Nill sold 8,000 shares for proceeds of $209,040, and Defendant Winiarski sold 4,500 shares for proceeds of $117,585.

- On May 7, 2001, at a price of $29.85 per share, Defendants, Ahmed, Gruber and Hluchyj each sold 27,500 shares for total proceeds to each of $820,875. Defendants Anderson, Mayersohn and Rogers each sold 11,000 shares for total proceeds to each of $328,350.  Defendant Nill sold 8,000 shares for proceeds of $238,800, and Defendant Winiarski sold 4,500 shares for proceeds of 4134,325.

104.    On May 15, 2001, Sonus filed its Form 10-Q for the first quarter ended March 31, 2001.  The 10-Q was signed by Nill.  The Form 10-Q repeated the Company's financial results as represented in the Company's earnings press release dated April 10, 2001.  The 10-Q stated: "We

area leading provider of voice infrastructure products for the new public network.  We offer a new generation of carrier-class switching equipment and software that enable voice services to be delivered over packet-based networks."

105.    The foregoing representations were materially false and misleading in that, among other things:

(i)    Sonus's products were not carrier-class as they did not have 99.999% availability, did not provide voice quality as good as circuit-switched networks, and did not have sophisticated network management and configuration capabilities, as detailed in ¶¶45-47 above;

(ii)    Contrary to the representation that Sonus's equipment and software enabled voice service to be delivered over packet-based networks, in truth and in fact, Sonus's products were not capable of carrying voice calls over packet-based networks at the reliability levels required by major carriers, as detailed in ¶¶45-47 above;

(iii)    Contrary to Defendants' representation that Sonus's products met the requirements of the New Public Network, in truth and in fact, they did not, as detailed in ¶¶45-47 above;

(iv)    In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified positive representations lacked a reasonable basis and were contradicted by negative facts known, to or recklessly disregarded by, Defendants.

106.    From May 16 through May 22, 2001, certain of the Individual Defendants sold a total of 1,106,000 shares from their personal holdings of Sonus stock, yielding total proceeds of $32,519,180:

- On May 16, 2001, at a price of $28.65 per share, Defendants Ahmed, Gruber and Hluchyj each sold 200,000 shares for total proceeds to each of $5,730,000. Defendant Mayersohn sold 100,000 shares for total proceeds of $2,865,000. Defendants Nill and Rogers each sold 50,000 shares for total proceeds to each of $1,432,500.

- On May 17, 2001, at a price of $31.18 per share, Defendants Ahmed, Gruber and Hluchyj each sold 27,500 shares for total proceeds to each of $857,450. Defendants Anderson, Mayersohn and Rogers each sold 11,000 shares for total proceeds to each of $342,980. Defendant Nill sold 8,000 shares for proceeds of $249,440, and Defendant Winiarski sold 4,500 shares for proceeds of $140,310.

- On May 18, 2001, at a price of $29.91 per share, Defendant Winiarski sold 50,000 shares for total proceeds of $1,495,500.

- On May 22, 2001, at a price of $32.13 per share, Defendants Ahmed, Gruber and Hluchyj each sold 27,500 shares for total proceeds to each of $883,575. Defendants Anderson, Mayersohn and Rogers each sold 11,000 shares for total proceeds to each of $353,430.  Defendant Nill sold 8,000 shares for proceeds of $257,040, and Defendant Winiarski sold 4,500 shares for proceeds of $144,585.

107.    Again on May 29, 2001, certain of the Individual Defendants sold a total of 128,000 shares from their personal holdings of Sonus stock, yielding total proceeds of $3,770,880:

- At a price of $29.46 per share, Defendants Ahmed, Gruber and Hluchyj each sold 27,500 shares for total proceeds to each of $810,150.  Defendants Anderson, Mayersohn and Rogers each sold 11,000 shares for total proceeds to each of $324,060.  Defendant Nill sold 8,000 shares for proceeds of $235,680, and Defendant Winiarski sold 4,500 shares for proceeds of $132,570.

108.    On June 4, 2001, Sonus issued a press release published in <u>Business Wire</u>, entitled

"Leading Research Firms Name Sonus Networks Number One Provider of Carrier-Class Packet

Voice Solutions."  The release stated in part :

Sonus delivers a complete family of carrier-class, packet voice infrastructure solutions for the new public network.  The company's award-winning solutions include the GSX9000(TM) Open Services Switch, the PSX6000(TM) SoftSwitch, the INtelligentIP(R) Softswitch, the SGX2000(TM) SS7 Signaling Gateway, and Sonus Insight(TM) Element Management System. <u>These solutions combine to form a system that delivers the scalability, reliability, interconnectivity and voice quality required for deployment in global service provider networks.  Moreover, the</u>

comprehensive Sonus solution offers a powerful and open platform upon which carriers can build new revenue streams through the rapid development and delivery of innovative voice and data services.  [Emphasis added.]

About Sonus Networks

Sonus Networks, Inc. is a leading provider of voice infrastructure products for the new public network.  Sonus' solutions enable service providers to deploy an integrated network capable of carrying both voice and data traffic, and to deliver a range of innovative, new services.  The Sonus Open Services Architecture (OSA) and award-winning Packet Telephone suite cut the time-to-market for competitive new service products, allowing carriers and third-party developers to expand marketshare and build important new revenue streams. Its highly scalable products fully interoperate with and extend the life and utility of today's public network.

109.     The foregoing representations were materially false and misleading in that, among other things:

(i)       Sonus's products were not carrier-class as they did not have 99.999% availability, did not have voice quality as good as circuit-switched networks and did not have sophisticated network management and configuration capabilities, as detailed in ¶¶45-47 above;

(ii)      Contrary to the statement that "Sonus' solutions enable service providers to deploy an integrated network capable of carrying both voice and data traffic, and to deliver a range of innovative, new services," in truth and in fact, Sonus's products were not capable of carrying voice calls over packet-based networks at the reliability levels required by major carriers, as detailed in ¶¶45-47 above;

(iii)     Contrary to Defendants' representation that Sonus's products met the requirements of the New Public Network, in truth and in fact, they did not, as detailed in ¶¶45-47 above;

(iv)     Contrary to Defendants' representation that Sonus's products "fully interoperate with and extend the life and utility of today's public network," in truth and in fact,

Sonus's products did not fully interoperate with the New Public Network because, among other things, they did not meet the relevant performance standards; and

(v)      In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified positive representations lacked a reasonable basis and were contradicted by negative facts known to, or recklessly disregarded by, Defendants.

110.    On June 4, 2001, <u>Bloomberg</u> reported a transcript of an interview with Ahmed. The interviewer begins by asking how Sonus is able to double revenue while most other companies are suffering from a spending slowdown.  Ahmed stated that Sonus is not like the other companies because:

> Sonus is a major beneficiary, because we build a new generation of voice networks, something that hasn't seen any innovation for about 25 years.

*       *       *

> I think the key thing that differentiates Sonus, if you think about the voice network, it's a very reliable network and very large. We're used to those levels of reliability. Really, Sonus to date is the only company in the next generation switching space that has detailed it can actually successfully build networks of that complexity.  It's a very, very hard thing to do.

111.    The foregoing representations were materially false and misleading in that, among other things:

(i)      Sonus's products were not carrier-class as they did not have 99.999% availability, did not provide voice quality as good as circuit-switched networks, and did not have sophisticated network management and configuration capabilities, as detailed in ¶¶45-47 above;

(ii)     Contrary to the statement that "[Sonus] built a new generation of voice networks," in truth and in fact, Sonus's products were not capable of carrying voice calls over

packet-based networks at the reliability levels required by major carriers, as detailed in ¶¶45-47 above;

(iii)    Contrary to Defendants' representation that Sonus's products met the requirements of the New Public Network, in truth and in fact, they did not, as detailed in ¶¶45-47 above; and

(iv)    In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified positive representations lacked a reasonable basis and were contradicted by negative facts known to, or recklessly disregarded by, Defendants.

112.    On June 4, 2001, certain of the Individual Defendants sold a total of 128,000 shares from their personal holdings of Sonus stock, yielding total proceeds of $3,508,480:

- At a price of $27.41 per share, Defendants Ahmed, Gruber and Hluchyj each sold 27,500 shares for total proceeds to each of $753,775.  Defendants Anderson, Mayersohn and Rogers each sold 11,000 shares for total proceeds to each of $301,510.  Defendant Nill sold 8,000 shares for proceeds of $219,280, and Defendant Winarski sold 4,500 shares for proceeds of $123,345.

113.    From June 5 through June 6, the price of Sonus's stock increased.  While the price closed at $27.31 per share on June 5, it closed at $30.07 on June 6.

114.    On June 11, 2001, Ahmed was interviewed by the Wall Street Transcript.  In that interview, Ahmed discussed Sonus's ability to provide carrier-class equipment.  Ahmed stated:

First of all, it's a very difficult technology to begin with and then on top of that, the voice network has established very significant benchmarks for both reliability and for scale over the last decade. If you want to use your telephone, you pick up the telephone and the network is always there. I think one of the main challenges, technologically, is being able to deliver the kind of scale and reliability that the voice network demands on this new packet technology.  To date, Sonus is the only company that's actually detailed the ability to do that and therefore, we've enjoyed a lot of success in the marketplace due to the fact that we're able to build very large

<u>public networks on the success plan of packet technology and we really are the</u>
<u>leader as a result from that.</u>

*       *       *

TWST:  So at this point, you have not been hurt by the slowdown?

Dr. Ahmed:  No, we certainly see carriers taking longer to settle their budgets and
so forth than as they did at the beginning of this year, but in the overall scheme of
things, <u>we have not experienced a significant slowdown.</u>

*       *       *

So as the network evolves from the core to the edge, <u>we're there meeting the carriers'</u>
<u>requirements.</u>

*       *       *

The guidance that we've given for this year is between $180-200 million for revenue,
so that's pretty substantial growth over last year.

*       *       *

I suppose, <u>in measuring the success of this acquisition</u> because in March, we
announced that we had been selected by Qwest Communications to build their next
generation voice network and in that selection Qwest selected all of the Sonus
products which included the products that telecom technologies built as well as the
products that we built.

TWST:  <u>Stamp of approval.</u>

Dr. Ahmed:  <u>Yes</u>, and it was nice.  [Emphasis added.]

115.    The foregoing representations were materially false and misleading in that, among

other things:

(i)    Defendants did not disclose that, pursuant to an undisclosed practice of

providing financial incentives to customers, the transaction with Qwest, which contributed more

than 10% of Sonus's first quarter 2001 revenues, was actually a quid pro quo deal wherein Sonus

had to agree to the purchase of a $20 million IRU from Qwest in exchange for an approximately $33

million order from Qwest for Sonus switching equipment, as detailed in ¶52 above;

(ii)     Contrary to the statement that "Qwest selected all of the Sonus products which included the products that telecom technologies built," in truth and in fact, Sonus in fact abandoned the TTI equipment almost immediately after the acquisition of TTI, as detailed in ¶58 above;

(iii)    Contrary to the statement that Sonus was able to "deliver the kind of scale and reliability that the voice network demands on this new packet technology," in truth and in fact, Sonus's products were not capable of carrying voice calls over packet-based networks at there liability levels required by major carriers, as detailed in ¶¶45-47 above;

(iv)     Sonus's products were not carrier-class as they did not have 99.999% availability, did not provide voice quality as good as circuit-switched networks and did not have sophisticated network management and configuration capabilities, as detailed in ¶¶45-47 above;

(v)      Contrary to Defendants' representation that Sonus's products met the requirements of the New Public Network, in truth and in fact, they did not, as detailed in ¶¶45-47 above;

(vi)     Defendants' representations regarding the Company's continued success in the face of the industry's slowdown were materially false and misleading and lacked a reasonable basis in light of the problems with the Company's products and other adverse facts known to or recklessly disregarded by Defendants; and

(vii)    In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified representations regarding revenue growth and other positive representations concerning the Company's performance and prospects lacked a reasonable basis and were contradicted by negative facts known to, or

recklessly disregarded by, Defendants.

116.    On July 11, 2001, Defendants issued a press release over <u>Business Wire</u> entitled

"Sonus Networks Provides Internet Call Diversion Solution for Bell South."  In the release, Ahmed

stated:

> Today we announced the addition of a major incumbent carrier, BellSouth, to our
> customer roster. The selection by BellSouth represents an important milestone for
> Sonus in our drive to penetrate the incumbents.
>
> *          *          *
>
> Coincident with this release, Sonus announced that BellSouth has chosen Sonus to
> provide its industry-leading packet voice infrastructure solutions to supplement
> BellSouth's existing voice network (see related announcement "Sonus Networks
> Provides Internet Call Diversion Solution for BellSouth.") BellSouth will implement
> a full Sonus packet voice solution as the foundation for offloading Internet traffic
> from its circuit-switched voice network. By deploying Sonus' solutions for Internet
> call diversion (ICD), BellSouth will be able to scale its network resources to
> efficiently manage Internet and voice traffic.
>
> *          *          *
>
> Sonus Networks, Inc. is a leading provider of voice infrastructure products for the
> new public network.  Sonus' solutions enable service providers to deploy an
> integrated network capable of carrying both voice and data traffic, and to deliver a
> range of innovative, new services.  The Sonus Open Services Architecture (TM)
> (OSA) and award-winning Packet Telephony suite cut the time-to-market for
> competitive new service products, allowing carriers and third-party developers to
> expand market share and build important new revenue streams.  Its highly scalable
> products fully interoperate with and extend the life and utility of today's public
> network.

117.    The foregoing representations were materially false and misleading in that, among

other things:

(i)      Defendants failed to disclose the true terms of Sonus's transaction with

BellSouth, as detailed above in ¶53, including the financial incentives offered to BellSouth to enter

into the transaction;

(ii)     Sonus's products were not carrier-class as they did not have 99.999% availability, did not provide voice quality as good as circuit-switched networks and did not have sophisticated network management and configuration capabilities, as detailed in ¶¶45-47 above;

(iii)    Contrary to Defendants' representation that Sonus's products met the requirements of the New Public Network, in truth and in fact, they did not, as detailed in ¶¶45-47 above;

(iv)    Contrary to Defendants' representation that Sonus's products "fully interoperate with an extend the life and utility of today's public network," in truth and in fact, Sonus's products did not fully interoperate with the New Public Network because, among other things, they did not meet the relevant performance standards; and

(v)     In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified positive representations lacked a reasonable basis and were contradicted by negative facts known to, or recklessly disregarded by, Defendants.

118.    On July 11, 2001, Defendants issued a press release over <u>Business Wire</u> entitled "Sonus Networks Reports 2001 Second Quarter Financial Results; Q2 Revenues Grow to $52.6 Million, Increase 27% Over Preceding Quarter."  The release stated:

> Revenues for the second quarter of fiscal 2001 were $52.6 million compared with $41.5 million for the first quarter of fiscal 2001, an increase of 27 percent.
>
> *        *        *
>
> "This was an exceptionally good quarter for Sonus, particularly in light of the currently challenging telecommunications market," commented Hassan Ahmed, president and CEO, Sonus Networks.  "<u>We've seized a significant market opportunity as carriers shift their spending to technologies that provide dramatic improvements in economics and the ability to offer new revenue-generating services.</u>" Ahmed

continued, "Today we announced the addition of a major incumbent carrier, BellSouth, to our customer roster.  The selection by BellSouth represents an important milestone for Sonus in our drive to penetrate the incumbents."

... "Finally, we made good progress in broadening our solutions to extend from the core to the edge of the network," concluded Ahmed.

Coincident with this release, Sonus announced that BellSouth has chosen Sonus to provide its industry-leading packet voice infrastructure solutions to supplement BellSouth's existing voice network (see related announcement "Sonus Networks Provides Internet Call Diversion Solution for BellSouth.") BellSouth will implement a full Sonus packet voice solution as the foundation for offloading Internet traffic from its circuit-switched voice network.  By deploying Sonus' solutions for Internet call diversion (ICD), BellSouth will be able to scale its network resources to efficiently manage Internet and voice traffic.

\*       \*       \*

Sonus Networks, Inc. is a leading provider of voice infrastructure products for the new public network.  Sonus' solutions enable service providers to deploy an integrated network capable of carrying both voice and data traffic, and to deliver a range of innovative, new services....  Its highly scalable products fully interoperate with and extend the life and utility of today's public network.  [Emphasis added.]

119.    The foregoing representations were materially false and misleading in that, among other things:

(i)    Sonus's products were not carrier-class as they did not have 99.999% availability, did not have voice quality as good as circuit-switched networks and did not provide sophisticated network management and configuration capabilities, as detailed in ¶¶45-47 above.

(ii)    Defendants failed to disclose the true terms of Sonus's transaction with BellSouth as detailed above in ¶53, including the financial incentives offered to BellSouth to enter into the transaction;

(iii)    Contrary to the statement that "Sonus' solutions enable service providers to deploy an integrated network capable of carrying both voice and data traffic, and to deliver a range

of innovative, new services" Sonus's products were not capable of carrying voice calls over packet-based networks at the reliability levels required by major carriers, as detailed in ¶¶45-47 above;

(iv)     Contrary to Defendants' representation that Sonus's products met the requirements of the New Public Network, in truth and in fact, they did not, as detailed in ¶¶45-47 above;

(v)     Contrary to Defendants' representation that Sonus's products "fully interoperate with and extend the life and utility of today's public network," in truth and in fact, Sonus's products did not fully interoperate with the New Public Network because, among other things, they did not meet the relevant performance standards;

(vi)     Defendants' representations regarding the Company's purported continued success in the face of the industry's slowdown were materially false and misleading and lacked a reasonable basis in light of the problems with the Company's products and other adverse facts known to, or recklessly disregarded by, Defendants; and

(vii)     In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified positive representations lacked a reasonable basis and were contradicted by negative facts known to, or recklessly disregarded by, Defendants.

120.     On July 12, 2001, Bloomberg News reported that Ahmed stated that Sonus would have revenue of $190 million to $210 million for the year.  This representation concerning Sonus's performance lacked a reasonable basis because Sonus's products were only capable of Internet offload functions, which carried a much lower revenue expectation than if the products were capable

of carrying voice calls over packet-based networks, as detailed in ¶¶39-41 above.

121.   On July 12, 2001, <u>CNBC</u> interviewed Ahmed regarding the Company's

second quarter results.  An excerpt from the interview reads:

> Mr. AHMED: Well, yes, we're -- you know, we're obviously mindful of the situation
> in the telecom industry, but -- but I think Sonus has been -- has been growing and
> growing well.
>
> HAINES: Well, how do you do that, given what's going on in that -- in that industry?
>
> Mr. AHMED: Well, I think the key for us is that, you know, carriers are still
> spending a lot of money, but they're really trying to focus their investments on
> building out their next-gen networks.  And that's what we do and so the fact that we
> can offer them immediate cost advantages, as well as migrating to their next-gen
> networks makes it a good investment for carriers to make in our equipment.
>
> *        *        *
>
> Mr. RIVKIN:  Mr. Ahmed, i-is - - the objective here to reduce costs for the carriers
> or to reduce costs for the consumers, in terms of voice communication?
>
> Mr. AHMED: Well, the -- i - i -- there are really two, Mark.  The - the first is that for
> -- for the carriers, themselves, they're really running down two parallel paths right
> now.  They've got the old circuit network that does voice and then they're building
> these new packet networks for data.  And what they really need to do -- they can't
> afford to build two parallel networks, so they really need to bring their voice traffic
> on to this new packet network they're building.  That's what we do and that reduces
> cost and -- very dramatically and in a very short period of time.

122.   The foregoing representations were materially false and misleading in that,

among other things:

(i)      Sonus's products were not carrier-class as they did not have 99.999%

availability, did not provide voice quality as good as circuit-switched networks and did not have

sophisticated network management and configuration capabilities, as detailed in ¶¶45-47 above;

(ii)     Contrary to the representation that Sonus could effectively carry voice calls

across a packet-based network, Sonus's products were not capable of carrying voice calls over

packet-based networks at the reliability levels required by major carriers, as detailed in ¶¶45-47 above;

(iii)    Sonus's revenue projections lacked a reasonable basis because Sonus's products were only capable of Internet offload functions, which carried a much lower revenue expectation than if the products were capable of carrying voice calls over packet-based networks, as detailed in ¶¶39-41 above;

(iv)    Defendants' representations regarding the Company's purported continued success in the face of the industry's slowdown were materially false and misleading and lacked a reasonable basis in light of the problems with the Company's products and other adverse facts known to, or recklessly disregarded by, Defendants;

(v)    Contrary to Defendants' representation that Sonus's products met the requirements of the New Public Network, in truth and in fact, they did not, as detailed in ¶¶45-47 above; and

(vi)    In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified positive representation lacked a reasonable basis and were contradicted by negative facts known to, or recklessly disregarded by, Defendants.

123.    Following Defendants' positive statements on July 11 and 12, Sonus's stock price again increased.  The stock had closed at $17.46 per share on July 10.  However, by July 13 the stock closed at $23.28.

124.    On July 16, the first trading day after July 13, certain of the Individual Defendants sold a total of 128,000 shares from their personal holdings of Sonus stock, yielding total proceeds

of $2,950,400:

- At a price of $23.05 per share, Defendants Ahmed, Gruber and Hluchyj each sold 27,500 shares for total proceeds to each of $633,875. Defendants Anderson, Mayersohn and Rogers each sold 11,000 shares for total proceeds to each of $253,550. Defendant Nill sold 8,000 shares for proceeds of $184,400, and Defendant Winiarski sold 4,500 shares for proceeds of $103,725.

125. On July 25, 2001, a <u>Boston Globe</u> article entitled, "Sonus Swims Against the Telecom Tide," reported among other things that Sonus's landing BellSouth as a customer was a "big new plus," thereby evidencing the materiality of Defendants' statements concerning the Company's relationship with BellSouth.

126. On July 25, certain of the Individual Defendants sold a total of 128,000 shares from their personal holdings of Sonus stock, yielding total proceeds of $2,602,240:

- At a price of $20.33 per share, Defendants Ahmed, Gruber and Hluchyj each sold 27,500 shares for total proceeds to each of $559,075. Defendants Anderson Mayersohn and Rogers each sold 11,000 shares for total proceeds to each of $223,630. Defendant Nill sold 8,000 shares for proceeds of $162,640, and Defendant Winiarski sold 4,500 shares for proceeds of $91,485.

127. On July 31, 2001, Sonus completed the purchase of certain intellectual property and other assets of Linguateq Inc. ("Linguateq"), a provider of data distribution and billing application software. The Linquateq assets were acquired in exchange for 221,753 newly-issued shares of Sonus common stock and $225,000 in cash.

128. From August 1-6, 2001, certain of the Individual Defendants sold a total of 622,000 shares from their personal holdings of Sonus stock, yielding total proceeds of $14,856,980:

- On August 1, 2001, at a price of $22.96 per share, Defendants Ahmed, Gruber and Hluchyj each sold 27,500 shares for total proceeds of $631,400. Defendants Anderson, Mayersohn and Rogers each sold 11,000 shares for total proceeds to each of $252,560. Defendant Nill sold 8,000 shares for proceeds of $183,680, and Defendant Winiarski sold 4,500 shares for proceeds of $103,320.

- On August 3, 2001, at a price of $24.39 per share, Defendant Ansari sold 366,000 shares in which she had a beneficial ownership interest for total proceeds of $8,926,740.

- On August 6, 2001, at a price of $23.37 per share, Defendants Ahmed, Gruber and Hluchyj each sold 27,500 shares for total proceeds to each of $642,675. Defendants Anderson, Mayersohn and Rogers each sold 11,000 shares for total proceeds to each of $257,070. Defendant Nill sold 8,000 shares for proceeds of $186,960, and Defendant Winiarski sold 4,500 shares for proceeds of $105,165.

129.    On August 7, 2001, Sonus filed with the SEC a Form S-3 Registration Statement

signed by Ahmed, Nill, Gruber and Anderson in connection with the issuance of 221,753 shares for

the Linguateq transaction.  The Form S-3 contained the following statements:

> We are a leading provider of voice infrastructure products for the new public network.  Our products are a new generation of carrier-class switching equipment and software that enable voice services to be delivered over packet-based networks.... By enabling voice traffic to be carried over these packet-based networks, our products will accelerate the convergence of voice and data into the new public network.

> *        *        *

> Designed for the largest telephone networks in the world, our products offer the reliability and voice quality that have been hallmarks of the public telephone network for decades.

> A recognized leader in carrier-class packet voice infrastructure products, Sonus' announced customers include some of the world's leading service providers: BellSouth, Global Crossing, Intermedia Communications, Qwest Communications, Time Warner Telecom, Williams Communications and XO Communications. [Emphasis added.]

130.    The foregoing representations were materially false and misleading in that, among

other things:

(i)     Sonus's products were not carrier-class as they did not have 99.999%

availability, did not provide voice quality as good as circuit-switched networks, and did not have

sophisticated network management and configuration capabilities, as detailed in ¶¶45-47 above;

(ii)     Contrary to Defendants' representation that Sonus's products met the requirements of the New Public Network, in truth and in fact, they did not, as detailed in ¶¶45-47 above;

(iii)     Contrary to the representation that Sonus's equipment and software enabled voice service to be delivered over packet-based networks, in truth and in fact, Sonus' products were not capable of carrying voice calls over packet-based networks at the reliability levels required by major carriers, as detailed in ¶¶45-47 above.

(iv)     Defendants failed to disclose the true terms of Sonus's transaction with BellSouth, as detailed above in ¶53, including the financial incentives offered to BellSouth to enter into the transaction;

(v)     Defendants did not disclose that, pursuant to an undisclosed practice of providing financial incentives to customers, the transaction with Qwest, which contributed more than 10% of Sonus' first quarter 2001 revenues, was actually a quid pro quo deal wherein Sonus had to agree to the purchase of a $20 million IRU from Qwest in exchange for an approximately $33 million order from Qwest for Sonus switching equipment, as detailed in ¶52 above; and

(vi)     In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified positive representations lacked a reasonable basis and were contradicted by negative facts known to, or recklessly disregarded by, Defendants.

131.     On August 9, 2001, Ahmed was interviewed by the <u>Wall Street Transcript</u>.  In that interview, Ahmed discussed Sonus's ability to provide carrier-class equipment.  Ahmed stated;

> And the thing that really distinguishes Sonus on the packet side is <u>our ability to, first of all, deliver on the kind of scale and reliability that everyone has become</u>

<u>accustomed to in the public telephone network.  That's a very difficult thing to do and we've demonstrated our ability to do that on packet equipment</u>.  [Emphasis added.]

132.    The foregoing representations were materially false and misleading in that, among other things:

(i)    Sonus's products were not carrier-class as they did not have 99.999% availability, did not provide voice quality as good as circuit-switched networks and did not have sophisticated network management and configuration capabilities, as detailed in ¶¶45-47 above;

(ii)    Contrary to the representation that Sonus's equipment and software enabled voice service to be delivered over packet-based networks, in truth and in fact, Sonus's products were not capable of carrying voice calls over packet-based networks at the reliability levels required by major carriers, as detailed in ¶¶45-47 above; and

(iii)    In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified positive representations lacked a reasonable basis and were contradicted by negative facts known to, or recklessly disregarded by, Defendants.

133.    On August 13, 2001, Sonus filed its Form 10-Q for the second quarter ended June 30, 2001.  The 10-Q was signed by Nill.  The Form 10-Q reiterated the Company's financial results as represented in the Company's earnings press release dated July 11, 2001.  The 10-Q stated: "We are a leading provider of voice infrastructure products for the new public network.  We offer a new generation of carrier-class switching equipment and software that enable voice services to be delivered over packet-based networks."

134.    The foregoing representations were materially false and misleading in that, among

other things:

(i)      Sonus's products were not carrier-class as they did not have 99.999% availability, did not have voice quality as good as circuit-switched networks and did not have sophisticated network management and configuration capabilities, as detailed in ¶¶45-47 above;

(ii)      Contrary to the representation that Sonus "offer[ed] a new generation of carrier-class switching equipment and software that enable voice services to be delivered over packet-based networks," in truth and fact, Sonus's products were not capable of carrying voice calls over packet-based networks at the reliability levels required by major carriers, as detailed in ¶¶45-47 above;

(iii)      In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified positive representations lacked a reasonable basis and were contradicted by negative facts known to, or recklessly disregarded by, Defendants.

135.    On August 27, 2001, Defendants announced the establishment of a Japanese subsidiary.  Defendants again represented:

> Sonus' solutions enable service providers to deploy an integrated network capable of carrying both voice and data traffic....   Its highly scalable products fully intemperate with and extend the life and utility of today's public network.

136.    The foregoing representations were materially false and misleading in that, among other things:

(i)      Sonus's products were not carrier-class as they did not have 99.999% availability, did not have voice quality as good as circuit-switched networks and did not have sophisticated network management and configuration capabilities, as detailed in ¶¶45-47 above;

(ii)     Contrary to Defendants' representation that Sonus's products met the requirements of the New Public Network, in truth and in fact, they did not, as detailed in ¶¶45-47 above;

(iii)     Contrary to the representation that Sonus "offer[ed] a new generation of carrier-class switching equipment and software that enable voice services to be delivered over packet-based networks," in truth and fact, Sonus's products were not capable of carrying voice calls over packet-based networks at the reliability levels required by major carriers, as detailed in ¶¶45-47 above;

(iv)     Contrary to Defendants' representation that Sonus's products "fully interoperate with and extend the life and utility of today's public network," in truth and in fact, Sonus's products did not fully interoperate with the New Public Network because, among other things, they did not meet the relevant performance standards; and

(v)     In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified positive representations lacked a reasonable basis and were contradicted by negative facts known to, or recklessly disregarded by, Defendants.

137.     An article appearing in the September 17, 2001 issue of <u>Forbes</u> magazine, entitled, "Switch Hitter ... Was it shrewd business or just revenue puffery?" indicated that Sonus Networks had sold debt to BellSouth as an part of its July 2001 contract with BellSouth:

> Sonus' bankers cheered [the announcement of the BellSouth contract], as they have filed with the SEC to raise as much as $1 billion in a second public stock offering (the first was in May 2000).  But Sonus didn't mention one side deal in the press release:  a $10 million sale to BellSouth of convertible debt, with a 4.75% coupon and a right to convert into Sonus stock at $30.

> .... [T]hanks to the conversion option, BellSouth may end up getting paid to use Sonus gear.  Sonus trades at $16.  Should it hit $40, BellSouth can convert for a $3.3 million pretax profit, At $60, BellSouth makes $10 million.

However, the article quoted Defendant Ahmed as insisting the switch sale and debt deal were unrelated:

> Sonus Chief Executive Hassan Ahmed insists the switch sale and debt deal are unrelated.  He says Sonus simply wanted to raise a little cash, and BellSouth's $10 million 'loan' replaced acquisition expenses.  BellSouth won't discuss its reasons for making the investment.

Defendant Ahmed's statements were false and misleading in that, as alleged above at ¶53, Defendants failed to disclose that, pursuant to an undisclosed practice of providing financial incentives to customers, the BellSouth deal was only made possible because Sonus issued to BellSouth $10 million of convertible debt with a 4.75% coupon and the right to convert the debt into Sonus stock in the event the trading price of the stock reached $30 per share, making the conversion feature potentially was worth millions of dollars to BellSouth.  In other words, Sonus was paying BellSouth to buy Sonus products, making the transaction much less valuable to Sonus than Defendant had led the investing public to believe.  The article went on to quote a securities analyst at mutual fund management company Olstein & Associates as commenting, with respect to the side deal, "From our perspective, it's a red flag." As a further indication of how desperate Defendants were to land customers, not based on the merit of Sonus' products, but on financial inducements, the Forbes article described how "Dana Crowne, chief technology officer at Allegiance Telecom, a carrier in Dallas, got turned off when Sonus sent him a FedEx package containing forms that would let him buy 2,000 shares in the [Sonus] public offering.  'I'd never even had any contact with Sonus before.  It was such a blatant and slimy tactic,' Crowne now says.  He now refuses to take calls from Sonus salespeople." Upon information and belief, based on Forbes' circulation practices,

this article was first available to the public on or about September 5, 2001.  On September 5, Sonus

stock, which had closed at $14.45 on September 4 on volume of 2,652,500 shares (and had closed

in the $14.29-$14.77 range or higher in the prior days or weeks), fell to a close of $12.89, on volume

of 7,877,300 shares.

138.    Similarly, rumors began circulating in the market thereafter that Sonus was having

trouble integrating its switches into Qwest, and that Sonus was in danger of losing its contract with

Qwest.  On September 18, 2001, internetnews.com reported that "Sonus (Quote) [sic] lost 2.36 to

7.85 on rumors that the company could lose a contract with Qwest."

139.    On September 26, 2001, Sonus announced that revenue for the third quarter 2001

was expected to fall below prior estimates ($40 million, compared to estimates of $57+ million).

Sonus attributed the shortfall to a "deterioration" of the telecom market.  The press release partially

revealed that Sonus' positive statements about its business and products were overstated but

continued to mislead investors as to the true condition of the Company's business and products.  The

press release stated in pertinent part as follows:

> The transformation of the world's telecommunications network is well under way
> and presents a major and long-lived opportunity for Sonus," said Hassan Ahmed,
> president and CEO, Sonus Networks.  "While carriers have recently slowed their
> spending as they reassess their business outlook, Sonus offers a powerful value
> proposition.  We continue to lead the market with innovative technologies, a
> marquee customer base and strong competitive position, and we maintain our focus
> on broadening our leadership.  Our view of the long-term opportunity has not
> changed."

Defendants reiterated that:

> Sonus Networks, Inc. is a leading provider of voice infrastructure products for the
> new public network.  Sonus' solutions enable service providers to deploy an
> integrated network capable of carrying both voice and data traffic, and to deliver a
> range of innovative, new services.  The Sonus Open Services Architecture (OSA)
> and award-winning Packet Telephony suite cut the time-to-market for competitive

new service products, allowing carriers and third-party developers to expand marketshare and build important new revenue streams.  Its highly scalable products fully interoperate with and extend the life and utility of today's public network. Sonus embodies in its management and staff decades of experience in developing carrier-class voice, data and multimedia solutions for implementation in the world's largest networks.  [Emphasis added.]

These partial disclosures were themselves materially false and misleading for the reasons stated in

¶¶45-47, 52-53 and 58.  In response to this announcement, the price of Sonus common stock

declined precipitously, falling from $6.40 per share to $2.88 per share on extremely heavy trading

volume of nearly 50 million shares.  Sonus common stock, however, continued to trade at artificially

inflated levels as Defendants continued to overstate the Company's products and market position.

140.    On October 11, 2001, Business Wire carried a Company press release titled

"Sonus Networks Reports 2001 Third Quarter Financial Results."  The release stated:

> Sonus ..., a leading provider of voice infrastructure solutions for the new public network, today reported financial results for its third quarter ended September 30,2001.
>
> Revenues for the third quarter of fiscal 2001 were $40.3 million compared with $15.6 million in the same period last year, an increase of 159 percent.  Adjusted net loss for the third quarter of fiscal 2001, which excludes restructuring charges, amortization of goodwill and purchased intangibles, impairment of assets, stock-based compensation and an in-process research and developments charge relating to the purchase of certain assets of Linguateq, Inc. in July 2001, was $11.4 million or $0.06 per share, compared with an adjusted net loss, which excludes stock-based compensation, of $5.4 million or $0.04 per share for the third quarter of fiscal 2000.
>
> Net loss for the third quarter of fiscal 2001, including restructuring charges, amortization of goodwill and purchased intangibles, impairment of assets, stock-based compensation and an in-process research and development charge, was $498.2 million or $2.81 per share, compared with a net loss, including stock-based compensation, of $12.4 million or $0.09 per share for the third quarter of fiscal 2000.
>
> In light of current market conditions, Sonus is aligning its cost structure with its revised business outlook, and as a result, recorded a restructuring charge of $25.8 million in the third quarter of fiscal 2001.  Additionally, Sonus recorded a one-time,

non-cash charge of $376.7 million for the accelerated write-off of goodwill and purchased intangibles related to the acquisition of telecom technologies, inc.  Sonus also recorded non-cash stock-based compensation expense of $25.4 million related to the acceleration of vesting of stock options restricted stock, and retention stock awards held by certain terminated employees.

*      *      *

"The financial results reported today were on track with the revised business outlook we provided in September," said Hassan Ahmed, president and CEO, Sonus Networks.  "We are making the necessary adjustments in our business to improve our near-term financial performance.  Importantly, we will continue to invest in the areas required to make us an excellent partner to our customers and position to us to broaden our leadership in the market for next-generation voice solutions."

*      *      *

"Looking forward, we are confident about the opportunity the packet voice revolution represents and Sonus' ability to lead it," continued Ahmed.  "The advantages that Sonus solutions bring to carriers, in terms of both cost reduction and increased revenue opportunities, remain as powerful as ever.  We continue to lead the market with innovative technologies, a marquee customer base and strong competitive position.  Our view of the long-term opportunity has not changed."

About Sonus Networks

Sonus Networks, Inc. is a leading provider of voice infrastructure products for the new public network.  Sonus' solutions enable service providers to deploy an integrated network capable of carrying both voice and data traffic, and to deliver a range of innovative, new services.  The Sonus Open Services Architecture (TM) (OSA) and award-winning Packet Telephony suite cut the time-to-market for competitive new service products, allowing carriers and third-party developers to expand market share and build important new revenue streams.  Its highly scalable products fully interoperate with and extend the life and utility of today's public network.

141.    The foregoing representations were materially false and misleading in that, among

other things:

(i)      Sonus's products were not carrier-class as they did not have 99.999%

availability, did not provide voice quality as good as circuit-switched networks and did not have

sophisticated network management and configuration capabilities, as detailed in ¶¶45-47 above;

(ii)     Contrary to the representation that "Sonus' solutions enable service providers to deploy an integrated network capable of carrying both voice and data traffic, and to deliver a range of innovative, new services," in truth and in fact, Sonus's products were not capable of carrying voice calls over packet-based networks at the reliability levels required by major carriers, as detailed in ¶¶45-47 above;

(iii)    Contrary to Defendants' representation that Sonus's products "fully interoperate with and extend the life and utility of today's public network," in truth and in fact, Sonus's products did not fully interoperate with the New Public Network because, among other things, they did not meet the relevant performance standards;

(iv)     Contrary to Defendants' representation that Sonus's products met the requirements of the New Public Network, in truth and in fact, they did not, as detailed in ¶¶45-47 above;

(v)      Sonus's "marquee customer base," of which Qwest and BellSouth were the main customers, was procured not on the merit of Sonus's products, but through Sonus's granting of financial incentives to these customers, as alleged above at ¶¶ 52-53; and

(vi)     In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified positive representations lacked a reasonable basis and were contradicted by negative facts known to, or recklessly disregarded by, Defendants.

142.    On November 5, 2001, Defendant Ahmed was interviewed by The Wall Street Transcript.  In that interview, Ahmed discussed Sonus's ability to provide carrier-class equipment.

Ahmed stated:

> Also in the third quarter, we revised our business outlook for the remainder of the year.  We actually revised it down to where it was at the beginning of this year, so we didn't revise downward to a large extent compared to what's been going on in the carrier space in general.  Our revised business outlook is really a reflection of the fact that we think that carrier spending had further deteriorated in the third quarter.  We're being mindful of that; we know this is an important issue, and investors need to pay attention to that as well.  As we look at the longer term outlook, <u>we continue to believe this is a significant market opportunity, and that carriers are still very focused on making the transition to new, packet voice networks, and that Sonus continues to be the number one player in this space. These are all very positive for us.</u>

*       *       *

> <u>The fact that Qwest and BellSouth have moved forward and adopted our technology is a very important milestone in the development of the markets in which we play</u>.

*       *       *

> TWST: What gives you some conviction you're going to be one of the survivors?

> DR. AHMED:  Obviously, from our perspective, that's what we focus our energies on all the time.  One of the things that gives me conviction is that this is very difficult technology, and <u>we have cleared the technology hurdle.  Our equipment works: it works at the level of scale and reliability in the packet world that the voice network has established</u>.  Today, there are really only two ways to build a voice network.  <u>In the packet world, the only supplier who can step up to the demands today is Sonus</u>. And in the circuit world, the only suppliers that can step up to the reliability and scale demands are the incumbent suppliers Lucent and Nortel, in the U.S., for example. There are huge barriers to entry here and I think Sonus has crossed many of those barriers. [Emphasis added.]

143.    The foregoing representations were materially false and misleading in that, among other things:

(i)    Sonus's products were not carrier-class as they did not have 99.999% availability, did not have voice quality as good as circuit-switched networks and did not have sophisticated network management and configuration capabilities, as detailed in ¶¶45-47 above;

(ii)     Contrary to Defendants' representation that Sonus's products met the requirements of the New Public Network, in truth and in fact, they did not, as detailed in ¶¶45-47 above;

(iii)    Contrary to the representations that Sonus had "cleared the technology hurdle," and that "[Sonus's] equipment works; it works at the level of scale and reliability in the packet world that the voice network has established," in truth and in fact, Sonus's products were not capable of carrying voice calls over packet-based networks at the reliability levels required by major carriers, as detailed in ¶¶45-47 above;

(iv)    Defendants failed to disclose the true terms of Sonus's transaction with BellSouth, as detailed above in ¶53, including the financial incentives offered to BellSouth to enter into the transaction;

(v)     Defendants did not disclose that, pursuant to an undisclosed practice of providing financial incentives to customers, the transaction with Qwest, which contributed more than 10% of Sonus's first quarter 2001 revenues, was actually a quid pro quo deal wherein Sonus had to agree to the purchase of a $20 million IRU from Qwest in exchange for an approximately $33 million order from Qwest for Sonus switching equipment, as detailed in ¶52 above; and

(vi)    In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified positive representations lacked a reasonable basis and were contradicted by negative facts known to, or recklessly disregarded by, Defendants.

144.    On November 14, 2001, Sonus filed its Form 10-Q for the third quarter ended September 30, 2001.  The 10-Q was signed by Nill.  The Form 10-Q repeated the Company's

financial results as represented in the Company's earnings press release dated October 11, 2001. The 10-Q stated: "We are a leading provider of voice infrastructure products for the new public network. We offer a new generation of carrier-class switching equipment and software that enable voice services to be delivered over packet-based networks."

145.    The foregoing representations were materially false and misleading in that, among other things:

(i)    Sonus's products were not carrier-class as they did not have 99.999% availability, did not have voice quality as good as circuit-switched networks and did not have sophisticated network management and configuration capabilities, as detailed in ¶¶45-47 above;

(ii)    Contrary to the representation that Sonus "offer[ed] a new generation of carrier-class switching equipment and software that enable voice services to be delivered over packet-based networks," in truth and in fact, Sonus's products were not capable of carrying voice calls over packet-based networks at the reliability levels required by major carriers, as detailed in ¶¶45-47 above; and

(iii)    In light of the foregoing, and other problems adversely affecting the Company's performance and prospects as detailed herein, Defendants' unqualified positive representations lacked a reasonable basis and were contradicted by negative facts known to, or recklessly disregarded by, Defendants.

146.    From November 13-16, 2001, Defendant Ansari sold a total of 1,035,000 shares from her personal holdings of Sonus stock, yielding total proceeds of $5,782,000:

- On November 13, Defendant Ansari sold 300,000 shares in which she had a beneficial ownership interest at a price of $5.11 for proceeds of $1,533,000.

- On November 14, Defendant Ansari sold 35,000 shares in which she had a beneficial

ownership interest at a price of $5.40 for proceeds of $189,000.

- On November 16, Defendant Ansari sold 700,000 shares in which she had a beneficial ownership interest at a price of $5.80 for proceeds of $4,070,000.

147. From December 6 through 12, 2001, Defendant Ansari sold a total of 378,000

shares of her personal holdings of Sonus, for total proceeds of $2,558,100:

- On December 6, Defendant Ansari sold 100,000 shares at a price of $6.19 per share for proceeds of $619,000.

- On December 7, Defendant Ansari sold 175,000 shares at a price of $6.89, 70,000 shares at $7.21 per share and 8,000 shares at $7.05 per share for total proceeds of $1,766,850.

- On December 12, Defendant Ansari sold 25,000 shares at a price of $6.89 per share for proceeds of $172,250.

148. Further evidencing that the products Sonus had been providing to Qwest were not

meeting Qwest's requirements, ultimately, Qwest opted to purchase traditional circuit switches from

Nortel, a competitor of Sonus, because it found Nortel switches to be superior, and because Sonus's

products were not capable of replacing traditional switches.

**The Truth Ultimately Emerges**

149. On January 16, 2002, the last day of the Class Period, Sonus announced

disappointing fourth quarter and year-end 2001 results in a release issued after the close of the

market, which stated in part:

> Revenues for the fourth quarter of fiscal 2001 were $38.9 million compared with $28.6 million for the same period last year, an increase of 36 percent. Adjusted net loss for the fourth quarter of fiscal 2001 was $7.7 million or $0.04 per share, excluding an adjustment of a previous write-off of goodwill and purchased intangibles of $2.0 million, amortization of goodwill and purchased intangibles of $0.5 million and stock-based compensation of $7.2 million, compared with adjusted net income for the fourth quarter of fiscal 2000 of $0.1 million or $0.00 per share excluding stock-based compensation of $6.4 million.

> Actual net loss for the fourth quarter of fiscal 2001 was $13.4 million of $0.07 per share, including an adjustment of a previous write-off of good will and purchased intangibles, amortization of good will and purchased intangibles and stock-based compensation, compared with an actual net loss for the fourth quarter of fiscal 2000 of $6.3 million or $0.04 per share, including stock-based compensation.

Revenues for the year were just $173 million, compared to Class Period estimates exceeding $200 million.

150.    Tellingly, the Company also changed its standard section titled "About Sonus Networks."  This section no longer claimed that Sonus provided "carrier-class" products, nor did it continue to claim that Sonus' s products "enable[d] service providers to deploy an integrated network capable of carrying both voice and data traffic" as previously represented.  Thus, Sonus now stated:

> About Sonus Networks
>
> Sonus Networks, Inc., is a leading provider of packet voice infrastructure products for the new public network.  With its Open Services Architecture(TM)(OSA), Sonus delivers end-to-end solutions addressing a full range of carrier applications, including trunking, residential access and Centrex, tandem switching, and IP voice termination, as well as enhanced services.  Sonus' award-winning voice infrastructure solutions, including media gateways, softswitches and network management systems, are deployed in service provider networks worldwide.

Nor, notably, did the release tout the deployment of the Sonus INtelligentIP softswitch, acquired from TTI, into Qwest any longer, or the benefits of the TTI acquisition, as Sonus had previously done throughout the Class Period (*e.g.*, ¶¶ 94, 96, 114), or even mention the INtelligentIP switch among its products, even though it listed Sonus' other products such as the GSX9000 Switch, the Insignus Softswitch, the ASX Access Server and PSX Policy Server modules, and the Sonus Insight Management System elsewhere in the release (nor was the INtelligentIP softswitch mentioned in Company's suite of products in the Sonus Form 10-K filed thereafter associated with this release).

151.    On January 16, 2002, J.P. Morgan downgraded Sonus to market perform from long-term buy and cut its 2002 estimates to $151 million and $(0.14) from $190 million and $(0.07).

152.    The next day, Sonus stock dropped from a close of $4.92 per share on January 16 to a close of $4.41 on January 17, on heavy trading volume of 20.8 million shares.

153.    Later, on April 9, 2002, Sonus reported its horrible first quarter 2002 results:

Sonus Networks, Inc., a leading provider of voice infrastructure solutions for the new public network, today reported its actual financial results for the first quarter ended March 31, 2002.  These results are consistent with the estimated results the Company provided on March 27, 2002.

Revenues for the first quarter of fiscal 2002 were $21.2 million compared with $41.5 million in the same period last year.  Adjusted net loss for the first quarter of fiscal 2002 was $12.8 million or $0.07 per share compared with adjusted net income for the first quarter of fiscal 2001 of $0.2 million or $0.00 per share. Actual net loss for the first quarter of fiscal 2002 was $16.2 million or $0.09 per share compared with an actual net loss for the first quarter of fiscal 2001 of $82.5 million or $0.51 per share.

154.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.   Defendants' material misrepresentations and omissions, as set forth above, included those regarding the quality and customers' acceptance of Sonus' products, especially in face of a downturn in its customers' industry, which defendants falsely denied was materially affecting Sonus, but rather, claimed was to its benefit.  Sonus' disappointing fourth quarter and year-end 2001 shortfalls in revenue and earnings were due in substantial part to the fact that Sonus' switches were not carrier class as Defendants had claimed and had therefore not gained market acceptance or generated revenues from the more lucrative market for carrying voice traffic as Defendants had represented during the Class Period, but rather were relegated to much less profitable functions such as internet offloading.  The

January 16, 2002 release and the poor earnings results issued by Sonus at the end of the Class Period reflected to the investing public that such lucrative market acceptance had not occurred. Moreover, the only reason Sonus was able to gain such major customers as Qwest and BellSouth and book such revenues as it did was that Defendants offered undisclosed substantial financial inducements to their biggest customers during this period, *i.e.*, Qwest and BellSouth, which made those highly touted contracts far less valuable to Sonus.

155. Defendants' material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Sonus and its business, operations, performance, products, and prospects, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements and omissions during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices that did not reflect the stock's true value, thus causing the damages complained of herein.

## LOSS CAUSATION/ECONOMIC LOSS

156. The material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.

157. As described herein, during the Class Period, Defendants engaged in the fraudulent scheme, and made or caused to be made a series of materially false or misleading statements about Sonus' business, prospects and operations.

158. The scheme, including the material misstatements and omissions, had the cause and effect of creating in the market an unrealistically positive assessment of Sonus and its business,

prospects and operations, thus causing the Company's securities to be overvalued and artificially inflated during the Class Period. Defendants' scheme, including the materially false and misleading statements during the Class Period, resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices.

159.     Defendants' fraudulent conduct caused the damages complained of herein when the price of Sonus common stock subsequently declined 55%, from $6.40 per share to $2.88 per share, following Defendants' September 26, 2001 announcement which partially revealed that Defendants had overstated the Company's products and business and 10%, from $4.92 per share to $4.41 per share when on January 16, 2002, Sonus admitted, among other negative adverse facts, that its products were not carrier-class.

160.     As a result of these revelations, and the corresponding drop in the price of Sonus' stock, investors suffered real economic loss.

161.     Further, the timing and magnitude of Sonus' stock price decline negates any inference that the loss suffered by Plaintiff and other Class members was caused by changed market conditions, microeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiff and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate Sonus' stock price as alleged herein and the subsequent significant decline in the value of Sonus' stock when the true state of the Company's operations and finances were revealed to the market and investors as alleged above.

## **INSIDER TRADING**

162.     The Individual Defendants benefitted personally and directly from the artificial

inflation of Sonus stock by selling a total of more than 6.4 million shares of Sonus stock from their personal holdings for proceeds of almost $160 million.  Each of the Defendants sold the following amounts of their Sonus stock during the Class Period:

| Name | Shares Sold | Proceeds |
|------|-------------|----------|
| Ahmed | 807,450 | $23,491,373 |
| Anderson | 292,000 | $8,388,204 |
| Ansari | 2,111,000 | $26,333,630 |
| Gruber | 782,475 | $22,871,302 |
| Hluchyj | 854,475 | $25,671,230 |
| Mayersohn | 486,000 | $15,281,617 |
| Nill | 468,000 | $15,241,952 |
| Rogers | 431,474 | $13,919,815 |
| Winiarski | 254,000 | $7,568,093 |
| **Totals** | **6,486,874** | **$158,767,218** |

163.    The individual Class Period sales by each Defendant are set forth in the tables attached hereto as Exhibit "A" which constitutes a part of this Complaint and is incorporated herein.

164.    Defendants' sales of Sonus shares were highly suspicious and unusual in that, among other things:

(i)    The amounts of the sales were massive, both in dollar terms and in terms of the  numbers of shares sold;

(ii)    The timing of the sales by different Defendants was highly coordinated. On 21 different days during the Class Period, at least five of the Individual Defendants sold substantial amounts of stock;

(iii)    Defendants purchased either minimal amounts of Sonus stock or none at all during the Class Period.  The only purchases were made on January 31, 2001 by Defendants Hluchyj, Mayersohn, Mill and Rogers, each of whom purchased just 3,260 shares.  Defendants Anderson, Ahmed, Ansari, Gruber and Winiarski purchased no Sonus stock whatsoever during the

Class Period;

(iv)     Defendants sold very little, if any, Sonus stock before or after the Class Period.  Before the Class Period, Defendants sold a total of 59,000 shares of Sonus stock, as compared to sales of 6,525,374 shares during the Class Period.  Five of the nine Individual Defendants sold no stock at all before the Class Period;

(v)     Since the end of the Class Period, none of the Individual Defendants have sold any Sonus stock, except for a sale of 65,584 shares by Anderson on July 18, 2003; and

(vi)     Defendants' sales occurred within days of Defendants' public statements complained of herein, as detailed above.

## ADDITIONAL SCIENTER ALLEGATIONS

165.     As alleged herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements complained of herein were materially false and misleading; knew or recklessly disregarded that such statements and documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violators of the federal securities laws.  As set forth herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding Sonus, their control over and receipt of Sonus's materially false and misleading misstatements, and their associations with the Company which made them privy to confidential proprietary information concerning the Company, were active, culpable, and primary participants in the fraudulent scheme alleged herein.  The Individual Defendants knew or recklessly disregarded the materially false and misleading nature of the information they caused to be disseminated to the investing public.

166.    Defendants also knew or recklessly disregarded that the misleading statements and omissions complained of herein would adversely affect the integrity of the market for the Company's common stock and would cause the price of the Company's common stock to be artificially inflated.  Defendants acted knowingly or in such a reckless manner as to constitute a fraud and deceit upon Plaintiff and other members of the Class.

167.    In addition to the foregoing and other facts alleged herein, the following facts provide compelling evidence that Defendants acted with actual knowledge, or, at the very least, with extreme recklessness.

168.    Defendants had a powerful motive to inflate the price of Sonus's stock.  As detailed above, the Individual Defendants benefitted personally from the artificial inflation of Sonus stock by selling a total of more than 6.4 million shares of Sonus stock from their personal holdings for proceeds of $158 million.  As detailed above, these sales were highly suspicious and unusual, and were timed to take maximum advantage of Defendants' false and misleading statements about Sonus's performance, products and prospects.

169.    In addition, Defendants used 221,753 shares of newly-issued Sonus common stock as consideration for the July 2001 purchase of certain assets of Linguateq.  By inflating Sonus's stock price, Defendants were able to effect the transaction using fewer shares of stock which, in turn, reduced the dilutive effect resulting from the issuance of new shares.

170.    Defendants were also motivated to misrepresent the Company's financial condition and performance in order to attract and keep large carrier customers.  Defendants knew that, in order to get contracts, they needed to show the large carriers that Sonus was a viable company that would exist in the future to build networks.

171.    Defendants were further motivated to inflate Sonus stock price in order to protect its critical relationship with BellSouth, which accounted for several million dollars in revenues during 2001, as well as the Company's relationship with any other customers with which it had similar arrangements.  As detailed above in ¶¶53 and 137, Sonus had granted BellSouth the right to convert its debt into Sonus stock if the price hit $30.  This conversion factor was potentially worth many millions of dollars to BellSouth.

172.    The Individual Defendants were senior executive officers and directors of Sonus and were intimately involved with and had direct responsibility with respect to important issues affecting the Company's business, operations, products, performance, and prospects.

173.    As detailed above, Defendants were kept informed on an ongoing basis, including by e-mail, and participated in discussions with respect to the serious problems affecting the Company's business, products, performance, and prospects. For example,

(i)    During the Class Period, Confidential Source 1 alerted senior management at Sonus of the fact that the Sonus softswitch repeatedly failed the 72 hour soak test and therefore could not be considered carrier-class, by providing computer printouts showing the failing test results to the Sonus team, which included Warren Senecal, the senior manager, who passed along such reports to his superiors;

(ii)    Confidential Source 11 alerted Sonus' senior executive management that the TTI softswitch Sonus had acquired was "basically smoke and mirrors" and a dismal failure, did not function, had no speed and capacity and thus could not be considered carrier class, and stated that the problems with the softswitch were discussed in frequent meetings attended by senior executives at Sonus' corporate offices in Westford, MA, including Defendants Rogers, Mayersohn, Winiarski

and frequently Defendants Ahmed, Hluchyj and Nill, and that he personally discussed the problems outside these meetings with, among others, Defendants Gruber and Mayersohn; according to Source 11, the Sonus senior executives "were very involved and were very aware of what was going on," a fact echoed by Source 7;

(iii)     Confidential Source 12 confirmed that there were frequent meetings and calls about the softswitch problems with respect to Qwest, monthly, weekly, and even daily, as this was a major project for Qwest and Sonus/TTI and Sonus' largest account, and that Sonus/TTI's senior executives knew about the problems with the softswitch as they would frequently meet with Sonus personnel regarding such problems in person.

(iv)     According to Confidential Source 6, e-mails were sent during the Class Period to upper management detailing the problems with the Sonus softswitch;

(v)     Confidential Source 11 confirmed that he personally sent emails about the trouble with the Qwest account due to the problems with Sonus' softswitch to Sonus senior executives, including Defendants Mayersohn and others, and recalled seeing Defendants Ahmed and Hluchyj on other emails concerning the problems.  Source 11 stated that there were "tons of emails flying back and forth between Texas and [Sonus headquarters in] Massachusetts about the problems", and that Sonus maintained a comprehensive bug tracking system to document the problems, a fact also confirmed by Source 2.

(vi)     Confidential Source 13 also stated that he had sent emails regarding the problems with the Sonus softswitch to senior executives including Defendant Rogers, and Sonus' Vice President of Marketing, who reported directly to Defendant Ahmed, and spoke with them personally about the problems.  Source 13 stated that as a matter of practice any time there was a

complaint or comment from a customer regarding Sonus' product it would be passed along via e-mail and tracked to make sure there was follow-up.  Source stated that Defendant Rogers was regularly copied on such emails.

(vii)      According to Confidential Source 7, all the top Sonus executives, including Defendants Ahmed, Hluchyj, Nill, Rogers, Mayersohn, Winiarski, Gruber and Ansari, were always present at the semi-annual sales meetings, which were held in Westford, MA.  One meeting would be held in January and another in the summer.  During those meetings, problems with Sonus's products were discussed, and representatives from the Marketing Department would discuss how they would have to market the switch when certain features did not work.  Confidential Source 11 confirmed that the top executives attended these Winter and Summer sales meetings.  He also confirmed that the problems with the softwitch were discussed at these meetings and that Sonus employees were told to work around them and tell customers what they needed to satisfy them.  Source 14 stated that Defendant Rogers was among the most vocal at the meetings who would tell the Sonus people at the meetings to sell the product as if it had all the features required by the customer, even though it did not have them.  Confidential Source 13 also stated that all the Sonus senior executives attended the Sales meetings in Westford, and that discussions took place between the Sonus executives and the sales and marketing personnel regarding the problems and limitations of the Sonus softswitches, and the importance of selling around the problems or features that the softswitches did not have.

174.      The Individual Defendants clearly had the expertise and experience to understand the problems affecting the Company's key products.

175.      Certain of the Individual Defendants had business relationships prior to their

association at Sonus.  Defendants Ahmed and Hluchyj worked at Motorola Codex prior to joining

Sonus.  Defendants Gruber and Nill both worked at VideoServer, Inc. (now known as "ezenia!").

Defendants Gruber and Mayersohn were both at BBN Communications Corp.

176.    Sonus had few products.  According to Sonus's 2000 Form 10-K, the "Sonus

solution consists of five carrier-class products."  These were:  the GSX9000 Open Services Switch;

the PSX6000 SoftSwitch; the INtelligentIP softswitch; the SGX2000 SS7 Signaling Gateway; and

the System 9200 Internet offload solution. The products at issue in this action, especially the

GSX9000 Open Services Switch, were critical to the Company's overall performance and prospects.

The other main Sonus product, the INtelligentIP softswitch, was purportedly the entire focal point

of the TTI acquisition.

177.    Sonus had relatively few customers.  A September 18, 2001 report by UBS

Warburg stated:  "The Company still relies heavily on a small concentration of customers in any

given quarter." In its 2000 10-K, Sonus stated it had only eleven announced customers.  Those at

issue in this action, including Qwest and BellSouth, which, together accounted for 50% of the

Company's overall revenue in the fourth quarter of 2001, were critical to the Company's business.

Consequently, as officers and directors of Sonus, the Individual Defendants would likely have

known about a major product problem affecting Sonus's relationship with Qwest.  According to

Confidential Source 12, Qwest was TTI's and later Sonus' largest account, and the Qwest project

was a major project for Sonus, thus, Sonus/TTI's senior executives kept close tabs on the projects

through, among other things, in-person meetings with Sonus personnel working on the project.

Similarly, according to Confidential Source 13, Qwest was Sonus' largest customer and drove

everything Sonus did, with Sonus giving it priority over all other customers.

178.    The Company's transactions with BellSouth and Qwest, which are described herein, were in dollar terms extremely large and were highly important to the Company's performance and prospects.  According to a report issued by C.E. Unterberg, Towbin on January 17, 2002, Qwest and BellSouth were 10% customers in fourth quarter 2001 and together represented over 50% of Sonus' revenue.

179.    On July 28, 2004, Sonus filed a Form 10-K/A restating earnings for 2001, and periods thereafter.  Sonus admitted that it had prematurely recognized revenue during 2001 for product not fully delivered or accepted by a customer and thus not earned or recognizable, and stated: "[w]e have deferred revenues of $36.7 million previously reported in 2001 from a particular customer transaction."  That customer was Qwest.  Two days later, Defendant Nill resigned.

180.    The problems affecting the Company's products were of such a nature and severity, as specified above, as to compel an inference of knowledge on the part of Defendants.

181.    In December 2001, Defendant Ansari, head of TTI and Sonus' INtelligentIP division, left Sonus altogether.

182.    As indicated above, during the Class Period, Sonus had direct communications with one of its most significant customers, Qwest, in which Sonus agreed to upgrade the switches previously sold to Qwest because they did not meet Qwest's standards.

183.    Defendants' representations concerning the quality and capabilities of the Company's key products, including, among others, that the products were carrier-class, were directly contradicted by the true facts, as set forth herein.

184.    Defendants' own documents, including but not limited to Sonus's 2000 10-K, plainly evidence a clear understanding of the requirements of the New Public Network.

185.    Defendants had the opportunity to commit the fraud alleged.  As the top officers and directors of Sonus, Defendants controlled the dissemination of, and could thereby falsify, information about Sonus's business, performance, products, and prospects that reached the investing public and affected the price of Sonus stock.  Defendants controlled the content of Sonus's press releases, corporate reports, SEC filings, and other public statements, which were created, reviewed, and approved by Defendants.

186.    In addition, further evidence that Defendants, the senior officers and directors of Sonus, were motivated by a common scheme to enrich themselves through fraudulent activity and misrepresentations and omissions during the Class Period is provided by Sonus's recent admission that Sonus had backdated options granted to senior management during 2000-2003.  On November 6, 2006, Sonus announced that "the appropriate measurement dates for financial accounting purposes of certain stock option grants, primarily in fiscal years 2000 to 2003, differ from the recorded grant dates of those awards."  Sonus stated that, while it had not yet determined the amount of the non-cash, stock-based compensation charges or related tax impact resulting from these changes, it had concluded that such charges will be material with respect to certain fiscal periods and require restatement of certain historical financial statements.  The Company stated that it was still reviewing which specific periods will require restatement, and had that day filed a Form 8-K with the SEC "stating that the financial statements, related notes and selected financial data and all financial press releases and similar communications issued by the Company and the related reports of independent registered public accounting firms relating to fiscal periods 2000 through 2005 and the first and second quarters of 2006 should no longer be relied upon."  On February 28, 2007, Sonus announced as part of its fourth quarter earnings release, that it still has not completed its

review, it is unable to file timely its Form 10-K for the year ended December 31, 2006, and that it

expects to receive a notice of formal order of investigation from the SEC concering the options

backdating.  These additional facts bolster the already strong inference of the fraudulent intent of

Defendants' conduct during the Class Period herein.

## FRAUDULENT SCHEME AND COURSE OF BUSINESS

187.    Defendants are liable for (i) making false statements and (ii) failing to disclose

adverse facts about Sonus's business, performance, products and prospects.  Defendants' fraudulent

scheme and course of business operated as a fraud and deceit on purchasers of Sonus's common

stock and was a success, as it:   (i) deceived the investing public regarding Sonus's business,

performance, products and prospects; (ii) artificially inflated and maintained the trading price of

Sonus common stock; (iii) permitted the Individual Defendants to sell 6.4 million of their Sonus

stock at inflated prices, reaping $158 million in illicit insider trading proceeds; (iv) permitted Sonus

to acquire the principal assets of Lingateq using artificially inflated Sonus stock as currency; and

(v) caused Plaintiff and other members of the Class to purchase Sonus common stock at inflated

prices.

## STATUTORY SAFE HARBOR

188.    The federal statutory safe harbor provided for forward-looking statements under

certain circumstances does not apply to any of the allegedly false statements pleaded in this

Complaint.  Further, none of the statements pleaded herein which were forward-looking statements

were appropriately identified as "forward-looking statements" when made.  Nor was it appropriately

stated that actual results "could differ materially from those projected."  Nor were the forward-

looking statements pleaded accompanied by meaningful cautionary statements identifying important

factors that could cause actual results to differ materially from the statements made therein. Defendants are liable for the forward-looking statements pleaded because, at the time each of those forward-looking statements was made, the speaker knew the forward-looking statement was false and the forward-looking statement was authorized and/or approved by an executive officer of Sonus who knew that those statement were false when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

189.    At all relevant times, the market for Sonus common stock was an efficient market for the following reasons, among others:

(a)    Sonus common stock met the requirements for listing and was listed and actively traded on the NASDAQ National Market System, a highly efficient market;

(b)    As a regulated issuer, Sonus filed periodic and other public reports with the SEC;

(c)    Sonus stock was followed by securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and customers of their respective brokerage firms.  These reports were publicly available and entered the public marketplace; and

(d)    Sonus regularly issued press releases that were carried by national news wires.  These releases were publicly available and entered the public marketplace.

190.    As a result, the market for Sonus common stock promptly digested current information with respect to Sonus from all publicly-available sources and reflected such information in Sonus's stock price.  Under these circumstances, all purchasers of Sonus common stock during the Class Period suffered similar injury through their purchase of such stock at artificially inflated prices and a presumption of reliance applies.

## COUNT I

### FOR VIOLATIONS OF §10(b) OF THE 1934 ACT
### AND RULE 10b-5 AGAINST ALL DEFENDANTS

191.    Plaintiff incorporates ¶¶ l-190.  This Count is asserted against all Defendants.

192.    During the Class Period, Defendants, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and the mails, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Sonus common stock; and (iii) cause Plaintiff and other members of the Class to purchase Sonus stock at artificially inflated prices that did not reflect the stock's true value.  In furtherance of this unlawful scheme, plan and course of conduct, Sonus and the Individual Defendants took the actions set forth herein.

193.    Defendants:  (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock and the marketplace in an effort to maintain an artificially high market price for Sonus common stock in violation of §10(b) of the 1934 Act and Rule 10b-5.  Sonus and the Individual Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued herein as controlling persons of Sonus, as alleged below.

194.    In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or their participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful

information that would be material to investors in compliance with the integrated disclosure provisions of the SEC, as embodied in SEC Regulation S-X (17 C.F.R. §210.01 *et seq.*) and S-K (17 C.F.R. §229.10 *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's business operations, financial condition, performance, products and prospects so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

195.   Defendants also had a duty of disclosure arising from their sales of Sonus stock during the Class Period.

196.   Defendants had actual knowledge of the misrepresentations and omissions of material facts complained of herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were readily available to them. Defendants' material misrepresentations and omissions were done knowingly or recklessly and for the purpose and effect of concealing the truth regarding Sonus' business, operations, performance, products, and prospects from the investing public, and supporting the artificially inflated price of its stock.

197.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Sonus common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of Sonus shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period,

Plaintiff and other members of the Class purchased Sonus common stock during the Class Period at artificially inflated high prices and were damaged thereby upon disclosure of the true facts.

198.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and other members of the Class and the marketplace known the truth regarding the business, operations, performance, products, prospects, and intrinsic value of Sonus, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased Sonus stock during the Class Period, or, if they had acquired such stock during the Class Period, they would not have done so at the artificially inflated prices they paid.

199.    By virtue of the foregoing, Defendants each violated §10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

200.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class have suffered damages in connection with their purchases of the Company's stock during the Class Period.

<u>COUNT II</u>

**FOR VIOLATIONS OF §20(a) OF THE
<u>1934 ACT AGAINST THE INDIVIDUAL DEFENDANTS</u>**

201.    Plaintiff incorporates ¶¶1-200.  This Count is asserted against the Individual Defendants.

202.    Defendants were, and acted as, controlling persons of Sonus within the meaning of §20(a) of the 1934 Act as alleged herein.  By virtue of their high-level positions with the Company, participation in and awareness of the Company's operations and business, and intimate knowledge of the Company's actual performance, they had the power to influence and control, and

did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements Plaintiff contends are materially false and misleading.  Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements complained of herein prior to or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

203.    In addition, Defendants had direct involvement in the day-to-day operations of the Company at the highest levels and, therefore, were presumed to have had the power to control or influence the particular acts and transactions giving rise to the securities violations alleged herein, and exercised the same.

204.    As set forth above, Defendants Sonus, Ahmed, Hluchyj, Nill, Rogers, Mayersohn, Winiarski, Gruber, Anderson, and Ansari each violated §10(b) of the 1934 Act and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons of Sonus, Defendants Ahmed, Hluchyj, Nill, Rogers, Mayersohn, Winiarski, Gruber, Anderson, and Ansari also are liable pursuant to §20(a) of the 1934 Act.

205.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class have suffered damages in connection with their purchases of the Company's stock during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the Class, prays for judgment as follows:

(i)    Determining that this action is a proper class action under Rule 23 of the

Federal Rules of Civil Procedure;

       (ii)    Awarding Plaintiff and members of the Class damages in an amount to be determined at trial, together with interest thereon;

       (iii)    Awarding Plaintiff and members of the Class pre-judgment and post-judgment interest, as allowed by law, as well as attorneys' and experts' fees and other costs; and

       (iv)    Awarding such other and further relief as this Court may deem just and proper including any extraordinary equitable and/or injunctive relief as permitted by law or equity to attach, impound or otherwise restrict the Defendants' assets to assure Plaintiff has an effective remedy.

## **JURY DEMAND**

       Plaintiff demands a trial by jury.

DATED:  March 5, 2007

                                       /s/ Andrew E. Lencyk

Marian P. Rosner (Admitted Pro Hac Vice)
Andrew E. Lencyk (Admitted Pro Hac Vice)
WOLF POPPER LLP
845 Third Avenue
New York, New York  10022
Tel:  (212) 759-4600
Fax: (212) 486-2093

*Counsel for Lead Plaintiff Public Employees' Retirement System of Mississippi and Lead Counsel for the Class*

**EXHIBIT A**

**INDIVIDUAL DEFENDANTS' SALES OF SONUS STOCK
DURING THE CLASS PERIOD**

Defendant Ahmed made the following sales during the Class Period:

| Date | Number of Shares Sold | Per Price Share | Proceeds |
|---|---|---|---|
| 12/12/2000 | 28,000 | $ 37.66 | $1,054,480 |
| 01/23/2001 | 57,800 | 38.62 | 2,232,236 |
| 01/24/2001 | 5,800 | 40.83 | 236,814 |
| 01/29/2001 | 8,400 | 39.39 | 330,876 |
| 02/12/2001 | 4,950 | 34.94 | 172,941 |
| 03/06/2001 | 160,000 | 29.96 | 4,794,032 |
| 03/07/2001 | 12,000 | 29.96 | 359,476 |
| 03/13/2001 | 28,000 | 24.91 | 697,598 |
| 04/16/2001 | 27,500 | 20.59 | 566,129 |
| 04/25/2001 | 27,500 | 23.58 | 648,502 |
| 05/01/2001 | 27,500 | 26.13 | 718,548 |
| 05/07/2001 | 27,500 | 29.85 | 820,875 |
| 05/16/2001 | 200,000 | 28.65 | 5,729,460 |
| 05/17/2001 | 27,500 | 31.18 | 857,365 |
| 05/22/2001 | 27,500 | 32.13 | 883,616 |
| 05/29/2001 | 27,500 | 29.46 | 810,092 |
| 06/04/2001 | 27,500 | 27.41 | 753,775 |
| 07/16/2001 | 27,500 | 23.05 | 633,999 |
| 07/25/2001 | 27,500 | 20.33 | 559,100 |
| 08/01/2001 | 27,500 | 22.96 | $631,461 |
| **Totals** | **807,450** | | **$23,491,375** |

Defendant Anderson made the following sales during the Class Period:

| Date | Number of Shares Sold | Per Price Share | Proceeds |
|------|-----------------------|-----------------|----------|
| 02/27/2001 | 35,000 | $ 31.02 | $1,085,627 |
| 02/27/2001 | 35,000 | 31.02 | 1,085.627 |
| 03/01/2001 | 45,000 | 31.17 | 1,402,502 |
| 03/01/2001 | 45,000 | 31.17 | 1,402,502 |
| 04/16/2001 | 5,500 | 20.87 | 114,758 |
| 04/16/2001 | 5,500 | 20.59 | 113,226 |
| 04/25/2001 | 5,500 | 23.58 | 129,700 |
| 04/25/2001 | 5,500 | 23.58 | 129,700 |
| 05/01/2001 | 5,500 | 26.13 | 143,710 |
| 05/01/2001 | 5,500 | 26.13 | 143,710 |
| 05/07/2001 | 5,500 | 29.85 | 164,175 |
| 05/07/2001 | 5,500 | 29.85 | 164,175 |
| 05/17/2001 | 5,500 | 31.18 | 171,473 |
| 05/17/2001 | 5,500 | 31.18 | 171,473 |
| 05/22/2001 | 5,500 | 32.13 | 176,723 |
| 05/22/2001 | 5,500 | 32.13 | 176,723 |
| 05/29/2001 | 5,500 | 29.46 | 162,018 |
| 05/29/2001 | 5,500 | 29.46 | 162,018 |
| 06/04/2001 | 5,500 | 27.41 | 150,755 |
| 06/04/2001 | 5,500 | 27.41 | 150,764 |
| 07/16/2001 | 5,500 | 23.05 | 126,800 |
| 07/16/2001 | 5,500 | 23.05 | 126,800 |
| 07/25/2001 | 5,500 | 20.33 | 111,820 |
| 07/25/2001 | 5,500 | 20.33 | 111,820 |
| 08/01/2001 | 5,500 | 22.96 | 126,292 |
| 08/01/2001 | 5,500 | 22.96 | 126,292 |
| 08/06/2001 | 5,500 | 23.37 | 128,511 |
| 08/06/2001 | 5,500 | 23.37 | $128,511 |
| **Totals** | **292,200** | | **$8,388,204** |

Defendant Ansari made the following sales during the Class Period:

| Date | Number of Shares Sold | Per Price Share | Proceeds |
|---|---|---|---|
| 01/31/2001 | 25,000 | $ 43.19 | $1,079,750 |
| 03/06/2001 | 52,400 | 30.00 | 1,572,105 |
| 03/06/2001 | 16,550 | 30.00 | 496,533 |
| 03/06/2001 | 11,050 | 30.00 | 331,522 |
| 04/18/2001 | 27,000 | 23.44 | 632,880 |
| 04/19/2001 | 100,000 | 24.77 | 2,477,000 |
| 04/19/2001 | 88,900 | 24.77 | 2,202,053 |
| 04/19/2001 | 11,100 | 24.77 | 274,947 |
| 08/03/2001 | 183,000 | 24.39 | 4,463,370 |
| 08/03/2001 | 183,000 | 24.39 | 4,463,370 |
| 11/13/2001 | 300,000 | 5.11 | 1,533,000 |
| 11/14/2001 | 35,000 | 5.40 | 189,000 |
| 11/16/2001 | 395,691 | 5.80 | 2,295,008 |
| 11/16/2001 | 304,309 | 5.80 | 1,764,992 |
| 12/06/2001 | 50,000 | 6.19 | 309,500 |
| 12/06/2001 | 50,000 | 6.19 | 309,500 |
| 12/07/2001 | 125,000 | 6.89 | 861,250 |
| 12/07/2001 | 70,000 | 7.21 | 504,700 |
| 12/07/2001 | 50,000 | 6.89 | 344,500 |
| 12/07/2001 | 8,000 | 7.05 | 56,400 |
| 12/12/2001 | 25,000 | 6.89 | 172,250 |
| **Totals** | **2,111,000** | | **$26,333,630** |

Defendant Gruber made the following sales during the Class Period:

| Date | Number of Shares Sold | Per Price Share | Proceeds |
|------|------|------|------|
| 12/12/2000 | 28,000 | $ 37.66 | $1,054,480 |
| 01/23/2001 | 57,800 | 38.62 | 2,232,236 |
| 01/24/2001 | 5,800 | 40.83 | 236,814 |
| 01/29/2001 | 8,400 | 39.39 | 330,876 |
| 02/12/2001 | 52,475 | 34.94 | 1,833,345 |
| 03/06/2001 | 80,000 | 29.96 | 2,397,016 |
| 03/07/2001 | 6,500 | 29.96 | 194,716 |
| 03/13/2001 | 13,500 | 24.91 | 336,342 |
| 04/16/2001 | 27,500 | 20.59 | 566,129 |
| 04/25/2001 | 27,500 | 23.58 | 648,502 |
| 05/01/2001 | 27,500 | 26.13 | 718,548 |
| 05/07/2001 | 27,500 | 29.85 | 820,875 |
| 05/16/2001 | 200,000 | 28.65 | 5,729,460 |
| 05/17/2001 | 27,500 | 31.18 | 857,365 |
| 05/22/2001 | 27,500 | 32.13 | 883,616 |
| 05/29/2001 | 27,500 | 29.46 | 810,092 |
| 06/04/2001 | 27,500 | 27.41 | 753,775 |
| 07/16/2001 | 27,500 | 23.05 | 633,999 |
| 07/25/2001 | 27,500 | 20.33 | 559,100 |
| 08/01/2001 | 27,500 | 22.96 | 631,461 |
| 08/06/2001 | 27,500 | 23.37 | <u>$642,557</u> |
| **Totals** | **782,475** | | **$22,871,302** |

Defendant Hluchyj made the following sales during the Class Period:

| Date | Number of Shares Sold | Per Price Share | Proceeds |
|------|------|------|------|
| 12/12/2000 | 28,000 | $ 37.66 | $1,054,480 |
| 01/23/2001 | 57,800 | 38.62 | 2,232,236 |
| 01/23/2001 | 57,800 | 38.62 | 2,232,236 |
| 01/24/2001 | 5,800 | 40.83 | 236,814 |
| 01/24/2001 | 5,800 | 40.83 | 236,814 |
| 01/29/2001 | 8,400 | 39.39 | 330,876 |
| 01/29/2001 | 8,400 | 39.39 | 330,876 |
| 02/12/2001 | 52,475 | 34.94 | 1,833,345 |
| 03/06/2001 | 80,000 | 29.96 | 2,397,016 |
| 03/07/2001 | 6,500 | 29.96 | 194,716 |
| 03/13/2001 | 13,500 | 24.91 | 336,342 |
| 04/16/2001 | 27,500 | 20.59 | 566,129 |
| 04/25/2001 | 27,500 | 23.58 | 648,502 |
| 05/01/2001 | 27,500 | 26.13 | 718,548 |
| 05/07/2001 | 27,500 | 29.85 | 820,875 |
| 05/16/2001 | 200,000 | 28.65 | 5,729,460 |
| 05/17/2001 | 27,500 | 31.18 | 857,365 |
| 05/22/2001 | 27,500 | 32.13 | 883,616 |
| 05/29/2001 | 27,500 | 29.46 | 810,092 |
| 06/04/2001 | 27,500 | 27.41 | 753,775 |
| 07/16/2001 | 27,500 | 23.05 | 633,999 |
| 07/25/2001 | 27,500 | 20.33 | 559,100 |
| 08/01/2001 | 27,500 | 22.96 | 631,461 |
| 08/06/2001 | 27,500 | 23.37 | 642,557 |
| **Totals** | **854,475** | | **$25,671,230** |

Defendant Mayersohn made the following sales during the Class Period:

| Date | Number of Shares Sold | Per Price Share | Proceeds |
|------|------|------|------|
| 12/12/2000 | 35,000 | $ 35.70 | $1,249,360 |
| 01/23/2001 | 51,000 | 38.62 | 1,969,620 |
| 01/23/2001 | 51,000 | 38.62 | 1,969,620 |
| 01/24/2001 | 4,800 | 40.83 | 195,984 |
| 01/24/2001 | 4,800 | 40.83 | 195,984 |
| 01/29/2001 | 9,200 | 39.39 | 362,388 |
| 01/29/2001 | 9,200 | 39.39 | 362,388 |
| 03/06/2001 | 80,000 | 29.96 | 2,397,016 |
| 03/07/2001 | 6,500 | 29.96 | 194,716 |
| 03/13/2001 | 13,500 | 24.91 | 336,342 |
| 04/16/2001 | 11,000 | 20.59 | 226,452 |
| 04/25/2001 | 11,000 | 23.28 | 256,101 |
| 05/01/2001 | 11,000 | 26.13 | 287,419 |
| 05/07/2001 | 11,000 | 29.85 | 328,350 |
| 05/16/2001 | 100,000 | 28.65 | 2,864,730 |
| 05/17/2001 | 11,000 | 31.18 | 342,946 |
| 05/22/2001 | 11,000 | 32.13 | 353,447 |
| 05/29/2001 | 11,000 | 29.46 | 324,037 |
| 06/04/2001 | 11,000 | 27.41 | 301,510 |
| 07/16/2001 | 11,000 | 23.05 | 253,600 |
| 08/01/2001 | 11,000 | 22.96 | 252,584 |
| 08/06/2001 | 11,000 | 23.37 | 257,023 |
| **Totals** | **486,000** | | **$15,281,617** |

Defendant Nill made the following sales during the Class Period:

| Date | Number of Shares Sold | Per Price Share | Proceeds |
|------|------------|-----------------|----------|
| 12/12/2000 | 28,000 | $ 37.66 | $1,054,480 |
| 01/23/2001 | 57,800 | 38.62 | 2,232,236 |
| 01/23/2001 | 57,800 | 38.62 | 2,232,236 |
| 01/24/2001 | 5,800 | 40.83 | 236,814 |
| 01/24/2001 | 5,800 | 40.83 | 236,814 |
| 01/29/2001 | 8,400 | 39.39 | 330,876 |
| 01/29/2001 | 8,400 | 39.39 | 330,876 |
| 02/12/2001 | 50,000 | 34.94 | 1,746,875 |
| 03/06/2001 | 80,000 | 29.96 | 2,397,016 |
| 03/07/2001 | 6,500 | 29.96 | 194,716 |
| 03/13/2001 | 13,500 | 24.91 | 336,342 |
| 04/16/2001 | 8,000 | 20.59 | 164,692 |
| 04/25/2001 | 8,000 | 23.58 | 188,655 |
| 05/01/2001 | 8,000 | 26.13 | 209,032 |
| 05/07/2001 | 8,000 | 29.85 | 238,800 |
| 05/16/2001 | 50,000 | 28.65 | 1,432,375 |
| 05/17/2001 | 8,000 | 31.18 | 249,415 |
| 05/22/2001 | 8,000 | 32.13 | 257,052 |
| 05/29/2001 | 8,000 | 29.46 | 235,663 |
| 06/04/2001 | 8,000 | 27.41 | 219,280 |
| 07/16/2001 | 8,000 | 23.05 | 184,436 |
| 07/25/2001 | 8,000 | 20.33 | 162,647 |
| 08/01/2001 | 8,000 | 22.96 | 183,698 |
| 08/06/2001 | 8,000 | 23.37 | 186,926 |
| **Totals** | **486,000** | | **$515,241,952** |

Defendant Rogers made the following sales during the Class Period:

| Date | Number of Shares Sold | Per Price Share | Proceeds |
|------|-----------------------|-----------------|----------|
| 12/12/2000 | 28,000 | $ 37.66 | $1,054,480 |
| 01/23/2001 | 57,800 | 38.62 | 2,232,236 |
| 01/23/2001 | 57,800 | 38.62 | 2,232,236 |
| 01/24/2001 | 5,800 | 40.83 | 236,814 |
| 01/24/2001 | 5,800 | 40.83 | 236,814 |
| 01/29/2001 | 8,400 | 39.39 | 330,876 |
| 01/29/2001 | 8,400 | 39.39 | 330,876 |
| 02/12/2001 | 27,474 | 34.94 | 959,873 |
| 03/06/2001 | 40,000 | 29.96 | 1,198,508 |
| 03/07/2001 | 3,000 | 29.96 | 89,869 |
| 03/13/2001 | 7,000 | 24.91 | 174,399 |
| 04/16/2001 | 11,000 | 20.59 | 226,452 |
| 04/25/2001 | 11,000 | 23.58 | 259,401 |
| 05/01/2001 | 11,000 | 26.13 | 287,419 |
| 05/07/2001 | 11,000 | 29.85 | 328,350 |
| 05/16/2001 | 50,000 | 28.65 | 1,432,365 |
| 05/17/2001 | 11,000 | 31.18 | 342,946 |
| 05/22/2001 | 11,000 | 32.13 | 353,447 |
| 05/29/2001 | 11,000 | 29.46 | 324,037 |
| 06/04/2001 | 11,000 | 27.41 | 301,510 |
| 07/16/2001 | 11,000 | 23.06 | 253,660 |
| 07/25/2001 | 11,000 | 20.33 | 223,640 |
| 08/01/2001 | 11,000 | 22.96 | 252,584 |
| 08/06/2001 | 11,000 | 23.37 | 257,023 |
| **Totals** | **431,474** | | **$13,919,815** |

Defendant Winiarski made the following sales during the Class Period:

| Date | Number of Shares Sold | Per Price Share | Proceeds |
|------|------|------|------|
| 12/12/2000 | 10,000 | $ 37.88 | $   378,750 |
| 12/13/2000 | 40,000 | 34.27 | 1,370,624 |
| 12/14/2000 | 30,000 | 32.27 | 967,968 |
| 12/15/2000 | 20,000 | 29.08 | 581,564 |
| 03/06/2001 | 11,500 | 29.98 | 344,713 |
| 03/07/2001 | 13,500 | 29.57 | 399,168 |
| 03/14/2001 | 5,000 | 28.35 | 141,750 |
| 03/15/2001 | 2,500 | 25.85 | 64,625 |
| 03/16/2001 | 17,500 | 24.48 | 428,313 |
| 04/16/2001 | 4,500 | 20.59 | 92,639 |
| 04/25/2001 | 4,500 | 23.58 | 106,119 |
| 05/01/2001 | 4,500 | 26.13 | 117,581 |
| 05/07/2001 | 4,500 | 29.85 | 134,325 |
| 05/17/2001 | 4,500 | 31.18 | 140,296 |
| 05/18/2001 | 50,000 | 29.91 | 1,495,450 |
| 05/22/2001 | 4,500 | 32.13 | 144,592 |
| 05/29/2001 | 4,500 | 29.46 | 132,561 |
| 06/04/2001 | 4,500 | 27.41 | 123,345 |
| 07/16/2001 | 4,500 | 23.05 | 103,745 |
| 07/25/2001 | 4,500 | 20.33 | 91,489 |
| 08/01/2001 | 4,500 | 22.96 | 103,330 |
| 08/06/2001 | 4,500 | 23.37 | 105,146 |
| **Totals** | **254,000** | | **$ 7,568,093** |
| **GRAND TOTALS** | **6,486,874** | | **$158,767,218** |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants on March 5, 2007.


  /s/  Andrew E. Lencyk
       Andrew E. Lencyk